# EXHIBIT "1"



### Product Supply Agreement
### Dated: January 27, 2011
### Customer: Valley Protein LLC/Carefree Financial LLC

1.   **Sale of Product and Rental of Equipment.**

(a)  Except as otherwise provided for in this agreement: (1) Linde shall sell to Customer, and Customer shall buy exclusively from Linde, all of Customer's requirements for the Products for Customer's business operations conducted at the Locations; and (2) Customer shall not: (a) resell, distribute, or otherwise transfer any Products purchased by Customer from Linde; or (b) purchase from any person or entity any products that Customer could substitute for the Products.

(b)  Linde shall rent to Customer, and Customer shall rent from Linde, the Rental Equipment.

2.   **Term.** The initial term of this agreement ("Initial Term") starts on the date specified in the related Term Sheet and continues for the period specified in that Term Sheet. After the end of the Initial Term, the term of this agreement will automatically extend for successive terms (each, a "Renewal Term") each equal to the Initial Term. However, a Party may terminate this agreement on the last day of the Initial Term or any Renewal Term (each, an "Expiration Date") by giving the other Party a notice of termination at least 12 months before the Expiration Date. The Term is subject to extension as provided for in sub-paragraph 3(b) of this document, and in sub-paragraph 2(a)(iii)(2)(a) of the Bulk Rider.

3.   **Product Prices, Equipment Rent, and Revision.**

(a)  Prices and Rent. Customer shall pay to Linde the prices for the Products and the rent for the Rental Equipment listed on the related Term Sheet.

(b)  Prices and Rent Revision. Linde may revise the Product prices or the Rental Equipment rent by giving Customer a notice ("Price/Rent Revision Notice") that states the terms of the revision, at least 15 days before the effective date of the revision. Subject to paragraph 14, if a Price/Rent Revision Notice specifies an increase to the Product prices or Rental Equipment rent, then Customer may terminate this agreement, only as to those Products affected by the increase ("Affected Products"), and only if: (1) Customer received a bona fide, current written offer from another supplier to sell to Customer the Affected Products in like quantity, in like delivery, and under like conditions, or to rent to Customer equipment for the Affected Products that is equivalent to the Rental Equipment, at a price or at rent, respectively, lower than that established by the Price/Rent Revision Notice ("Offer"); (2) Customer gives Linde a notice ("Termination Notice") that states Customer's intent to terminate this agreement and includes a copy of the Offer within the 15-day period starting on the date of the Price/Rent Revision Notice; and (3) Linde does not agree to either meet the price or rent terms and related revision terms specified in the Offer (collectively, "Offer Price Terms"), or revert to its previous price or rent within the 30-day period starting on the date that Linde receives the Termination Notice. If Linde agrees to meet the Offer Price Terms, or to revert to its previous price or rent, then Linde may extend the Term until the greater of the end of the contract term provided for in the Offer, or by a period that is equal to the Initial Term, which begins on the date that Linde agrees to meet the Offer Price Terms or to revert to its previous price or rent.

VP/LINDE00001


4. Invoices and Payment Terms.

(a) <u>Payment</u>. Customer shall pay all Linde invoices within the 10-day period starting on the invoice date. Linde may charge interest on past due invoices at the lower of 1½% per month or the highest rate permitted by law.

(b) <u>Invoice Claims</u>. Customer waives any claim or defense that Customer has regarding any Linde invoice unless Customer delivers to Linde a notice, which describes the basis of the claim or defense, within the 30-day period starting on the invoice date.

5. Payment Obligations. If Customer fails to pay when due any payment required under this agreement, or if Customer enters into a bankruptcy, insolvency, receivership, liquidation, or similar proceeding, or makes an assignment for the benefit of creditors, then Linde may take any one or more of the following actions in addition to any other right or remedy authorized by law or this agreement: (1) refuse to make further deliveries of Product to Customer; (2) place Customer on a C.O.D. basis; (3) terminate this agreement; or (4) repossess any of its property in Customer's possession.

6. Delivery of Products.

(a) <u>Delivery Points</u>. Delivery of Products is: (1) F.O.B. the Location if delivered by Linde; or (2) F.O.B. the Pickup Location or Linde's shipping point if picked up by Customer or delivered by commercial carrier.

(b) <u>Shortage Claims</u>. Customer waives any claim or defense for shortage of Product unless Customer delivers to Linde a notice, which describes the claimed shortage, within the five-day period starting on the delivery date of the Product.

7. Change in Delivery Requirements and Location.

(a) <u>Change in Delivery Requirements</u>. Linde may satisfy any change in Customer's requirements for the delivery of Products, including a change in the Product Form or the Delivery System, as though the new requirements were originally included in this agreement, using any method of delivery that reasonably satisfies Customer's new requirements. If the terms or prices for the new requirements are not specified in this agreement, then Linde's standard terms will apply to the new requirements, and Linde shall charge: (1) a market price for Products sold under the new requirements; and (2) Linde's then current rent for any additional Rental Equipment necessary in connection with the new requirements.

(b) <u>Change in Location</u>. Linde may satisfy Customer's requirements, under the terms of this agreement, for Products at: (1) any location where Customer expands or relocates the operations of a Location; or (2) any location within a thirty mile radius of a Location where Customer begins conducting any business operations during the Term.

8. Health and Safety Concerns.

(a) <u>Acknowledgement and Warning of Hazards</u>. Customer acknowledges that: (1) the Products, and in particular the gas Products, are hazardous; and (2) Customer understands those hazards. Customer shall use Material Safety Data Sheets ("MSDS") for the gas Products to warn its employees and others who are exposed to the gas Products of the hazards associated with those Products. Linde shall provide Customer with a copy of the applicable MSDS, or access to the pages on Linde's website ("Website") that contain MSDS.

(b) <u>Responsibility for Use</u>. Customer is solely responsible for determining the suitability, compatibility, and use of the Products.

(c) <u>EPCRA</u>. Customer shall comply with all relevant reporting requirements under the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. Sections 11001-11049, resulting from the presence of the gas Products supplied under this agreement.

VP/LINDE00002

(d)    If Linde determines that the delivery of Product to a Location would be unsafe or in violation of applicable law due to a condition present at the Location, and Linde gives Customer a notice describing the condition, then Linde may refuse to make further deliveries of Product to that Location until Customer removes the condition. Linde may terminate this agreement if Customer does not promptly remove the condition.

9.    Warranty, Sole Remedies, and Limitation of Damages.

(a)    Express Warranty and Sole Remedy.  Linde warrants to Customer that gas Products delivered to Customer conform to the Specifications listed on the related Term Sheet. Linde does not make any other express warranty regarding the gas Products. Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to replace, free of charge, any gas Product that does not conform to Linde's warranty, if, and only if, Customer gives Linde notice of the breach of warranty within the 15-day period starting on the date of delivery of the gas Product. Any express warranty regarding the Rental Equipment or Products other than gas Products is specified in the related Term Sheet.  Linde does not make any other express warranty regarding the Rental Equipment or Products other than gas Products.

(b)    Disclaimer of all Implied Warranties.  LINDE SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES FOR THE PRODUCTS AND THE RENTAL EQUIPMENT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.

(c)    Sole Remedy for Delivery Breach.  Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's obligation to deliver Product as required under this agreement, is for Linde to deliver to Customer, free of charge, the quantity of Product that Linde failed to deliver as required under this agreement, if, and only if, Customer gives Linde notice of the breach within the 30-day period starting on the scheduled date of delivery of the Product.

(d)    Limitation on Damages.  In all events, regardless of the legal theory (e.g., breach of contract or warranty, negligence, strict liability, etc.): (1) LINDE IS NOT LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL DAMAGES, OR ECONOMIC LOSS, INCLUDING ANY LOSS OF BUSINESS, PRODUCTION, OR PROFITS; and (2) the total amount of damages that Customer may recover from Linde resulting from any occurrence arising in connection with their relationship contemplated by this agreement is limited to an amount equal to the payments made by Customer to Linde under this agreement during the 12-month period ending on the date of the occurrence.

(e)    Statute of Limitations.  A Party must commence an action for a breach of contract within one year after the action has accrued.

10.    Pre-Existing Agreements.  Customer warrants to Linde that Customer is not a party to any pre-existing agreements that obligate Customer to purchase its requirements for Products for its business operations conducted at the Locations (each, a "Pre-Existing Agreement") other than as identified in the related Term Sheet. Customer shall terminate each Pre-Existing Agreement identified in the related Term Sheet, and any Pre-Existing Agreements applicable to a location where Customer expands or relocates the operations of a Location, by giving the other party to the Pre-Existing Agreement a notice of non-extension or termination as permitted by the Pre-Existing Agreements or, if applicable, by giving the other party a notice of termination due to that party's breach of the Pre-Existing Agreement as permitted by applicable law.

11.    Force Majeure.

(a)    Force Majeure Events.  If Linde cannot perform any of its obligations under this agreement by reason of any cause or event, whether foreseeable or unforeseeable, beyond Linde's reasonable control, including any cause or event that makes the delivery of any of the Products commercially impracticable

3

("Force Majeure Event"), then Linde need not perform the obligation. A Force Majeure Event includes: (1) natural disasters (e.g., earthquake, hurricanes, floods, fire); (2) major upheavals (e.g., war, riots, act of terrorism, sabotage, labor strikes, embargoes); (3) performance failures of any person or entity other than Linde, such as Linde's suppliers or subcontractors (e.g., curtailment of energy sources or other raw materials or feedstock, common carrier failure, contracted labor); (4) extraordinary events (e.g., machinery and equipment failures or abnormal customer demand); and (5) government intervention (e.g., government orders, court orders, confiscation, condemnation, future laws).  If a Force Majeure Event occurs, then Linde shall use commercially reasonable efforts to continue to deliver Product to Customer or to provide Customer with replacement product.  In either case, Customer shall reimburse Linde for additional costs incurred by Linde in order to provide the Product or replacement product (e.g., additional costs associated with special purchase, freight or handling, and additional costs of electricity or other types of energy).  If a Force Majeure Event affects only a part of Linde's capacity to deliver Product, then Linde may allocate Product among its customers (including distributors) until its capacity is restored.

(b)    <u>Purchases from Other Suppliers</u>. Customer may purchase Product from another supplier for Customer's business operations conducted at a Location if: (1) Linde is unable to either continue to deliver Product or deliver replacement product to that Location due to a Force Majeure Event; or (2) Customer is able to purchase Product from the other supplier at a price lower than the amount equal to Linde's price plus the additional costs described in <u>sub-paragraph 11(a)</u>.  If Customer purchases Product from another supplier as authorized by the previous sentence, then:  (1) Customer shall resume purchasing its Product requirements exclusively from Linde when Linde is able to deliver Product or replacement product to the affected Location at no additional cost; (2) Linde's warranty obligations under <u>sub-paragraph 9(a)</u> will not apply during the period that any gas Product supplied by the other supplier is in any vessel used to store the Product, any system used to distribute the Product, or any process that uses the Product; and (3) Customer shall reimburse Linde for any costs incurred by Linde to clean Bulk Equipment to remove contamination caused by gas Products supplied by the other supplier.

12.    Linde Property.

(a)    <u>Ownership of Linde Property</u>.  Customer acknowledges that Linde owns the Rental Equipment and other Linde property located at the Locations (collectively, the "Linde Property"), even if Customer affixes the Linde Property to any real property owned or used by Customer. Customer shall not cause or permit: (1) any lien or other encumbrance on or against any Linde Property; or (2) the sublease, pledge, or transfer of possession of any Linde Property other than as permitted in a Distributor Rider. Customer shall cause to be removed any liens or other encumbrances that Customer causes or permits on or against any Linde Property.  Linde may file any financing statements and other notices that Linde deems necessary, including a notice that Linde owns the Linde Property.

(b)    <u>Risk of Loss or Damage</u>.  Customer assumes all risk of loss or damage to the Linde Property, except for any loss or damage resulting from Linde's negligence.  If the Linde Property is lost or cannot be repaired, then Customer shall pay to Linde an amount equal to the then current replacement cost of the Linde Property. If Linde elects to repair any damaged Linde Property, then Customer shall pay to Linde an amount equal to the cost of making the repairs.  Customer shall obtain and maintain insurance during the Term insuring against loss or damage to any Linde Property in amounts acceptable to Linde. Upon request, Customer shall deliver written evidence of Customer's compliance with this sub-paragraph.

(c)    <u>Use of Linde Property</u>.  Customer shall comply with the applicable policies and guidelines provided by Linde, pertaining to the possession, maintenance, and handling of the Rental Equipment.  Customer shall use the Rental Equipment in a careful and proper manner, and only for routine business operations common to the normal and intended use of the Rental Equipment. Customer shall not cause

4

VP/LINDE00004

or permit: (1) the abuse or misuse of the Rental Equipment in any manner; (2) the use of the Linde Property in any manner by a third party other than as permitted in a Distributor Rider; (3) the use of any Linde Property bearing a label or a mark owned by Linde or its affiliates after the expiration of Customer's rights under this agreement; (4) the filling or refilling of any Rental Equipment with any gas, liquid, or solid by any person or entity other than Linde or Linde's authorized representative, except for the filling of Bulk Equipment consisting of tanks by another supplier as necessary to deliver Product to Customer as permitted in sub-paragraph 11(b); or (5) any modifications, alterations, or repairs to the Linde Property by any person or entity other than Linde or an authorized Linde representative.

13.  Taxes and Other Charges and Revisions.

(a)  Taxes.  Customer shall pay or reimburse Linde for all taxes and other impositions (e.g., fees, permits, and other charges) that are charged by any government (except Linde's income taxes), which relate to the Products or the Rental Equipment, including their presence, use, operation, or maintenance.

(b)  Compliance Charge and Surcharges.  Linde may charge to Customer a regulatory compliance cost charge ("Compliance Charge"). The Compliance Charge results from the costs incurred by Linde in order to comply with federal, state, and local laws. However, the amount of the Compliance Charge may not relate to actual compliance costs incurred by Linde, which may vary by the type of Product, service, geographic location, or time. The Compliance Charge is not a federal, state, or local tax, and Linde need not collect and pay the Compliance Charge to any federal, state, or local government.  In addition, Linde may charge to Customer surcharges based upon increases in distribution or production costs (e.g., energy, feedstock, and other raw material costs) during the Term, and applied in accordance with Linde's then current cost recovery program ("Surcharges").

(c)  Revision to Other Charges.  Linde may revise the Compliance Charge, Surcharges, Incidental Charges, and Delivery Charges (collectively, "Other Charges") by giving Customer a notice that states the terms of the revision.

14.  Exclusion from Price and Rent Revision.  The following do not constitute, in any case, a price increase, as contemplated in sub-paragraph 3(b): (1) increases to the Product prices or Rental Equipment rent for Products that are identified in the related Term Sheet as exempt from sub-paragraph 3(b); (2) the reimbursements required under sub-paragraph 11(a); and (3) Other Charges or revisions to Other Charges.

15.  General Provisions.

(a)  Assignment.  Customer shall not, without Linde's written consent, assign or transfer its rights or delegate or transfer its duties under this agreement, whether voluntarily or involuntarily, or by operation of law or otherwise, including any transfer by a change in control, merger, consolidation, reorganization, or other similar transaction. Linde may terminate this agreement by giving Customer a notice of termination if Customer breaches the previous sentence.

(b)  Entire Agreement.  Each Term Sheet, in conjunction with the terms specified in this document and the related Riders: (1) constitutes a separate contract between the Parties; (2) constitutes all of the terms of the contract between the Parties regarding its subject matter; and (3) supersedes and terminates all previous agreements between the Parties regarding this agreement's subject matter.  Any term contained in a delivery document used by Linde, or a purchase order, confirmation, or acknowledgment used by Customer, that conflicts with, is different from, or is additional to, the terms of this agreement is not part of the contract between the Parties.

VP/LINDE00005

(c) <u>Governing Law.</u> New Jersey law governs all matters pertaining to the validity, construction, and effect of this agreement, without giving effect to any principles or rules of conflict of laws that apply the laws of another jurisdiction.

(d) <u>No Third Party Rights.</u> The Parties do not intend to confer any contractual rights or benefits upon any third party, either directly or incidentally.

(e) <u>Use of Linde Website.</u> Customer may purchase Products using the Website. If Customer uses the Website to purchase any Products, then Customer will be bound by the "terms of use" on the Web site. However, the terms of this agreement will govern the transaction, rather than any "terms of sale" specified on the Website.

(f) <u>Amendment.</u> The Parties may amend this agreement only by a writing that Customer and a Linde authorized representative sign.

(g) <u>No Waiver.</u> A waiver of any breach of this agreement does not constitute a waiver of any succeeding or other breach.

(h) <u>Severability.</u> Even if a court holds any part of this agreement to be invalid, this agreement will remain in force with such invalid part deleted.

(i) <u>Notices.</u> All notices must be written. Each Party shall deliver all notices by United States certified mail, postage prepaid, return receipt requested, or by overnight courier, to the representatives and addresses specified by the other Party, except that Linde may deliver Price/Rent Revision Notices or notices of revision to any Other Charges by regular United States mail or email, to a representative and address or email address specified by Customer.

(j) <u>Joint and Several Liability.</u> If Customer consists of more than one person or entity, then Customer's obligations under this agreement are joint and several.

(k) <u>Binding Nature.</u> The Parties are legally bound by this agreement when they sign the related Term Sheet, but as to Linde only when a Linde authorized representative signs on behalf of Linde. When the Parties are legally bound by this agreement, then their respective permitted successors, permitted assigns, heirs, and personal representatives are also legally bound and benefit from its terms. Regardless of <u>sub-paragraph 15(a),</u> if Customer determines to sell substantially all of its assets (other than in the ordinary course of business), or the assets at the Locations, then Customer shall require the buyer of those assets to assume the obligations of this agreement by written instrument delivered to Linde at the completion of the sale. However, Linde may terminate this agreement by giving Customer a notice of termination within 10 days after the date that Linde learns of the completion of the sale.

(l) <u>Reimbursement of Expenses.</u> Customer shall reimburse Linde for any fees, costs, and expenses (including attorneys fees) incurred by Linde in enforcing any of the provisions of this agreement.

(m) <u>Customer's Signature.</u> Customer warrants to Linde that the person signing the related Term Sheet on behalf of Customer has the authority to bind Customer to this agreement.

(n) <u>Definitions.</u> Capitalized terms or words are either defined in this document or have the meaning provided for in the related Term Sheets and Riders. Any reference to "this agreement" means this document and the related Riders and Term Sheet, collectively. "Delivery System" means the system for delivering Product, e.g., cylinders, tanks, tube trailers, pipeline, on-site facilities, etc. The word, "law" is used in its broadest sense, and includes statutes, ordinances, regulations, rules, orders, directives, governmental opinions, and the common law. "Parties" means both parties to this agreement. "Party" means a party to this agreement. "Product or Products" means all Product that is described in the Term Sheets. "Product Form" means, as to gas products, a gaseous, liquid, or solid state. "Rental Equipment" means all Rental Equipment that is described in the Term Sheets. "Term" means the Initial Term and all Renewal Terms, collectively.

(o) <u>Performance After Termination.</u> Until the Parties sign an agreement that supersedes this agreement, the terms of this agreement will apply to: (1) any Product that Linde sells to Customer, and Customer buys from Linde for Customer's business operations conducted at the Locations, after the termination of

6

VP/LINDE00006

this agreement as to those Products and Locations; and (2) any Rental Equipment that Linde rents to Customer and Customer rents from Linde after the termination of this agreement as to that Rental Equipment.  However, until the Parties sign an agreement that supersedes this agreement: (1) Customer may purchase Products from other suppliers for Customer's business operations conducted at the Locations after the termination of this agreement as to those Products and Locations; and (2) Linde may revise the Product prices or the Rental Equipment rent after the termination of this agreement as to those Products and Rental Equipment, by giving Customer a Price/Rent Revision Notice.

VP/LINDE00007



THE LINDE GROUP

Bulk Term Sheet

Linde LLC ("Linde"), a Delaware limited liability company, whose principal place of business is located at 575 Mountain Avenue, Murray Hill, New Jersey 07974 and Valley Protein LLC/Carefree Financial LLC ("Customer"), a California corporation, whose principal place of business is located at 1828 E. Hedges Avenue, Fresno, CA 93707 , effective January 27, 2011("Effective Date"), agree as follows:

1.  Incorporated Documents. The following documents are an integral part of, and incorporated within, this Bulk Term Sheet ("Term Sheet"), effective on the Effective Date of this Term Sheet:
    - The Product Supply Agreement dated January 27, 2011; and
    - The Bulk Rider dated January 27, 2011("Rider").

2.  Definitions. Capitalized terms or words are either defined in this Term Sheet or have the meaning provided for in the Product Supply Agreement or the related Rider.

3.  Products, Rental Equipment, and Related Terms. The Products and related Product Prices and Units of Measure, Rental Equipment, Rental Equipment Rent, Estimated Monthly Volumes, and the Delivery Charge and Surcharge are as follows:

| Product | Product Price and Unit of Measure | Rental Equipment | Rental Equipment Monthly Charge | Rental Equipment Maintenance | Estimated Monthly Volume |
|---|---|---|---|---|---|
| Carbon Dioxide | $110.00/ton | Portable 30 Ton | $1550.00/month | | |
| | $110.00/ton | 50 Ton Tank | $1400.00/month | $150.00/month | 125 TPM |

*Rental will begin three months after the installation of the 30 ton tank. Rental will begin six months after the installation of the 50 ton tank.

Product Delivery Charge:     $0

Surcharge:     Determined in accordance with Linde's cost recovery program in effect at the time that the surcharge is incurred.]

4.  Specifications. The Specifications for the Products listed in paragraph 3 are as follows:

CO2 Commercial Grade: CGA Grade H - 99.5%
LIN: CGA Grade M - 99.999%

5.  Location. The Location is:  1828 Hedges Avenue, Fresno, CA

6.  Initial Term. The Initial Term starts on the Effective Date of this Term Sheet and continues, with respect to each Product, for a period of 5 years starting on the later of: (1) the Effective Date of this Term Sheet; or (2) the date that Linde first delivers the Product to the last tank installed at the Location.

7.  Compliance Charge. The Compliance Charge is $25.00 per delivery.

8.  Incidental Charges. The Incidental Charges are Linde's charges for the following incidents in effect at the time of the incident:
    - Less than 48 hrs. notice/averted deliveries
    - Scale/weigh deliveries
    - Off-site scale/weigh
    - Certificate of Analysis
    - Restricted hours less than 120 hours/wk or predetermined delivery schedule
    - Signature required for delivery ticket
    - Copy of invoice or delivery ticket
    - Delivery delays >30 minutes

VP/LINDE00008





THE LINDE GROUP

*Linde*

Application Equipment, Ancillary Equipment, and Services Term Sheet

Linde LLC ("Linde"), a Delaware limited liability company, whose principal place of business is located at 575 Mountain Avenue, Murray Hill, New Jersey 07974 and, Valley Protein LLC/Carefree Financial LLC ("Customer"), whose principal place of business is located 1828 E. Hedges Avenue, Fresno, CA 93703 effective January 27, 2011 ("Effective Date"), agree as follows:

1.  Incorporated Documents. The following documents are an integral part of, and incorporated within, this Application Equipment Term Sheet ("Term Sheet"), effective on the Effective Date of this Term Sheet:
    • The Product Supply Agreement dated January 27, 2011 and
    • The Application Equipment, Ancillary Equipment, and Services Rider dated January 27, 2011 ("Rider").

2.  Definitions. Capitalized terms or words are either defined in this Term Sheet or have the meaning provided for in the Product Supply Agreement or the related Rider.

3.  Rental Equipment and Related Terms. The Rental Equipment and related Serial Number, Rental Equipment Rent, and Security Deposit are as follows:

| Rental Equipment | Serial Number | Rental Equipment Rent |
|---|---|---|
| Cryoline (Cryowave) Tunnel 48-30 | | $2500.00/month |

4.  Location. The Location is: 1828 Hedges Avenue, Fresno, CA 93707

5.  Initial Term. The Initial Term starts on the Effective Date of this Term Sheet and continues, with respect to each item of Rental Equipment, for a period of 5 years starting on the date that Customer's obligation to pay rent for the Rental Equipment begins, as provided for in paragraph 2(a) of the related Rider.

    If at any time during this Agreement, Customer's production increases substantially and Customer needs to upgrade to a higher production rated Application Equipment, Customer will not be responsible for the above rental, but only for the new Application Equipment that is installed.

    After the Initial Term of this Agreement, Linde will reduce the rental by 50% to $1250.00/month.

Valley Protein LLC/Carefree Financial LLC

By: _____

Print Full Name  Rozert Coy

Title  PRES. dot

Date: 1/27/11

Linde LLC

By: _____

Michael Beckman
Print Full Name

Title  VP West Market

Date: 2/4/11

VP/LINDE00009

9.  Pre-Existing Agreements. The Products covered by a Pre-Existing Agreement and the termination date of the Pre-Existing Agreement are as follows:

Product                                              Termination Date

No Pre-Existing Agreement

Linde will not deliver any Product described in this paragraph to the Location until the earlier of: (1) the related Termination Date listed in this paragraph; or (2) the actual termination date of the Pre-Existing Agreement with respect to such Product.

Valley Protein LLC/Carefree Financial LLC

By: _____

Print Full Name

Title _____

Date: 1/29/11

Linde LLC

By: _____

Michael Beckman
Print Full Name

VP West Market
Title

Date: 2/4/11

2

VP/LINDE00010



Application Equipment, Ancillary Equipment, and Services Rider
Dated: January 27, 2011
to
Product Supply Agreement
Dated: January 27, 2011
Customer: Valley Protein LLC/Carefree Financial LLC

1.    Definitions. Capitalized terms or words are either defined in this Rider or have the meaning provided for in the Product Supply Agreement or the related Term Sheets. "Agreement" means this Rider and the related Product Supply Agreement and Term Sheet, collectively. "Application Equipment" means the Rental Equipment described in the related Term Sheets.

2.    Application Equipment.
(a)    Rent. Customer shall pay to Linde the rent for the Application Equipment listed on the related Term Sheet starting on the earlier of: (1) the first day of the month after the month in which Linde installs the Application Equipment as provided for in sub-paragraph 4(a)(ii); or (2) the first day of the month after the date that the Application Equipment is ready for shipment, if Linde does not install the Application Equipment due to events caused by Customer or its employees or agents, or their refusal to permit the delivery or installation of the Application Equipment.
(b)    Rent on Termination. If Linde terminates the Agreement with respect to any Application Equipment, as provided for in Paragraph 5 of the Product Supply Agreement, then, in addition to any other right or remedy authorized by law or the Agreement, Linde may invoice Customer for the then current rent for that Application Equipment, for the number of months of the Term remaining on the day before the date that Linde terminates the Agreement.
(c)    Security Deposit. Linde may invoice Customer for any security deposit listed on the related Term Sheet before Linde arranges for the delivery of the Application Equipment to Customer as provided for in sub-paragraph 4(a)(i). Linde may apply the security deposit against any charges outstanding on Customer's account, or against the loss of, damage to, or destruction of the Application Equipment. Linde shall return the security deposit to Customer, less any amounts applied as described in the previous sentence, after Linde removes the Application Equipment from the Site (defined in sub-paragraph 4(b)(i)).
(d)    Additions to Application Equipment. Any items, including replacement parts, installed on the Application Equipment in connection with its maintenance are part of the Application Equipment. The installation of any such item on the Application Equipment constitutes the transfer of ownership of the item to Linde.
(e)    Commissioning. The commissioning described in sub-paragraph 4(a)(iii) ("Commissioning") will be deemed to be successful if the Application Equipment meets Linde's then current acceptance criteria during the Commissioning. Customer's sole remedy, and the sole obligation of Linde if the Commissioning is not successful, is for Linde to either: (1) modify the Application Equipment, at Linde's expense, as Linde determines is necessary for a successful Commissioning, and repeat the Commissioning; or (2) terminate the Agreement as to the affected Application Equipment, and reimburse Customer for any amounts paid by Customer for the shipment, installation, or Commissioning of the Application Equipment.

3.    Ancillary Equipment and Services.
(a)    Sale of Ancillary Equipment. Linde shall sell to Customer, and Customer shall buy from Linde, the Ancillary Equipment.
(b)    Performance of Services. Linde shall perform the Services.
(c)    Prices. Customer shall pay to Linde the prices for the Ancillary Equipment and Services listed on the related Term Sheet.
(d)    Payment Terms. Payment terms are as follows:
       (i)    Customer shall pay 50% of the total price listed on the related Term Sheet on the date that Customer signs the related Term Sheet; and
       (ii)   Linde may invoice Customer for 50% of the total price listed on the related Term Sheet on the later of: (1) the date of delivery of the Ancillary Equipment; or (2) the date that Linde completes all of the Services.
       However, Linde may invoice Customer for any unpaid portion of the price of any Ancillary Equipment that is ready for shipment, or any Service that Linde performs, before the date specified in sub-paragraph 3(d)(ii), if the Ancillary Equipment is not delivered, or Linde does not complete all of the Services, due to events caused by Customer or its employees or agents, or their refusal to permit the delivery of the Ancillary Equipment or the completion the Services, as applicable.
(e)    Taxes. Customer shall pay or reimburse Linde for all taxes and other impositions (e.g., fees, permits, and other charges) that are charged by any government (except Linde's income taxes), which relate to the Ancillary Equipment or the Services.
(f)    Risk of Loss to Ancillary Equipment. Risk of loss to the Ancillary Equipment will pass to Customer when the Ancillary Equipment is delivered to the Location.

4.    Obligations and Rights Regarding Equipment.
(a)    Linde's Obligations and Rights. Linde:
       (i)    shall arrange for the delivery of the Application Equipment and the Ancillary Equipment to the Location;
       (ii)   shall install the Application Equipment at the Location, after Customer has complied with its obligations in sub-paragraphs 4(b)(i)

VP7/LINDE00011

(iii) shall commission the Application Equipment at the Location, after Customer has complied with its obligations in sub-paragraphs 4(b)(i) and (ii); and

(iv) may remove the Application Equipment after the termination of the Agreement with respect to that equipment.

(b) Customer's Obligations. In addition to Customer's obligations under paragraph 12 of the Product Supply Agreement with respect to the Application Equipment, Customer:

(i) shall furnish and prepare, at Customer's expense, a site ("Site") on which the Application Equipment and Ancillary Equipment will be located, before the delivery and installation of the Application Equipment or the Ancillary Equipment. Customer shall cause the Site to conform to: (1) all applicable laws (including environmental laws), and (2) Linde's specifications and safety requirements for site preparation, including the requirements that Customer shall cause the Site to have all piping and connections (other than any piping and connections listed as Ancillary Equipment on the related Term Sheet), including utility and exhaust connections, required for the ready and proper use and operation of the Application Equipment;

(ii) shall obtain any engineering drawings or site drawings (other than those listed on the related Term Sheet under Services), permits, or licenses that are required for the installation or operation of the Application Equipment or the Ancillary Equipment at the Site;

(iii) shall pay to Linde Linde's costs for: (1) the removal of the Application Equipment from the Site, including shipment costs, unless Linde terminates the Agreement as provided for in sub-paragraph 2(e); and (2) any repairs required to return the Application Equipment to a good and fully functional condition if Customer breaches its obligation under sub-paragraph 4(b)(v) or sub-paragraph 4(b)(x);

(iv) shall maintain the Site in good order and repair, at all times;

(v) shall keep the Application Equipment clean at all times, and, regardless of sub-paragraph 12(c)(5) of the Product Supply Agreement, maintain the Application Equipment in a good and fully functional condition, in accordance with any written instructions provided by Linde;

(vi) shall maintain an inventory of consumable supplies as necessary to meet Customer's obligations under sub-paragraph 4(b)(v);

(vii) shall grant Linde's authorized representatives access to the Site, at any time required for the performance of the Agreement;

(viii) shall not cause or permit any person or entity other than Linde or Linde's authorized representatives to remove the Application Equipment from the Site;

(ix) shall not cause or permit any third party to have access to the Site while the Application Equipment is located at the Site;

(x) shall surrender to Linde the Application Equipment in a good and fully functional condition, ordinary wear and tear excepted, at the time of Linde's removal of the Application Equipment, and shall not impair Linde's right of access to or removal of the Application Equipment;

(xi) acknowledges that Linde or a Linde affiliate owns any intellectual property (e.g., patents, trademarks, copyrights, etc.) incorporated into the Application Equipment, or Linde is authorized to use such intellectual property;

(xii) shall not use any intellectual property, including know-how, with respect to the Application Equipment at any site or location other than the Site; and

(xiii) shall not cause or permit the transfer or sublicense of any intellectual property, including know-how, with respect to the Application Equipment to any third party, or otherwise disclose any such intellectual property to any third party.

5. Shortage Claims. Customer waives any claim or defense for shortage of the Application Equipment or the Ancillary Equipment and their related parts unless Customer delivers to Linde a notice, which describes the claimed shortage, within the five-day period starting on the delivery date of the equipment or parts.

6. Responsibility for Use. Customer is solely responsible for determining the suitability, compatibility, and use of the Application Equipment and the Ancillary Equipment.

7. Express Warranties and Sole Remedies.

(a) Application Equipment. Regardless of sub-paragraph 9(a) of the Product Supply Agreement, Linde warrants to Customer that each item of Application Equipment, and its related parts, will be free from any material manufacturing defects in workmanship or material for the 90-day period starting on the date of delivery of the Application Equipment or part ("Application Equipment Warranty Period"), if, and only if, the Application Equipment is properly maintained. Linde does not make any other express warranty regarding the Application Equipment or related parts; however, Linde shall assign to Customer any applicable manufacturer's warranty for Application Equipment or related parts manufactured by a third party, to the extent that the manufacturer permits assignment. Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to repair or replace, free of charge, any Application Equipment or related part that does not conform to Linde's warranty if, and only if, Customer gives Linde a notice of the breach of warranty within the Application Equipment Warranty Period. However, Linde is not required to repair or replace any non-conforming Application Equipment or related parts manufactured by a third party if the repair or replacement is covered by a manufacturer's warranty assigned to Customer.

(b) Ancillary Equipment. Linde does not make any express warranty regarding the Ancillary Equipment; however, Linde shall assign any applicable manufacturer's warranty for such equipment to Customer, to the extent that the manufacturer permits assignment.

(c) Services. Linde warrants to Customer that each Service will be free from any material defects in workmanship for the 90-day period starting on the date of its completion ("Services Warranty Period"). Linde does not make any other express warranty regarding the Services. Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to re-perform, free of charge, any Service that does not conform to Linde's warranty if, and only if Customer gives Linde notice of the breach of warranty within the Services Warranty Period.

(d) Disclaimer of Implied Warranties for Ancillary Equipment and Services. LINDE SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES FOR THE ANCILLARY EQUIPMENT AND SERVICES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.

VP/LINDE00012



Bulk Rider
Dated January 27, 2011
to
Product Supply Agreement
Dated January 27, 2011
Customer: Valley Protein LLC/Carefree Financial LLC

1.   **Definitions.** Capitalized terms or words are either defined in this Rider or have the meaning provided for in the Product Supply Agreement or the related Term Sheets. "Agreement" means this Rider and the related Product Supply Agreement and Term Sheet, collectively. "Bulk Equipment" means the Rental Equipment, described in the related Term Sheets, used in connection with the Products (e.g., tanks and other storage equipment, vaporizers, tube trailers, and ancillary equipment).

2.   **Bulk Equipment.**
(a)  **Linde's Obligations and Rights.** Regarding the Bulk Equipment, Linde:
     (i)    shall deliver and, if required, install the Bulk Equipment, and connect it to Customer's distribution system, after Customer has complied with its obligations in sub-paragraphs 2(b)(i) and (ii);
     (ii)   shall maintain the Bulk Equipment;
     (iii)  may relocate or replace Bulk Equipment, or deliver and, if required, install additional Bulk Equipment as Linde determines is necessary due to significant changes in Customer's requirements, methods, or operations at the Locations. If Linde relocates, replaces, delivers, or installs any Bulk Equipment as provided for in the previous sentence, then Linde may: (1) revise the Bulk Equipment rent consistent with Linde's then current rental charges for the Bulk Equipment; and (2) at Linde's option, either: (a) extend the Term of the Agreement as to the Location affected by a period that is equal to the Initial Term and begins on the date of completion of the relocation, replacement, delivery, or installation; or (b) invoice Customer for the cost of the relocation, replacement, or installation; and
     (iv)   may remove the Bulk Equipment after: (1) the termination of the Agreement with respect to that equipment; or (2) the cessation of Customer's requirements for the related Product.
(b)  **Customer's Obligations.** Regarding the Bulk Equipment, in addition to Customer's obligations under paragraph 12 of the Product Supply Agreement, Customer shall:
     (i)    furnish and prepare, at Customer's expense, a site ("Equipment Site") on which the Bulk Equipment will be located before Customer requests Linde to deliver and, if required, install the Bulk Equipment. Customer shall cause the Equipment Site to conform to: (1) all applicable laws (including environmental laws), and (2) Linde's specifications and safety requirements for site preparation, including the requirements that Customer shall cause the Equipment Site to:
            (1)   include a suitable, concrete foundation, free of any oil, grease, lubricants, and other combustibles;
            (2)   have all utilities, including phone lines, required for the ready and proper use and operation of the Bulk Equipment;
            (3)   be accessible to a distribution system for the delivery of Product from the Equipment Site to all points of use;
            (4)   have adequate security, including any fencing required to protect against the altering, repairing, adjusting of, or tampering with, the Bulk Equipment by unauthorized individuals;
            (5)   be free of any underground or overhead obstructions;
     (ii)   obtain any permits or licenses that are required for the installation or operation of the Bulk Equipment at the Equipment Site;
     (iii)  pay to Linde Linde's then current charges for the shipment of Bulk Equipment other than tube trailers from the point of manufacture or storage to the Equipment Site, and for any rigging required for the installation of the Bulk Equipment;
     (iv)   pay any additional costs incurred by Linde if Customer fails to comply with its obligations under sub-paragraphs 2(b)(i) and (ii);
     (v)    pay to Linde the rent for the Bulk Equipment listed on the related Term Sheet starting on the date that the Bulk Equipment is installed and ready for use.
     (vi)   maintain the Equipment Site in good order and repair, at all times;
     (vii)  pay for Linde's maintenance of the Bulk Equipment at Linde's rates in effect at the time of performance of the maintenance, if no Maintenance Charge is listed on the related Term Sheet for the Bulk Equipment;
     (viii) grant Linde's authorized representatives access to the Equipment Site, at any time required for the performance of the Agreement;
     (ix)   not cause or permit any person or entity other than Linde or Linde's authorized representatives to remove the Bulk Equipment from the Equipment Site;
     (x)    not cause or permit any third party to have access to the Equipment Site except to fill Bulk Equipment consisting of tanks as necessary for another supplier to deliver Product to Customer as permitted in sub-paragraph 11(b) of the Product Supply Agreement;
     (xi)   surrender to Linde the Bulk Equipment in good condition, ordinary wear and tear excepted, at the time of Linde's removal of the Bulk Equipment, and shall not impair Linde's right of access to or removal of the Bulk Equipment;
     (xii)  pay or reimburse Linde for all inspections required by law or Linde's inspection policy; and
     (xiii) pay the cost of installation and removal of the Bulk Equipment.

VP/LINDE00013

3.    Product Delivery.
(a)    Linde's Obligations. Regarding the delivery of Product, Linde shall:
    (i)    subject to paragraph 4, within 48 hours after Customer's request, or as planned consistent with information generated by an electronic monitor on the Bulk Equipment, use commercially reasonable efforts to deliver to the Location specified in Customer's request, those quantities of Product that are necessary to supply Customer's requirements at the Location. Linde's delivery of Product into the storage equipment at the Equipment Site, or delivery of the tube trailer to the Equipment Site will constitute Customer's purchase of the Product delivered. Linde is not required to reimburse or credit Customer for the price of any residual Product contained in a tube trailer that Linde picks up from a Location.
    (ii)    measure the quantities of Product delivered by the method it customarily uses for the type of delivery made.
(b)    Customer's Rights and Obligations. Regarding the delivery of Product, Customer:
    (i)    shall monitor the inventory of the storage equipment or tube trailer at each Location and:
        (1)    order Product on a timely basis to avoid Product run-out if either: (a) the Bulk Equipment does not have an electronic monitor; or (b) there is an issue with the power supply to the electronic monitor on the Bulk Equipment or the communication lines (e.g. phone lines or cellular coverage) between the monitor and Linde's operations center; and
        (2)    communicate usage and operational patterns to Linde regardless of whether the Bulk Equipment has an electronic monitor.
    (ii)    shall pay to Linde any special expenses incurred if, at Customer's request, Linde delivers into any storage equipment less than 75% of its capacity.

4.    Product Requirements.
(a)    Subject to sub-paragraph 2(a)(iii) of this Rider and sub-paragraph 7(a) of the Product Supply Agreement: (1) Linde shall supply to Customer an average monthly volume of Product up to 120% of the Estimated Monthly Volume; and (2) Linde may supply Product to Customer in excess of 120% of the Estimated Monthly Volume ("Excess Product") if Linde determines that it has Excess Product available, in which case, the Parties shall proceed in good faith to determine any costs required for Linde to supply Excess Product to Customer that are not provided for in sub-paragraph 2(a)(iii) of this Rider or sub-paragraph 7(a) of the Product Supply Agreement, if applicable, and Customer shall pay those costs to Linde.
(b)    If Customer's average consumption of Product in any six month period is not more than 50% of the Estimated Monthly Volume, then Linde may adjust the Product prices.

5.    Exclusion from Rent and Price Revision. Increases to the Bulk Equipment rent as provided for in sub-paragraph 2(a)(iii)(1) of this Rider, and increases to the Product prices as provided for in sub-paragraph 4(b) of this Rider, do not constitute, in any case, a price increase, as contemplated in sub-paragraph 3(b) of the Product Supply Agreement.

VP/LINDE00014

# EXHIBIT "2"



Valley Protein Update

Gregory Vreeburg  to: Amanda Guzman, Kevin Decker, Ben Garris, Sean Pickering          09/04/2014 06:11 AM

Fyi on Valley Protein

Regards
Gregory Vreeburg
Account Manager
Linde LLC
510.258.8183

Mike Iannelli --- Re: Update ---
From:    "Mike Iannelli" <Mike.Iannelli@linde.com>
To:      "Bob Coyle" <BCoyle@valproca.com>
Cc:      "Gregory Vreeburg" <Gregory.Vreeburg@linde.com>, "Al Zall" <AZall@valproca.com>, "Durbin Breckenridge" <DBreckenridge@valproca.com>
Date:    Wed, Sep 3, 2014 10:21 PM
Subject: Re: Update

Bob,

Great news. Yes we have some options we can discuss to improve the freezing operation. We'll get Amanda engaged and set up a time to meet with you when you're back.

Best Regards,
Mike

Sent from my iPhone

On Sep 3, 2014, at 4:47 PM, "Bob Coyle" <BCoyle@valproca.com> wrote:

Mike & Greg,

After almost 1 year of negotiations and waiting, yesterday we were finally awarded the Safeway IQF project for the China Garden. This immediately represents over 450,000#'sper month of IQF product, in addition they will be transitioning the Denver and Phoenix divisions to us in Q1 2015. This along with our current IQF wing business will push finished product weight up to approx. 1,000,000#'s monthly. The gas totals will increase accordingly.

Which brings me to my biggest point; the current tunnel is not dependable and able to consistently "stay up" to handle such capacity. When the tunnel was first put in almost 4 years ago, neither VP or Linde ever expected we would be taxing the tunnel with this amount of product. We need some help. We are currently "re-building the belting section-by-section. The parts are not available so we are having them fabricated. Tomorrow we will receive 400 "flights and rods" that we can replace in the belting system. Now that we have a source for this

at the very least we can fix the holes in the linking system to keep the belt moving. This should get our gas usage back down into the $0.08 - $0.09 range, instead of the $0.10 - $0.11 range we currently are at.

What if anything does Linde have in newer technology? Surely you have made technological advances in tunnels and freezing in the 15 or more years since this tunnel was created.

I am out of town until next Monday, but available via email and spotty cell while traveling. Let's talk about some options.

Thanks

Bob

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

EXHIBIT "3"

**Brittani Jacobs**

| | |
|---|---|
| From: | amanda.guzman@linde.com |
| Sent: | Tuesday, September 09, 2014 5:24 PM |
| To: | Bob Coyle |
| Subject: | RE: Valley Protein Freezer Options |
| Attachments: | SOC Form.doc; socfre.pdf |

Hi Bob,

I'm sorry about that. Try this one. If not I also attached a pdf version so maybe you can just print it and hand write it.

Please fill out one for each of your different products.


Thanks,
Amanda Guzman
Application Sales Engineer–Food
Linde LLC
680 North Baldwin Park Boulevard
City of Industry, CA 91746
626.379.0114 (cell)
lindefood.com
amanda.guzman@linde.com


From:    Bob Coyle <BCoyle@valproca.com>
To:    "amanda.guzman@linde.com" <amanda.guzman@linde.com>,
Date:    09/09/2014 10:51 AM
Subject:    RE: Valley Protein Freezer Options


Can you resend...it says its protected????

From: amanda.guzman@linde.com [mailto:amanda.guzman@linde.com]
Sent: Thursday, September 04, 2014 9:58 AM
To: Bob Coyle
Cc: Mike.Iannelli@linde.com; Gregory.Vreeburg@linde.com
Subject: Valley Protein Freezer Options

Hi Bob,

Congratulations on this new business!

Before we can determine the ideal solution to help you with this increase, we will need a bit more information.

When are you starting production on this Safeway product?

You also mentioned picking up additional business in Denver and Phoenix next year, what will the associated production be for this business? We want to make sure that we take this into consideration so that you aren't maxed out again.

1

What is your current production rate and operating hours for a baseline?

Can you please fill out the attached SOC form for each of your main products and also let us know of that 1,000,000 lb/month total, how much of each specific product you are running?
This will help us to understand what equipment will best suit your needs for your portfolio of products, making sure that you are most efficient for your highest throughput items.

Thanks,
Amanda Guzman
Application Sales Engineer- Food
Linde LLC
680 North Baldwin Park Boulevard
City of Industry, CA 91746
626.379.0114 (cell)
lindefood.com
amanda.guzman@linde.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited

VP/LINDE00198

EXHIBIT "4"

From:           Bob Coyle [BCoyle@valproca.com]
Sent:           Monday, September 29, 2014 2:04 PM
To:             amanda.guzman@linde.com
Subject:        RE: Valley Protein Freezer Options
Attachments:    SOC Form.doc

That works.

Attached forms

**From:** amanda.guzman@linde.com [mailto:amanda.guzman@linde.com]
**Sent:** Monday, September 29, 2014 1:32 PM
**To:** Bob Coyle
**Subject:** RE: Valley Protein Freezer Options

Hi Bob,

I just wanted to confirm that you are still available to meet tomorrow afternoon.

We are coming from another meeting in the area, but should be at your facility by about 2:00-2:30

Will that work for you?

Thanks,
**Amanda Guzman**
**Application Sales Engineer- Food**
Linde LLC
680 North Baldwin Park Boulevard
City of Industry, CA 91746
626.379.0114 (cell)
lindefood.com
amanda.guzman@linde.com

From:     Bob Coyle <BCoyle@valproca.com>
To:       "amanda.guzman@linde.com" <amanda.guzman@linde.com>,
Date:     09/09/2014 10:51 AM
Subject:  RE: Valley Protein Freezer Options

Can you resend...it says its protected????

**From:** amanda.guzman@linde.com [mailto:amanda.guzman@linde.com]
**Sent:** Thursday, September 04, 2014 9:58 AM
**To:** Bob Coyle
**Cc:** Mike.Iannelli@linde.com; Gregory.Vreeburg@linde.com
**Subject:** Valley Protein Freezer Options

Hi Bob,

Congratulations on this new business!

Before we can determine the ideal solution to help you with this increase, we will need a bit more information.

When are you starting production on this Safeway product?

You also mentioned picking up additional business in Denver and Phoenix next year, what will the associated production be for this business? We want to make sure that we take this into consideration so that you aren't maxed out again.

What is your current production rate and operating hours for a baseline?

Can you please fill out the attached SOC form for each of your main products and also let us know of that 1,000,000 lb/month total, how much of each specific product you are running?
This will help us to understand what equipment will best suit your needs for your portfolio of products, making sure that you are most efficient for your highest throughput items.

Thanks,
**Amanda Guzman**
**Application Sales Engineer- Food**
Linde LLC
680 North Baldwin Park Boulevard
City of Industry, CA 91746
626.379.0114 (cell)
lindefood.com
amanda.guzman@linde.com

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

# SOC
# FOR FREEZING

## Customer Information

Contact Name: _____  Date: _____
Title: _____  Sales Representative: _____
Company Name: _____  Sales Territory: _____
Address: _____  Is customer using $CO_2/N_2$ at this
_____  location?:  $CO_2$ ____ $N_2$ ____
_____  If yes, describe storage tank location:
Phone Number: _____  Capacity (Tons): _____
Fax Number: _____  Vaporizer (Kw): _____
Is this an existing BOC customer? _____
Is product to be crusted?: _____ % ____

Product Name: _____IQF B/S Diced Thigh_____
Product Shape:



| RECTANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
| A= __1"__ | D= _____ | D= _____ | D= _____ | D= _____ |
| B= __1"__ | H= _____ | d= _____ | | H= _____ |
| H= __1"__ | | H= _____ | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp+btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Chicken Thigh | | | | 60% - 85% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### Belt Loading Information

Final temp. (F): __0° to 5°__  Space between pieces: ↔ _____
Freezer operating temp.: _____  Space between rows: ⤡ _____
Is product in container?: __No__  Is this a loose product?: _____
Container dimension: L ___ W ___ H ___  How may pounds of prod/
Weight of container: _____  sq. ft. of belt?: _____
Is product wrapped?: __No__  Is there a max. number of
What type of wrap?: _____  pieces across belt?: ___ No. __X__
Hours per day: __16__  Can product handle high
Days per week: __6__  speed fans?: __Yes__ _____
Desired production rate: __3500__ Lb./Hr.  Peak production: __3500__ Lb./Hr.

Customer Signature: _____

Date: _____
FMS-Form-002                    Rev 0

00984

# SOC
# FOR FREEZING

## Customer Information

| | | | |
|---|---|---|---|
| Contact Name: | _____ | Date: | _____ |
| Title: | _____ | Sales Representative: | _____ |
| Company Name: | _____ | Sales Territory: | _____ |
| Address: | _____ | Is customer using $CO_2/N_2$ at this | |
| | _____ | location?: | $CO_2$ ____  $N_2$ ____ |
| | _____ | If yes, describe storage tank location: | |
| Phone Number: | _____ | Capacity (Tons): | _____ |
| Fax Number: | _____ | Vaporizer (Kw): | _____ |
| | | Is this an existing BOC customer? | _____ |
| | | Is product to be crusted?: | ____  % |

Product Name: _____ IQF B/S Diced Breast _____

Product Shape:



**RECTANGULAR**  **SOLID CYLINDER**  **HOLLOW CYLINDER**  **SPHERE**  **1/2 SPHERE**

| RECTANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A= __1"__ | D= _____ | D= _____ | D= _____ | D= _____ |
| B= __1"__ | H= _____ | d= _____ | | H= _____ |
| H= __1"__ | | H= _____ | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp↑btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Chicken Breast | | | | 60% - 85% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

### Belt Loading Information

| | | | |
|---|---|---|---|
| Final temp. (F): | 0° to 5° | Space between pieces: ↔ | _____ |
| Freezer operating temp.: | _____ | Space between rows: ≺ | _____ |
| Is product in container?: | No | Is this a loose product?: | _____ |
| Container dimension: | L ___ W ___ H ___ | How may pounds of prod/ sq. ft. of belt?: | _____ |
| Weight of container: | _____ | | |
| Is product wrapped?: | No | Is there a max. number of pieces across belt?: | ____  No. __X__ |
| What type of wrap?: | _____ | | |
| Hours per day: | 16 | Can product handle high speed fans?: | Yes |
| Days per week: | 6 | | |
| Desired production rate: | 3500 ___ Lb./Hr. | Peak production: | 3500 ___ Lb./Hr. |

Customer Signature: _____

Date: _____

FMS-Form-002                    Rev 0

## SOC
## FOR FREEZING

**Customer Information**

| | | | |
|---|---|---|---|
| Contact Name: | _____ | Date: | _____ |
| Title: | _____ | Sales Representative: | _____ |
| Company Name: | _____ | Sales Territory: | _____ |
| Address: | _____ | Is customer using $CO_2/N_2$ at this | |
| | _____ | location?: | $CO_2$ ____ $N_2$ ____ |
| | _____ | If yes, describe storage tank location: | |
| Phone Number: | _____ | Capacity (Tons): | _____ |
| Fax Number: | _____ | Vaporizer (Kw): | _____ |
| | | Is this an existing BOC customer?: | _____ |
| | | Is product to be crusted?: | _____ % _____ |

Product Name:    IQF Sliced Beef_____

Product Shape:



| RECTANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A=   1/8" | D=_____ | D=_____ | D=_____ | D=_____ |
| B=   1 ½" | H=_____ | d=_____ | | H=_____ |
| H=   1" | | H=_____ | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp-btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Sliced Beef | | | | 68% - 72% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | **Belt Loading Information** | |
|---|---|---|---|
| Final temp. (F): | 0° to 5° | Space between pieces: ↔ | _____ |
| Freezer operating temp.: | _____ | Space between rows: | _____ |
| Is product in container?: | No | Is this a loose product?: | Yes |
| Container dimension: | L ____ W ____ H ____ | How may pounds of prod/ | |
| Weight of container: | _____ | sq. ft. of belt?: | _____ |
| Is product wrapped?: | No | Is there a max. number of | |
| What type of wrap?: | _____ | pieces across belt?: | _____ No. ___ X |
| Hours per day: | 16 | Can product handle high | |
| Days per week: | 6 | speed fans?: | Yes |
| Desired production rate: | 3500 ____ Lb./Hr. | Peak production: | 3500 ____ Lb./Hr. |

Customer Signature: _____

Date: _____

# SOC
# FOR FREEZING

## Customer Information

| | | |
|---|---|---|
| Contact Name: | | Date: |
| Title: | | Sales Representative: |
| Company Name: | | Sales Territory: |
| Address: | | Is customer using $CO_2/N_2$ at this location?: $CO_2$ ___ $N_2$ ___ |
| | | If yes, describe storage tank location: |
| Phone Number: | | Capacity (Tons): |
| Fax Number: | | Vaporizer (Kw): |
| | | Is this an existing BOC customer?: |
| | | Is product to be crusted?: ___ % ___ |

Product Name: ___ IQF Diced Pork ___
Product Shape:



| RECTANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A= 3/4" | D= | D= | D= | D= |
| B= 3/4" | H= | d= | | H= |
| H= 3/4" | | H= | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp+btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Pork Cushion | | | | 68% - 70% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

## Belt Loading Information

| | | |
|---|---|---|
| Final temp. (F): | 0° to 5° | Space between pieces: ↔ |
| Freezer operating temp.: | | Space between rows: ↗ |
| Is product in container?: | No | Is this a loose product?: Yes |
| Container dimension: | L ___ W ___ H ___ | How may pounds of prod/ sq. ft. of belt?: |
| Weight of container: | | |
| Is product wrapped?: | No | Is there a max. number of pieces across belt?: ___ No. X |
| What type of wrap?: | | |
| Hours per day: | 16 | Can product handle high speed fans?: Yes |
| Days per week: | 6 | |
| Desired production rate: | 3500 Lb./Hr. | Peak production: 3500 Lb./Hr. |

Customer Signature: ___

FMS-Form-002                      Rev 0

00987

# SOC
# FOR FREEZING

**Customer Information**

| | |
|---|---|
| Contact Name: _____ | Date: _____ |
| Title: _____ | Sales Representative: _____ |
| Company Name: _____ | Sales Territory: _____ |
| Address: _____ | Is customer using $CO_2/N_2$ at this |
| _____ | location?: $CO_2$ ____ $N_2$ ____ |
| | If yes, describe storage tank location: |
| Phone Number: _____ | Capacity (Tons): _____ |
| Fax Number: _____ | Vaporizer (Kw): _____ |
| | Is this an existing BOC customer? _____ |
| | Is product to be crusted?: ____ % ____ |

Product Name: ____ IQF Wing Portions _____

Product Shape:



| TRIANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A= 1" | D= | D= | D= | D= |
| B= 3" | H= | d= | | H= |
| H= 1" | | H= | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp+btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Chicken Drumette | | | | 68% - 70% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Belt Loading Information**

| | |
|---|---|
| Final temp. (F): 0° to 5° | Space between pieces: ↔ _____ |
| Freezer operating temp.: _____ | Space between rows: ⊀ _____ |
| Is product in container?: No | Is this a loose product?: Yes |
| Container dimension: L ___ W ___ H ___ | How may pounds of prod/ |
| Weight of container: _____ | sq. ft. of belt?: _____ |
| Is product wrapped?: No | Is there a max. number of |
| What type of wrap?: _____ | pieces across belt?: No. X |
| Hours per day: 16 | Can product handle high |
| Days per week: 6 | speed fans?: Yes |
| Desired production rate: 3500 Lb./Hr. | Peak production: 3500 Lb./Hr. |

Customer Signature: _____

FMS-Form-002                Rev 0

## SOC
## FOR FREEZING

### Customer Information

| | |
|---|---|
| Contact Name: | Date: |
| Title: | Sales Representative: |
| Company Name: | Sales Territory: |
| Address: | Is customer using $CO_2/N_2$ at this location? $CO_2$ ___ $N_2$ ___ |
| | If yes, describe storage tank location: |
| Phone Number: | Capacity (Tons): |
| Fax Number: | Vaporizer (Kw): |
| | Is this an existing BOC customer? |
| | Is product to be crusted? ___ % |

Product Name: _____ IQF Bone In Thigh _____
Product Shape:



| TRIANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A= 1" | D= | D= | D= | D= |
| B= 5" | H= | d= | | H= |
| H= 3" | | H= | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp+btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Chicken   B/I Thigh | | | | 68% - 70% | | 28°-32° |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | Belt Loading Information | |
|---|---|---|---|
| Final temp. (F): | 0° to 5° | Space between pieces: ↔ | |
| Freezer operating temp.: | | Space between rows: ◁ | |
| Is product in container?: | No | Is this a loose product?: | Yes |
| Container dimension: | L ___ W ___ H ___ | How may pounds of prod/ sq. ft. of belt?: | |
| Weight of container: | | | |
| Is product wrapped?: | No | Is there a max. number of | |
| What type of wrap?: | | pieces across belt?: | ___ No. X |
| Hours per day: | 16 | Can product handle high | |
| Days per week: | 6 | speed fans?: | Yes |
| Desired production rate: | 3500 Lb./Hr. | Peak production: | 3500 Lb./Hr. |

Customer Signature: _____

00989

# SOC
# FOR FREEZING

## Customer Information

| | | |
|---|---|---|
| Contact Name: _____ | Date: _____ | |
| Title: _____ | Sales Representative: _____ | |
| Company Name: _____ | Sales Territory: _____ | |
| Address: _____ | Is customer using $CO_2/N_2$ at this | |
| _____ | location?: | $CO_2$ _____  $N_2$ _____ |
| | If yes, describe storage tank location: | |
| Phone Number: _____ | Capacity (Tons): _____ | |
| Fax Number: _____ | Vaporizer (Kw): _____ | |
| | Is this an existing BOC customer?: _____ | |
| | Is product to be crusted?: _____ % | |

Product Name: _____ IQF Drumstick_____
Product Shape:



| TRIANGULAR | SOLID CYLINDER | HOLLOW CYLINDER | SPHERE | 1/2 SPHERE |
|---|---|---|---|---|
| A=__1 1/2"__ | D=_____ | D=_____ | D=_____ | D=_____ |
| B=__5"__ | H=_____ | d=_____ | | H=_____ |
| H=__2"__ | | H=_____ | | |

Describe in table below composition or product and initial temps of each item.

| Ingredients | Cp+btu/lb °F | Cp-btu/lb | dHf btu/lb | % Moisture | Weight | Initial Temp. |
|---|---|---|---|---|---|---|
| Chicken | | | | 68% - 70% | | 28°-32° |
| Drumstick | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Belt Loading Information**

| | | |
|---|---|---|
| Final temp. (F): 0° to 5° | Space between pieces: ↔ _____ | |
| Freezer operating temp.: _____ | Space between rows: ↙ _____ | |
| Is product in container?: No | Is this a loose product?: Yes | |
| Container dimension: L___ W___ H___ | How may pounds of prod/ | |
| Weight of container: _____ | sq. ft. of belt?: _____ | |
| Is product wrapped?: No | Is there a max. number of | |
| What type of wrap?: _____ | pieces across belt?: No. X | |
| Hours per day: 16 | Can product handle high | |
| Days per week: 6 | speed fans?: Yes | |
| Desired production rate: 3500 Lb./Hr. | Peak production: 3500 Lb./Hr. | |

Customer Signature: _____

FMS-Form-002                    Rev 0

00990

# EXHIBIT "5"



**Product Supply Agreement**
**Dated November 1, 2014**
**Customer: Valley Protein LLC**

1. Sale of Product and Rental of Equipment.

    (a) Except as otherwise provided for in this agreement: (1) Linde shall sell to Valley Protein , and Valley Protein shall buy exclusively from Linde, all of Valley Protein's requirements for the Products for Valley Protein's business operations conducted at the Locations; and (2) Valley Protein shall not: (i) resell, distribute, or otherwise transfer any Products purchased by Valley Protein from Linde; or (ii) purchase from any person or entity any products that Valley Protein could substitute for the Products.

    (b) Linde shall rent to Valley Protein, and Valley Protein shall rent from Linde, the Rental Equipment.

2. **Term.** The initial term of this agreement ("Initial Term") starts on the date specified in the related Term Sheet and continues for the period specified in that Term Sheet. After the end of the Initial Term, the term of this agreement will automatically extend for successive terms (each, a "Renewal Term") each equal to the Initial Term. However, a Party may terminate this agreement on the last day of the Initial Term or any Renewal Term (each, an "Expiration Date") by giving the other Party a notice of termination at least 12 months before the Expiration Date. The Term is subject to extension as provided for in sub-paragraph 3(b) of this document, and in sub-paragraph 2(a)(3)(ii)(a) of the Bulk Rider.

3. Product Prices, Equipment Rent, and Revision.

    (a) <u>Prices and Rent.</u>  Valley Protein shall pay to Linde the prices for the Products and the rent for the Rental Equipment listed on the related Term Sheet.

    (b) <u>Prices and Rent Revision.</u>  Linde may revise the Product prices or the Rental Equipment rent by giving Valley Protein a notice ("Price/Rent Revision Notice") that states the terms of the revision, at least 15 days before the effective date of the revision. Subject to paragraph 14, if a Price/Rent Revision Notice specifies an increase to the Product prices or Rental Equipment rent, then Valley Protein may terminate this agreement, only as to those Products affected by the increase ("Affected Products"), and only if: (1) Valley Protein received a bona fide, current written offer from another supplier to sell to Valley Protein the Affected Products in like quantity, in like delivery, and under like conditions, or to rent to Valley Protein equipment for the Affected Products that is equivalent to the Rental Equipment, at a price or at rent, respectively, lower than that established by the Price/Rent Revision Notice ("Offer"); (2) Valley Protein gives Linde a notice ("Termination Notice") that states Valley Protein's intent to terminate this agreement and includes a copy of the Offer within the 15-day period starting on the date of the Price/Rent Revision Notice; and (3) Linde does not agree to either meet the price or rent terms and related revision terms specified in the Offer (collectively, "Offer Price Terms"), or revert to its previous price or rent within the 30-day period starting on the date that Linde receives the Termination Notice. If Linde agrees to meet the Offer Price Terms, or to revert to its previous price or rent, then Linde may extend the Term until the greater of the end of the contract term provided for in the Offer, or by a period that is equal to the

1

Initial Term, which begins on the date that Linde agrees to meet the Offer Price Terms or to revert to its previous price or rent.

4.  Invoices and Payment Terms.

    (a) Payment. Valley Protein shall pay all Linde invoices within the 10-day period starting on the invoice date. Linde may charge interest on past due invoices at the lower of 1.5% per month or the highest rate permitted by law.

    (b) Invoice Claims. Valley Protein waives any claim or defense that Valley Protein has regarding any Linde invoice unless Valley Protein delivers to Linde a notice, which describes the basis of the claim or defense, within the 30-day period starting on the invoice date.

5.  Payment Obligations. If Valley Protein fails to pay when due any payment required under this agreement, or if Valley Protein enters into a bankruptcy, insolvency, receivership, liquidation, or similar proceeding, or makes an assignment for the benefit of creditors, then Linde may take any one or more of the following actions in addition to any other right or remedy authorized by law or this agreement: (a) refuse to make further deliveries of Product to Valley Protein; (b) place Valley Protein on a C.O.D. basis; (c) terminate this agreement; or (d) repossess any of its property in Valley Protein's possession.

6.  Delivery of Products.

    (a) Delivery Points. Delivery of Products is: (1) F.O.B. the Location if delivered by Linde; or (2) F.O.B. the Pickup Location or Linde's shipping point if picked up by Valley Protein or delivered by commercial carrier.

    (b) Shortage Claims. Valley Protein waives any claim or defense for shortage of Product unless Valley Protein delivers to Linde a notice, which describes the claimed shortage, within the five-day period starting on the delivery date of the Product.

7.  Change in Delivery Requirements and Location.

    (a) Change in Delivery Requirements. Linde may satisfy any change in Valley Protein's requirements for the delivery of Products, including a change in the Product Form or the Delivery System, as though the new requirements were originally included in this agreement, using any method of delivery that reasonably satisfies Valley Protein's new requirements. If the terms or prices for the new requirements are not specified in this agreement, then Linde's standard terms will apply to the new requirements, and Linde shall charge: (1) a market price for Products sold under the new requirements; and (2) Linde's then current rent for any additional Rental Equipment necessary in connection with the new requirements.

    (b) Change in Location. Linde may satisfy Valley Protein's requirements, under the terms of this agreement, for Products at: (1) any location where Valley Protein expands or relocates the operations of a Location; or (2) any location within a thirty mile radius of a Location where Customer begins conducting any business operations during the Term.

8.  Health and Safety Concerns.

    (a) Acknowledgement and Warning of Hazards. Valley Protein acknowledges that: (1) the Products, and in particular the gas Products, are hazardous; and (2) Valley Protein understands those hazards. Valley Protein shall use Material Safety Data Sheets ("MSDS") for the gas Products to warn its employees and others who are exposed to the gas Products of the hazards associated with those Products. Linde shall provide Valley Protein with a copy of the applicable MSDS, or access to the pages on Linde's website ("Website") that contain MSDS.

    (b) <u>Responsibility for Use</u>. Valley Protein is solely responsible for determining the suitability, compatibility, and use of the Products.

    (c) <u>EPCRA</u>. Valley Protein shall comply with all relevant reporting requirements under the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. Sections 11001-11049, resulting from the presence of the gas Products supplied under this agreement.

    (d) If Linde determines that the delivery of Product to a Location would be unsafe or in violation of applicable law due to a condition present at the Location, and Linde gives Valley Protein a notice describing the condition, then Linde may refuse to make further deliveries of Product to that Location until Valley Protein removes the condition. Linde may terminate this agreement if Valley Protein does not promptly remove the condition.

9. **Warranty, Sole Remedies, and Limitation of Damages.**

    (a) <u>Express Warranty and Sole Remedy</u>. Linde warrants to Valley Protein that gas Products delivered to Valley Protein conform to the Specifications listed on the related Term Sheet. Linde does not make any other express warranty regarding the gas Products. Valley Protein's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to replace, free of charge, any gas Product that does not conform to Linde's warranty, if, and only if, Valley Protein gives Linde notice of the breach of warranty within the 15-day period starting on the date of delivery of the gas Product. Any express warranty regarding the Rental Equipment or Products other than gas Products is specified in the related Term Sheet. Linde does not make any other express warranty regarding the Rental Equipment or Products other than gas Products.

    (b) <u>Disclaimer of all Implied Warranties</u>. LINDE SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES FOR THE PRODUCTS AND THE RENTAL EQUIPMENT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.

    (c) <u>Sole Remedy for Delivery Breach</u>. Valley Protein's sole remedy, and the sole obligation of Linde for a breach of Linde's obligation to deliver Product as required under this agreement, is for Linde to deliver to Valley Protein, free of charge, the quantity of Product that Linde failed to deliver as required under this agreement, if, and only if, Valley Protein gives Linde notice of the breach within the 30-day period starting on the scheduled date of delivery of the Product.

    (d) <u>Limitation on Damages</u>. In all events, regardless of the legal theory (e.g., breach of contract or warranty, negligence, strict liability, etc.): (1) LINDE IS NOT LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL DAMAGES, OR ECONOMIC LOSS, INCLUDING ANY LOSS OF BUSINESS, PRODUCTION, OR PROFITS; and (2) the total amount of damages that Valley Protein may recover from Linde resulting from any occurrence arising in connection with their relationship contemplated by this agreement is limited to an amount equal to the payments made by Valley Protein to Linde under this agreement during the 12-month period ending on the date of the occurrence.

    (e) <u>Statute of Limitations</u>. A Party must commence an action for a breach of contract within one year after the action has accrued.

10. **Pre-Existing Agreements.** Valley Protein warrants to Linde that Valley Protein is not a party to any pre-existing agreements that obligate Valley Protein to purchase its requirements for Products for its business operations conducted at the Locations (each, a "Pre-Existing Agreement") other than as identified in the related Term Sheet. Valley Protein shall terminate each Pre-Existing Agreement identified in the related Term Sheet, and any Pre-Existing Agreements applicable to a location where Valley Protein expands or relocates the operations of a Location, by giving the other party to the Pre-Existing Agreement a notice of non-extension or termination as permitted by the

Pre-Existing Agreements or, if applicable, by giving the other party a notice of termination due to that party's breach of the Pre-Existing Agreement as permitted by applicable law.

11. Force Majeure.

(a) <u>Force Majeure Events.</u> If Linde cannot perform any of its obligations under this agreement by reason of any cause or event, whether foreseeable or unforeseeable, beyond Linde's reasonable control, including any cause or event that makes the delivery of any of the Products commercially impracticable ("Force Majeure Event"), then Linde need not perform the obligation. A Force Majeure Event includes: (1) natural disasters (e.g., earthquake, hurricanes, floods, fire); (2) major upheavals (e.g., war, riots, act of terrorism, sabotage, labor strikes, embargoes); (3) performance failures of any person or entity other than Linde, such as Linde's suppliers or subcontractors (e.g., curtailment of energy sources or other raw materials or feedstock, common carrier failure, contracted labor); (4) extraordinary events (e.g., machinery and equipment failures or abnormal customer demand); and (5) government intervention (e.g., government orders, court orders, confiscation, condemnation, future laws). If a Force Majeure Event occurs, then Linde shall use commercially reasonable efforts to continue to deliver Product to Valley Protein or to provide Valley Protein with replacement product. In either case, Valley Protein shall reimburse Linde for additional costs incurred by Linde in order to provide the Product or replacement product (e.g., additional costs associated with special purchase, freight or handling, and additional costs of electricity or other types of energy). If a Force Majeure Event affects only a part of Linde's capacity to deliver Product, then Linde may allocate Product among its customers (including distributors) until its capacity is restored.

(b) <u>Purchases from Other Suppliers.</u> Valley Protein may purchase Product from another supplier for Valley Protein's business operations conducted at a Location if: (1) Linde is unable to either continue to deliver Product or deliver replacement product to that Location due to a Force Majeure Event; or (2) Valley Protein is able to purchase Product from the other supplier at a price lower than the amount equal to Linde's price plus the additional costs described in sub-paragraph 11(a). If Valley Protein purchases Product from another supplier as authorized by the previous sentence, then: (3) Valley Protein shall resume purchasing its Product requirements exclusively from Linde when Linde is able to deliver Product or replacement product to the affected Location at no additional cost; (4) Linde's warranty obligations under sub-paragraph 9(a) will not apply during the period that any gas Product supplied by the other supplier is in any vessel used to store the Product, any system used to distribute the Product, or any process that uses the Product; and (5) Valley Protein shall reimburse Linde for any costs incurred by Linde to clean Bulk Equipment to remove contamination caused by gas Products supplied by the other supplier.

12. Linde Property.

(a) <u>Ownership of Linde Property.</u> Valley Protein acknowledges that Linde owns the Rental Equipment and other Linde property located at the Locations (collectively, the "Linde Property"), even if Valley Protein affixes the Linde Property to any real property owned or used by Valley Protein. Valley Protein shall not cause or permit: (1) any lien or other encumbrance on or against any Linde Property; or (2) the sublease, pledge, or transfer of possession of any Linde Property other than as permitted in a Distributor Rider. Valley Protein shall cause to be removed any liens or other encumbrances that Valley Protein causes or permits on or against any Linde Property. Linde may file any financing statements and other notices that Linde deems necessary, including a notice that Linde owns the Linde Property.

(b) <u>Risk of Loss or Damage.</u> Valley Protein assumes all risk of loss or damage to the Linde Property, except for any loss or damage resulting from Linde's negligence. If the Linde Property is lost or cannot be repaired, then Valley Protein shall pay to Linde an amount equal to the then current replacement cost of the Linde Property. If Linde elects to repair any damaged Linde Property, then Valley Protein shall pay to Linde an amount equal to the cost

of making the repairs.  Valley Protein shall obtain and maintain insurance during the Term insuring against loss or damage to any Linde Property in amounts acceptable to Linde.  Upon request, Valley Protein shall deliver written evidence of Customer's compliance with this sub-paragraph.

(c) Use of Linde Property.  Valley Protein shall comply with the applicable policies and guidelines provided by Linde, pertaining to the possession, maintenance, and handling of the Rental Equipment.  Valley Protein shall use the Rental Equipment in a careful and proper manner, and only for routine business operations common to the normal and intended use of the Rental Equipment.  Valley Protein shall not cause or permit: (1) the abuse or misuse of the Rental Equipment in any manner; (2) the use of the Linde Property in any manner by a third party other than as permitted in a Distributor Rider; (3) the use of any Linde Property bearing a label or a mark owned by Linde or its affiliates after the expiration of Valley Protein's rights under this agreement;  (4) the filling or refilling of any Rental Equipment with any gas, liquid, or solid by any person or entity other than Linde or Linde's authorized representative, except for the filling of Bulk Equipment consisting of tanks by another supplier as necessary to deliver Product to Valley Protein as permitted in sub-paragraph 11(b); or (5) any modifications, alterations, or repairs to the Linde Property by any person or entity other than Linde or an authorized Linde representative.

13. Taxes and Other Charges and Revisions.

(a) Taxes.  Valley Protein shall pay or reimburse Linde for all taxes and other impositions (e.g., fees, permits, and other charges) that are charged by any government (except Linde's income taxes), which relate to the Products or the Rental Equipment, including their presence, use, operation, or maintenance.

(b) Compliance Charge and Surcharges.  Linde may charge to Valley Protein a regulatory compliance cost charge ("Compliance Charge").  The Compliance Charge results from the costs incurred by Linde in order to comply with federal, state, and local laws.  However, the amount of the Compliance Charge may not relate to actual compliance costs incurred by Linde, which may vary by the type of Product, service, geographic location, or time.  The Compliance Charge is not a federal, state, or local tax, and Linde need not collect and pay the Compliance Charge to any federal, state, or local government.  In addition, Linde may charge to Valley Protein surcharges based upon increases in distribution or production costs (e.g., energy, feedstock, and other raw material costs) during the Term, and applied in accordance with Linde's then current cost recovery program ("Surcharges").

(c) Revision to Other Charges.  Linde may revise the Compliance Charge, Surcharges, Incidental Charges, and Delivery Charges (collectively, "Other Charges") by giving Valley Protein a notice that states the terms of the revision.

14. Exclusion from Price and Rent Revision.  The following do not constitute, in any case, a price increase, as contemplated in sub-paragraph 3(b): (1) increases to the Product prices or Rental Equipment rent for Products that are identified in the related Term Sheet as exempt from sub-paragraph 3(b); (2) the reimbursements required under sub-paragraph 11(a); and (3) Other Charges or revisions to Other Charges.

15. General Provisions.

(a) Assignment.  Valley Protein shall not, without Linde's written consent, assign or transfer its rights or delegate or transfer its duties under this agreement, whether voluntarily or involuntarily, or by operation of law or otherwise, including any transfer by a change in control, merger, consolidation, reorganization, or other similar transaction.  Linde may terminate this agreement by giving Valley Protein a notice of termination if Valley Protein breaches the previous sentence.

(b) <u>Entire Agreement</u>. Each Term Sheet, in conjunction with the terms specified in this document and the related Riders: (1) constitutes a separate contract between the Parties; (2) constitutes all of the terms of the contract between the Parties regarding its subject matter; and (3) supersedes and terminates all previous agreements between the Parties regarding this agreement's subject matter. Any term contained in a delivery document used by Linde, or a purchase order, confirmation, or acknowledgment used by Valley Protein, that conflicts with, is different from, or is additional to, the terms of this agreement is not part of the contract between the Parties.

(c) <u>Governing Law.</u> New Jersey law governs all matters pertaining to the validity, construction, and effect of this agreement, without giving effect to any principles or rules of conflict of laws that apply the laws of another jurisdiction.

(d) <u>No Third Party Rights.</u> The Parties do not intend to confer any contractual rights or benefits upon any third party, either directly or incidentally.

(e) <u>Use of Linde Website</u>. Valley Protein may purchase Products using the Website. If Valley Protein uses the Website to purchase any Products, then Valley Protein will be bound by the "terms of use" on the Web site. However, the terms of this agreement will govern the transaction, rather than any "terms of sale" specified on the Website.

(f) <u>Amendment</u>. The Parties may amend this agreement only by a writing that Valley Protein and a Linde authorized representative sign.

(g) <u>No Waiver.</u> A waiver of any breach of this agreement does not constitute a waiver of any succeeding or other breach.

(h) <u>Severability</u>. Even if a court holds any part of this agreement to be invalid, this agreement will remain in force with such invalid part deleted.

(i) <u>Notices</u>. All notices must be written. Each Party shall deliver all notices by United States certified mail, postage prepaid, return receipt requested, or by overnight courier, to the representatives and addresses specified by the other Party, except that Linde may deliver Price/Rent Revision Notices or notices of revision to any Other Charges by regular United States mail or email, to a representative and address or email address specified by Customer.

(j) <u>Joint and Several Liability.</u> If Valley Protein consists of more than one person or entity, then Valley Protein's obligations under this agreement are joint and several.

(k) <u>Binding Nature.</u> The Parties are legally bound by this agreement when they sign the related Term Sheet, but as to Linde only when a Linde authorized representative signs on behalf of Linde. When the Parties are legally bound by this agreement, then their respective permitted successors, permitted assigns, heirs, and personal representatives are also legally bound and benefit from its terms. Regardless of sub-paragraph 15(a), if Valley Protein determines to sell substantially all of its assets (other than in the ordinary course of business), or the assets at the Locations, then Valley Protein shall require the buyer of those assets to assume the obligations of this agreement by written instrument delivered to Linde at the completion of the sale. However, Linde may terminate this agreement by giving Valley Protein a notice of termination within 10 days after the date that Linde learns of the completion of the sale.

(l) <u>Reimbursement of Expenses</u>. Valley Protein shall reimburse Linde for any fees, costs, and expenses (including attorneys fees) incurred by Linde in enforcing any of the provisions of this agreement.

(m) Customer's Signature. Valley Protein warrants to Linde that the person signing the related Term Sheet on behalf of Valley Protein has the authority to bind Valley Protein to this agreement.

(n) Definitions. Capitalized terms or words are either defined in this document or have the meaning provided for in the related Term Sheets and Riders. Any reference to "this agreement" means this document and the related Rider and Term Sheet, collectively. "Delivery System" means the system for delivering Product, e.g., cylinders, tanks, tube trailers, pipeline, on-site facilities, etc. The word, "law" is used in its broadest sense, and includes statutes, ordinances, regulations, rules, orders, directives, governmental opinions, and the common law. "Parties" means both parties to this agreement. "Party" means a party to this agreement. "Product or Products" means all Product that is described in the Term Sheets. "Product Form" means, as to gas products, a gaseous, liquid, or solid state. "Rental Equipment" means all Rental Equipment that is described in the Term Sheets. "Term" means the Initial Term and all Renewal Terms, collectively.

(o) Performance After Termination. Until the Parties sign an agreement that supersedes this agreement, the terms of this agreement will apply to: (1) any Product that Linde sells to Valley Protein, and Valley Protein buys from Linde for Valley Protein's business operations conducted at the Locations, after the termination of this agreement as to those Products and Locations; and (2) any Rental Equipment that Linde rents to Valley Protein and Valley Protein rents from Linde after the termination of this agreement as to that Rental Equipment. However, until the Parties sign an agreement that supersedes this agreement: (3) Valley Protein may purchase Products from other suppliers for Valley Protein's business operations conducted at the Locations after the termination of this agreement as to those Products and Locations; and (4) Linde may revise the Product prices or the Rental Equipment rent after the termination of this agreement as to those Products and Rental Equipment, by giving Valley Protein a Price/Rent Revision Notice.



THE LINDE GROUP

*Linde*

**Bulk Rider**
**Dated November 1, 2014**
**to**
**Product Supply Agreement**
**Dated November 1, 2014**
**Customer: Valley Protein LLC**

1. **Definitions.** Capitalized terms or words are either defined in this Rider or have the meaning provided for in the Product Supply Agreement or the related Term Sheet. "Agreement" means this Rider and the related Product Supply Agreement and Term Sheet, collectively. "Bulk Equipment" means the Rental Equipment, described in the related Term Sheets, used in connection with the Products (e.g., tanks and other storage equipment, vaporizers, tube trailers, and ancillary equipment).

2. **Bulk Equipment.**

   (a) <u>Linde's Obligations and Rights.</u> Regarding the Bulk Equipment, Linde:

      (1) shall deliver and, if required, install the Bulk Equipment, and connect it to Valley Protein's distribution system, after Valley Protein has complied with its obligations in <u>sub-paragraphs 2(b)(1) and (2)</u>;

      (2) shall maintain the Bulk Equipment;

      (3) may relocate or replace Bulk Equipment, or deliver and, if required, install additional Bulk Equipment as Linde determines is necessary due to significant changes in Valley Protein's requirements, methods, or operations at the Locations. If Linde relocates, replaces, delivers, or installs any Bulk Equipment as provided for in the previous sentence, then Linde may: (i) revise the Bulk Equipment rent consistent with Linde's then current rental charges for the Bulk Equipment; and (ii) at Linde's option, either: (a) extend the Term of the Agreement as to the Location affected by a period that is equal to the initial Term and begins on the date of completion of the relocation, replacement, delivery, or installation; or (b) invoice Valley Protein for the cost of the relocation, replacement, or installation; and

      (4) may remove the Bulk Equipment after: (i) the termination of the Agreement with respect to that equipment; or (ii) the cessation of Valley Protein's requirements for the related Product.

   (b) <u>Customer's Obligations.</u> Regarding the Bulk Equipment, in addition to Valley Protein's obligations under paragraph 12 of the Product Supply Agreement, Valley Protein shall:

      (1) furnish and prepare, at Valley Protein's expense, a site ("Equipment Site") on which the Bulk Equipment will be located before Valley Protein requests Linde to deliver and, if required, install the Bulk Equipment. Valley Protein shall cause the Equipment Site to conform to: (i) all applicable laws (including environmental laws), and (ii) Linde's specifications and safety requirements for site preparation, including the requirements that Valley Protein shall cause the Equipment Site to:

(A) include a suitable, concrete foundation, free of any oil, grease, lubricants, and other combustibles;

(B) have all utilities, including phone lines, required for the ready and proper use and operation of the Bulk Equipment;

(C) be accessible to a distribution system for the delivery of Product from the Equipment Site to all points of use;

(D) have adequate security, including any fencing required to protect against the altering, repairing, adjusting of, or tampering with, the Bulk Equipment by unauthorized individuals;

(E) be free of any underground or overhead obstructions;

(2) obtain any permits or licenses that are required for the installation or operation of the Bulk Equipment at the Equipment Site;

(3) pay to Linde Linde's then current charges for the shipment of Bulk Equipment other than tube trailers from the point of manufacture or storage to the Equipment Site, and for any rigging required for the installation of the Bulk Equipment;

(4) pay any additional costs incurred by Linde if Valley Protein fails to comply with its obligations under sub-paragraphs 2(b)(1) and (2);

(5) pay to Linde the rent for the Bulk Equipment listed on the related Term Sheet starting on the date that the Bulk Equipment is installed and ready for use;

(6) maintain the Equipment Site in good order and repair, at all times;

(7) pay for Linde's maintenance of the Bulk Equipment at Linde's rates in effect at the time of performance of the maintenance, if no Maintenance Charge is listed on the related Term Sheet for the Bulk Equipment;

(8) grant Linde's authorized representatives access to the Equipment Site, at any time required for the performance of the Agreement;

(9) not cause or permit any person or entity other than Linde or Linde's authorized representatives to remove the Bulk Equipment from the Equipment Site;

(10) not cause or permit any third party to have access to the Equipment Site except to fill Bulk Equipment consisting of tanks as necessary for another supplier to deliver Product to Valley Protein as permitted in sub-paragraph 11(b) of the Product Supply Agreement.;

(11) surrender to Linde the Bulk Equipment in good condition, ordinary wear and tear excepted, at the time of Linde's removal of the Bulk Equipment, and shall not impair Linde's right of access to or removal of the Bulk Equipment;

(12) pay or reimburse Linde for all inspections required by law or Linde's inspection policy; and

(13) pay the cost of installation and removal of the Bulk Equipment.

3. **Product Delivery.**

(a) Linde's Obligations. Regarding the delivery of Product, Linde shall:

    (1) subject to paragraph 4, use commercially reasonable efforts to deliver to each Location, those quantities of Product that are necessary to supply Valley Protein's requirements at the Location. Linde shall schedule deliveries based upon information generated by an electronic monitor on the storage equipment or tube trailers at the Location, if applicable, Product inventory readings, and usage and operational patterns communicated by Customer, unless Customer requests deliveries on an order only basis ("Order Only"). If Customer requests Order Only, then, until Customer notifies Linde to resume scheduled deliveries: (1) Linde shall use commercially reasonable efforts to deliver Product within 48 hours after Customer's order, subject to an incidental Charge per order; and (2) Linde will not monitor the Product inventory at the Locations, or schedule deliveries. Linde's delivery of Product into the storage equipment at the Equipment Site, or delivery of the tube trailer to the Equipment Site will constitute Valley Protein's purchase of the Product delivered. Linde is not required to reimburse or credit Valley Protein for the price of any residual Product contained in a tube trailer that Linde picks up from a Location.

    (2) measure the quantities of Product delivered by the method it customarily uses for the type of delivery made.

(b) Customer's Rights and Obligations. Regarding the delivery of Product, Valley Protein:

    (1) shall monitor the Product inventory at each Location and:

        (i) provide Linde with Product inventory readings on a timely basis to avoid a Product run-out if either: (a) the storage equipment or tube trailers at the Location do not have an electronic monitor; (b) there is an issue with the power supply to the electronic monitor or the communication lines (e.g. phone lines or cellular coverage) between the monitor and Linde's operations center;

        (ii) order Product on a timely basis to avoid a Product run-out if deliveries are Order Only; and

        (iii) communicate usage and operational patterns to Linde regardless of whether the storage equipment or tube trailers at the Location have an electronic monitor or deliveries are Order Only.

    (2) shall pay to Linde any special expenses incurred if, at Valley Protein's request, Linde delivers into any storage equipment less than 75% of its capacity.

4. Product Requirements.

    (a) Subject to sub-paragraph 2(a)(3) of this Rider and sub-paragraph 7(a) of the Product Supply Agreement: (1) Linde shall supply to Valley Protein an average monthly volume of Product up to 120% of the Estimated Monthly Volume; and (2) Linde may supply Product to Valley Protein in excess of 120% of the Estimated Monthly Volume ("Excess Product") if Linde determines that it has Excess Product available, in which case the Parties shall proceed in good faith to determine any costs required for Linde to supply Excess Product to Valley Protein that are not provided for in sub-paragraph 2(a)(3) or sub-paragraph 7(a) of the Product Supply Agreement, if applicable, and Valley Protein shall pay those costs to Linde.

    (b) If Valley Protein's average consumption of Product in any six month period is not more than 50% of the Estimated Monthly Volume, then Linde may adjust the Product prices.

5. Exclusion from Rent and Price Revision. Increases to the Bulk Equipment rent as provided for in sub-paragraph 2(a)(3)(i), and increases to the Product prices as provided for in sub-paragraph 4(b), do not constitute, in any case, a price increase, as contemplated in sub-paragraph 3(b) of the Product Supply Agreement.



THE LINDE GROUP

**Linde**

## Bulk Term Sheet

Linde LLC ("Linde"), a Delaware limited liability company, whose principal place of business is located at 575 Mountain Avenue, Murray Hill, New Jersey 07974, and Valley Protein LLC ("Valley Protein"), a California Limited Liability Company, whose principal place of business is located at 1828 East Hedges Avenue, Fresno CA 93703, effective November 1, 2014 ("Effective Date"), agree as follows:

1. **Incorporated Documents.** The following documents are an integral part of, and incorporated within, this Bulk Term Sheet ("Term Sheet"), effective on the Effective Date of this Term Sheet:
   - The Product Supply Agreement dated November 1, 2014; and
   - The Bulk Rider dated November 1, 2014 ("Rider").

2. **Definitions.** Capitalized terms or words are either defined in this Term Sheet or have the meaning provided for in the Product Supply Agreement or the related Rider.

3. **Products, Locations, Rental Equipment, and Related Terms.** The Product and related Location, Product Price and Unit of Measure, Rental Equipment, Rental Equipment Rent, Estimated Monthly Volume, and the Delivery Charge and Surcharge are as follows:

| Product | Location | Product Price and Unit of Measure | Rental Equipment | Rental Equipment Rent | | Estimated Monthly Volume |
|---------|----------|-----------------------------------|------------------|-----------------------|---|--------------------------|
| | | | | Rental Charge | Maintenance Charge | |
| CO2 | 1828 E. Hedges Ave, Fresno California 93703 | $129.00 per ton | 50 TON TANK | $1400.00 per month | $150.00 per month | 420 tons |

Delivery Charges and Surcharges

| Product | Product Delivery Charge | Fuel Surcharge |
|---------|-------------------------|----------------|
| CO2 | $100.00 per delivery 50.00 GV | Determined in accordance with Linde's cost recovery program in effect at the time that the surcharge is incurred. |

4. **Specifications.** The Specifications for the Products listed in paragraph 3 are as follows:

| Product | Specification |
|---------|---------------|
| CO2 | Commercial Grade: CGA Grade H - 99.5% |

5. **Initial Term.** The Initial Term starts on the Effective Date of this Term Sheet and continues, with respect to each Product and Location, for a period of five (5) years starting on the later of: (1) the Effective Date of this Term Sheet; or (2) the date that Linde first delivers the Product to the last tank installed at the Location.

6. **Compliance Charge.** The Compliance Charge is $23.00 per delivery.

7. **Incidental Charges.** The Incidental Charges are Linde's charges for the following incidents in effect at the time of the incident:
   - Less than 48 hrs. notice/averted deliveries
   - Scale/weigh deliveries
   - Off-Site scale/weigh
   - Certificate of Analysis
   - Restricted hours less than 120 hours/wk or predetermined delivery schedule
   - Signature required for delivery ticket
   - Copy of invoice or delivery ticket
   - Delivery delays >30 minutes
   - Must be First Stop
   - Trailer Seals
   - Order Only

8. **Pre-Existing Agreements.** The Products covered by a Pre-Existing Agreement and the termination date of the Pre-Existing Agreement are as follows:

| Product | Termination Date |
|---|---|
| CO2 | November 1, 2014 |

Linde will not deliver any Product described in this paragraph to the related Location until the earlier of : (1) the related Termination Date listed in this paragraph; or (2) the actual termination date of the Pre-Existing Agreement with respect to such Product and Location.

| Valley Protein LLC | | Linde LLC | |
|---|---|---|---|
| By: | _____ | By: | _____ |
| Name | Robert Coyle | Name | John C. MacRitchie |
| | | | Head of Markets - East and Midwest |
| Title | President | Title | OCT 3 0 2014 |
| Date: | 10/21/14 | Date: | _____ |



THE LINDE GROUP

*Linde*

Application Equipment, Ancillary Equipment, and Services Rider
Dated November 1, 2014
to
Product Supply Agreement
Dated November 1, 2014
Customer: Valley Protein LLC

1.  Definitions. Capitalized terms or words are either defined in this Rider or have the meaning provided for in the Product Supply Agreement or the related Term Sheets. "Agreement" means this Rider and the related Product Supply Agreement and Term Sheet, collectively. "Application Equipment" means the Rental Equipment described in the related Term Sheets.

2.  Application Equipment.

    (a) <u>Rent.</u> Customer shall pay to Linde the rent for the Application Equipment listed on the related Term Sheet starting on the earlier of: (1) the first day of the month after the month in which Linde installs the Application Equipment as provided for in <u>sub-paragraph</u> 4(a)(2); or (2) the first day of the month after the date that the Application Equipment is ready for shipment, if Linde does not install the Application Equipment due to events caused by Customer or its employees or agents, or their refusal to permit the delivery or installation of the Application Equipment.

    (b) <u>Rent on Termination.</u> If Linde terminates the Agreement with respect to any Application Equipment, as provided for in <u>Paragraph 5</u> of the Product Supply Agreement, then, in addition to any other right or remedy authorized by law or the Agreement, Linde may invoice Customer for the then current rent for that Application Equipment, for the number of months of the Term remaining on the day before the date that Linde terminates the Agreement.

    (c) <u>Security Deposit.</u> Linde may invoice Customer for any security deposit listed on the related Term Sheet before Linde arranges for the delivery of the Application Equipment to Customer as provided for in <u>sub-paragraph</u> 4(a). Linde may apply the security deposit against any charges outstanding on Customer's account, or against the loss of, damage to, or destruction of the Application Equipment. Linde shall return the security deposit to Customer, less any amounts applied as described in the previous sentence, after Linde removes the Application Equipment from the Site (defined in <u>sub-paragraph</u> 4(b)).

    (d) <u>Additions to Application Equipment.</u> Any items, including replacement parts, installed on the Application Equipment in connection with its maintenance are part of the Application Equipment. The installation of any such item on the Application Equipment constitutes the transfer of ownership of the item to Linde.

    (e) <u>Commissioning.</u> The commissioning described in <u>sub-paragraph</u> 4(a)(3) ("Commissioning") will be deemed to be successful if the Application Equipment meets Linde's then current acceptance criteria during the Commissioning. Customer's sole remedy, and the sole obligation of Linde if the Commissioning is not successful, is for Linde to either: (1) modify the Application Equipment, at Linde's expense, as Linde determines is necessary for a successful Commissioning, and repeat the Commissioning; or (2) terminate the Agreement as to the

affected Application Equipment, and reimburse Customer for any amounts paid by Customer for the shipment, installation, or Commissioning of the Application Equipment.

3. Ancillary Equipment and Services.

    (a) <u>Sale of Ancillary Equipment.</u> Linde shall sell to Customer, and Customer shall buy from Linde, the Ancillary Equipment.

    (b) <u>Performance of Services.</u> Linde shall perform the Services.

    (c) <u>Prices.</u> Customer shall pay to Linde the prices for the Ancillary Equipment and Services listed on the related Term Sheet.

    (d) <u>Payment Terms.</u> Payment terms are as follows:

        (1) Customer shall pay 50% of the total price listed on the related Term Sheet on the date that Customer signs the related Term Sheet; and

        (2) Linde may invoice Customer for 50% of the total price listed on the related Term Sheet on the later of: (i) the date of delivery of the Ancillary Equipment; or (ii) the date that Linde completes all of the Services.

        However, Linde may invoice Customer for any unpaid portion of the price of any Ancillary Equipment that is ready for shipment, or any Service that Linde performs, before the date specified in <u>sub-paragraph</u> 3(d)(2), if the Ancillary Equipment is not delivered, or Linde does not complete all of the Services, due to events caused by Customer or its employees or agents, or their refusal to permit the delivery of the Ancillary Equipment or the completion the Services, as applicable.

    (e) <u>Taxes.</u> Customer shall pay or reimburse Linde for all taxes and other impositions (e.g., fees, permits, and other charges) that are charged by any government (except Linde's income taxes), which relate to the Ancillary Equipment or the Services.

    (f) <u>Risk of Loss to Ancillary Equipment.</u> Risk of loss to the Ancillary Equipment will pass to Customer when the Ancillary Equipment is delivered to the Location.

4. Obligations and Rights Regarding Equipment.

    (a) <u>Linde's Obligations and Rights.</u> Linde:

        (1) shall arrange for the delivery of the Application Equipment and the Ancillary Equipment to the Location;

        (2) shall install the Application Equipment at the Location, after Customer has complied with its obligations in <u>sub-paragraphs</u> 4(b)(1)<u>and (2);</u>

        (3) shall commission the Application Equipment at the Location, after Customer has complied with its obligations in <u>sub-paragraphs</u> 4(b)(1)<u>and (2);</u> and

        (4) may remove the Application Equipment after the termination of the Agreement with respect to that equipment.

    (b) <u>Customer's Obligations.</u> In addition to Customer's obligations under <u>paragraph 12</u> of the Product Supply Agreement with respect to the Application Equipment, Customer:

(1) shall furnish and prepare, at Customer's expense, a site ("Site") on which the Application Equipment and Ancillary Equipment will be located, before the delivery and installation of the Application Equipment or the Ancillary Equipment. Customer shall cause the Site to conform to: (i) all applicable laws (including environmental laws), and (ii) Linde's specifications and safety requirements for site preparation, including the requirements that Customer shall cause the Site to have all piping and connections (other than any piping and connections listed as Ancillary Equipment on the related Term Sheet), including utility and exhaust connections, required for the ready and proper use and operation of the Application Equipment;

(2) shall obtain any engineering drawings or site drawings (other than those listed on the related Term Sheet under Services), permits, or licenses that are required for the installation or operation of the Application Equipment or the Ancillary Equipment at the Site;

(3) shall pay to Linde Linde's costs for: (i) the removal of the Application Equipment from the Site, including shipment costs, unless Linde terminates the Agreement as provided for in sub-paragraph 2(e); and (ii) any repairs required to return the Application Equipment to a good and fully functional condition if Customer breaches its obligation under sub-paragraph 4(b)(5) or sub-paragraph 4(b)(10);

(4) shall maintain the Site in good order and repair, at all times;

(5) shall keep the Application Equipment clean at all times, and, regardless of sub-paragraph 12(c)(5) of the Product Supply Agreement, maintain the Application Equipment in a good and fully functional condition, in accordance with any written instructions provided by Linde;

(6) shall maintain an inventory of consumable supplies as necessary to meet Customer's obligations under sub-paragraph 4(b)(5);

(7) shall grant Linde's authorized representatives access to the Site, at any time required for the performance of the Agreement;

(8) shall not cause or permit any person or entity other than Linde or Linde's authorized representatives to remove the Application Equipment from the Site;

(9) shall not cause or permit any third party to have access to the Site while the Application Equipment is located at the Site;

(10) shall surrender to Linde the Application Equipment in a good and fully functional condition, ordinary wear and tear excepted, at the time of Linde's removal of the Application Equipment, and shall not impair Linde's right of access to or removal of the Application Equipment;

(11) acknowledges that Linde or a Linde affiliate owns any intellectual property (e.g., patents, trademarks, copyrights, etc.) incorporated into the Application Equipment, or Linde is authorized to use such intellectual property;

(12) shall not use any intellectual property, including know-how, with respect to the Application Equipment at any site or location other than the Site; and

(13) shall not cause or permit the transfer or sublicense of any intellectual property, including know-how, with respect to the Application Equipment to any third party, or otherwise disclose any such intellectual property to any third party.

5. **Shortage Claims.** Customer waives any claim or defense for shortage of the Application Equipment or the Ancillary Equipment and their related parts unless Customer delivers to Linde a notice, which describes the claimed shortage, within the five-day period starting on the delivery date of the equipment or parts.

6. **Responsibility for Use.** Customer is solely responsible for determining the suitability, compatibility, and use of the Application Equipment and the Ancillary Equipment.

7. **Express Warranties and Sole Remedies.**

   (a) Application Equipment. Regardless of sub-paragraph 9(a) of the Product Supply Agreement, Linde warrants to Customer that each item of Application Equipment, and its related parts, will be free from any material manufacturing defects in workmanship or material for the 90-day period starting on the date of delivery of the Application Equipment or part ("Application Equipment Warranty Period"), if, and only if, the Application Equipment is properly maintained. Linde does not make any other express warranty regarding the Application Equipment or related parts; however, Linde shall assign to Customer any applicable manufacturer's warranty for Application Equipment or related parts manufactured by a third party, to the extent that the manufacturer permits assignment. Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to repair or replace, free of charge, any Application Equipment or related part that does not conform to Linde's warranty if, and only if, Customer gives Linde a notice of the breach of warranty within the Application Equipment Warranty Period. However, Linde is not required to repair or replace any non-conforming Application Equipment or related parts manufactured by a third party if the repair or replacement is covered by a manufacturer's warranty assigned to Customer.

   (b) Ancillary Equipment. Linde does not make any express warranty regarding the Ancillary Equipment; however, Linde shall assign any applicable manufacturer's warranty for such equipment to Customer, to the extent that the manufacturer permits assignment.

   (c) Services. Linde warrants to Customer that each Service will be free from any material defects in workmanship for the 90-day period starting on the date of its completion ("Services Warranty Period"). Linde does not make any other express warranty regarding the Services. Customer's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to re-perform, free of charge, any Service that does not conform to Linde's warranty if, and only if Customer gives Linde notice of the breach of warranty within the Services Warranty Period.

   (d) Disclaimer of Implied Warranties for Ancillary Equipment and Services. LINDE SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES FOR THE ANCILLARY EQUIPMENT AND SERVICES, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.



THE LINDE GROUP                                    *Linde*

## Application Equipment, Ancillary Equipment, and Services Term Sheet

Linde LLC ("Linde"), a Delaware limited liability company, whose principal place of business is located at 575 Mountain Avenue, Murray Hill, New Jersey 07974 and, Valley Protein LLC ("Customer"), a California Limited Liability Company, whose principal place of business is located at 1828 East Hedges Avenue, Fresno California 93703, effective November 1, 2014 ("Effective Date"), agree as follows:

1.  **Incorporated Documents.** The following documents are an integral part of, and incorporated within, this Application Equipment Term Sheet ("Term Sheet"), effective on the Effective Date of this Term Sheet:
    *   The Product Supply Agreement dated November 1, 2014; and
    *   The Application Equipment, Ancillary Equipment, and Services Rider dated November 1, 2014 ("Rider").

2.  **Definitions.** Capitalized terms or words are either defined in this Term Sheet or have the meaning provided for in the Product Supply Agreement or the related Rider.

3.  **Rental Equipment and Related Terms.** The Rental Equipment and related Serial Number, Rental Equipment Rent, and Security Deposit are as follows:

| Rental Equipment | Serial Number | Rental Equipment Rent | Security Deposit |
|---|---|---|---|
| Spiral Freezer 20-175S | | $2,915.00 per month | $0.00 |

4.  **Location.** The Location is: 1828 Hedges Avenue, Fresno CA 93707

5.  **Initial Term.** The Initial Term starts on the Effective Date of this Term Sheet and continues, with respect to each item of Rental Equipment, for a period of five years starting on the date that Customer's obligation to pay rent for the Rental Equipment begins, as provided for in paragraph 2(a) of the related Rider.

|  | **Valley Protein LLC** | | **Linde LLC** |
|---|---|---|---|
| By: | | By: | |
| Name | Robert Coyle | Name | John C. MacRitchie |
|  | | | Head of Markets - East and Midwest |
| Title | President | Title | OCT 3 0 2014 |
| Date: | 10/21/14 | Date: | |

Initial Term, which begins on the date that Linde agrees to meet the Offer Price Terms or to revert to its previous price or rent.

4. Invoices and Payment Terms.

    (a) <u>Payment</u>. Valley Protein shall pay all Linde invoices within the 10-day period starting on the invoice date. Linde may charge interest on past due invoices at the lower of 1.5% per month or the highest rate permitted by law.

    (b) <u>Invoice Claims</u>. Valley Protein waives any claim or defense that Valley Protein has regarding any Linde invoice unless Valley Protein delivers to Linde a notice, which describes the basis of the claim or defense, within the 30-day period starting on the invoice date.

5. Payment Obligations. If Valley Protein fails to pay when due any payment required under this agreement, or if Valley Protein enters into a bankruptcy, insolvency, receivership, liquidation, or similar proceeding, or makes an assignment for the benefit of creditors, then Linde may take any one or more of the following actions in addition to any other right or remedy authorized by law or this agreement: (a) refuse to make further deliveries of Product to Valley Protein; (b) place Valley Protein on a C.O.D. basis; (c) terminate this agreement; or (d) repossess any of its property in Valley Protein's possession.

6. Delivery of Products.

    (a) <u>Delivery Points</u>. Delivery of Products is: (1) F.O.B. the Location if delivered by Linde; or (2) F.O.B. the Pickup Location or Linde's shipping point if picked up by Valley Protein or delivered by commercial carrier.

    (b) <u>Shortage Claims</u>. Valley Protein waives any claim or defense for shortage of Product unless Valley Protein delivers to Linde a notice, which describes the claimed shortage, within the five-day period starting on the delivery date of the Product.

7. Change in Delivery Requirements and Location.

    (a) <u>Change in Delivery Requirements</u>. Linde may satisfy any change in Valley Protein's requirements for the delivery of Products, including a change in the Product Form or the Delivery System, as though the new requirements were originally included in this agreement, using any method of delivery that reasonably satisfies Valley Protein's new requirements. If the terms or prices for the new requirements are not specified in this agreement, then Linde's standard terms will apply to the new requirements, and Linde shall charge: (1) a market price for Products sold under the new requirements; and (2) Linde's then current rent for any additional Rental Equipment necessary in connection with the new requirements.

    (b) <u>Change in Location</u>. Linde may satisfy Valley Protein's requirements, under the terms of this agreement, for Products at: (1) any location where Valley Protein expands or relocates the operations of a Location; or (2) any location within a thirty mile radius of a Location where Customer begins conducting any business operations during the Term.

8. Health and Safety Concerns.

    (a) <u>Acknowledgement and Warning of Hazards</u>. Valley Protein acknowledges that: (1) the Products, and in particular the gas Products, are hazardous; and (2) Valley Protein understands those hazards. Valley Protein shall use Material Safety Data Sheets ("MSDS") for the gas Products to warn its employees and others who are exposed to the gas Products of the hazards associated with those Products. Linde shall provide Valley Protein with a copy of the applicable MSDS, or access to the pages on Linde's website ("Website") that contain MSDS.

(b) Responsibility for Use. Valley Protein is solely responsible for determining the suitability, compatibility, and use of the Products.

(c) EPCRA. Valley Protein shall comply with all relevant reporting requirements under the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. Sections 11001-11049, resulting from the presence of the gas Products supplied under this agreement.

(d) If Linde determines that the delivery of Product to a Location would be unsafe or in violation of applicable law due to a condition present at the Location, and Linde gives Valley Protein a notice describing the condition, then Linde may refuse to make further deliveries of Product to that Location until Valley Protein removes the condition. Linde may terminate this agreement if Valley Protein does not promptly remove the condition.

9.  Warranty, Sole Remedies, and Limitation of Damages.

(a) Express Warranty and Sole Remedy. Linde warrants to Valley Protein that gas Products delivered to Valley Protein conform to the Specifications listed on the related Term Sheet. Linde does not make any other express warranty regarding the gas Products. Valley Protein's sole remedy, and the sole obligation of Linde for a breach of Linde's warranty is for Linde to replace, free of charge, any gas Product that does not conform to Linde's warranty, if, and only if, Valley Protein gives Linde notice of the breach of warranty within the 15-day period starting on the date of delivery of the gas Product. Any express warranty regarding the Rental Equipment or Products other than gas Products is specified in the related Term Sheet. Linde does not make any other express warranty regarding the Rental Equipment or Products other than gas Products.

(b) Disclaimer of all Implied Warranties. LINDE SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES FOR THE PRODUCTS AND THE RENTAL EQUIPMENT, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.

(c) Sole Remedy for Delivery Breach. Valley Protein's sole remedy, and the sole obligation of Linde for a breach of Linde's obligation to deliver Product as required under this agreement, is for Linde to deliver to Valley Protein, free of charge, the quantity of Product that Linde failed to deliver as required under this agreement, if, and only if, Valley Protein gives Linde notice of the breach within the 30-day period starting on the scheduled date of delivery of the Product.

(d) Limitation on Damages. In all events, regardless of the legal theory (e.g., breach of contract or warranty, negligence, strict liability, etc.): (1) LINDE IS NOT LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL DAMAGES, OR ECONOMIC LOSS, INCLUDING ANY LOSS OF BUSINESS, PRODUCTION, OR PROFITS; and (2) the total amount of damages that Valley Protein may recover from Linde resulting from any occurrence arising in connection with their relationship contemplated by this agreement is limited to an amount equal to the payments made by Valley Protein to Linde under this agreement during the 12-month period ending on the date of the occurrence.

(e) Statute of Limitations. A Party must commence an action for a breach of contract within one year after the action has accrued.

10. Pre-Existing Agreements. Valley Protein warrants to Linde that Valley Protein is not a party to any pre-existing agreements that obligate Valley Protein to purchase its requirements for Products for its business operations conducted at the Locations (each, a "Pre-Existing Agreement") other than as identified in the related Term Sheet. Valley Protein shall terminate each Pre-Existing Agreement identified in the related Term Sheet, and any Pre-Existing Agreements applicable to a location where Valley Protein expands or relocates the operations of a Location, by giving the other party to the Pre-Existing Agreement a notice of non-extension or termination as permitted by the

Pre-Existing Agreements or, if applicable, by giving the other party a notice of termination due to that party's breach of the Pre-Existing Agreement as permitted by applicable law.

11. Force Majeure.

   (a) Force Majeure Events. If Linde cannot perform any of its obligations under this agreement by reason of any cause or event, whether foreseeable or unforeseeable, beyond Linde's reasonable control, including any cause or event that makes the delivery of any of the Products commercially impracticable ("Force Majeure Event"), then Linde need not perform the obligation. A Force Majeure Event includes: (1) natural disasters (e.g., earthquake, hurricanes, floods, fire); (2) major upheavals (e.g., war, riots, act of terrorism, sabotage, labor strikes, embargoes); (3) performance failures of any person or entity other than Linde, such as Linde's suppliers or subcontractors (e.g., curtailment of energy sources or other raw materials or feedstock, common carrier failure, contracted labor); (4) extraordinary events (e.g., machinery and equipment failures or abnormal customer demand); and (5) government intervention (e.g., government orders, court orders, confiscation, condemnation, future laws). If a Force Majeure Event occurs, then Linde shall use commercially reasonable efforts to continue to deliver Product to Valley Protein or to provide Valley Protein with replacement product. In either case, Valley Protein shall reimburse Linde for additional costs incurred by Linde in order to provide the Product or replacement product (e.g., additional costs associated with special purchase, freight or handling, and additional costs of electricity or other types of energy). If a Force Majeure Event affects only a part of Linde's capacity to deliver Product, then Linde may allocate Product among its customers (including distributors) until its capacity is restored.

   (b) Purchases from Other Suppliers. Valley Protein may purchase Product from another supplier for Valley Protein's business operations conducted at a Location if: (1) Linde is unable to either continue to deliver Product or deliver replacement product to that Location due to a Force Majeure Event; or (2) Valley Protein is able to purchase Product from the other supplier at a price lower than the amount equal to Linde's price plus the additional costs described in sub-paragraph 11(a). If Valley Protein purchases Product from another supplier as authorized by the previous sentence, then: (3) Valley Protein shall resume purchasing its Product requirements exclusively from Linde when Linde is able to deliver Product or replacement product to the affected Location at no additional cost; (4) Linde's warranty obligations under sub-paragraph 9(a) will not apply during the period that any gas Product supplied by the other supplier is in any vessel used to store the Product, any system used to distribute the Product, or any process that uses the Product; and (5) Valley Protein shall reimburse Linde for any costs incurred by Linde to clean Bulk Equipment to remove contamination caused by gas Products supplied by the other supplier.

12. Linde Property.

   (a) Ownership of Linde Property. Valley Protein acknowledges that Linde owns the Rental Equipment and other Linde property located at the Locations (collectively, the "Linde Property"), even if Valley Protein affixes the Linde Property to any real property owned or used by Valley Protein. Valley Protein shall not cause or permit: (1) any lien or other encumbrance on or against any Linde Property; or (2) the sublease, pledge, or transfer of possession of any Linde Property other than as permitted in a Distributor Rider. Valley Protein shall cause to be removed any liens or other encumbrances that Valley Protein causes or permits on or against any Linde Property. Linde may file any financing statements and other notices that Linde deems necessary, including a notice that Linde owns the Linde Property.

   (b) Risk of Loss or Damage. Valley Protein assumes all risk of loss or damage to the Linde Property, except for any loss or damage resulting from Linde's negligence. If the Linde Property is lost or cannot be repaired, then Valley Protein shall pay to Linde an amount equal to the then current replacement cost of the Linde Property. If Linde elects to repair any damaged Linde Property, then Valley Protein shall pay to Linde an amount equal to the cost

of making the repairs.  Valley Protein shall obtain and maintain insurance during the Term insuring against loss or damage to any Linde Property in amounts acceptable to Linde.  Upon request, Valley Protein shall deliver written evidence of Customer's compliance with this sub-paragraph.

(c) Use of Linde Property.  Valley Protein shall comply with the applicable policies and guidelines provided by Linde, pertaining to the possession, maintenance, and handling of the Rental Equipment.  Valley Protein shall use the Rental Equipment in a careful and proper manner, and only for routine business operations common to the normal and intended use of the Rental Equipment.  Valley Protein shall not cause or permit: (1) the abuse or misuse of the Rental Equipment in any manner; (2) the use of the Linde Property in any manner by a third party other than as permitted in a Distributor Rider; (3) the use of any Linde Property bearing a label or a mark owned by Linde or its affiliates after the expiration of Valley Protein's rights under this agreement;  (4) the filling or refilling of any Rental Equipment with any gas, liquid, or solid by any person or entity other than Linde or Linde's authorized representative, except for the filling of Bulk Equipment consisting of tanks by another supplier as necessary to deliver Product to Valley Protein as permitted in sub-paragraph 11(b); or (5) any modifications, alterations, or repairs to the Linde Property by any person or entity other than Linde or an authorized Linde representative.

13. Taxes and Other Charges and Revisions.

(a) Taxes.  Valley Protein shall pay or reimburse Linde for all taxes and other impositions (e.g., fees, permits, and other charges) that are charged by any government (except Linde's income taxes), which relate to the Products or the Rental Equipment, including their presence, use, operation, or maintenance.

(b) Compliance Charge and Surcharges.  Linde may charge to Valley Protein a regulatory compliance cost charge ("Compliance Charge"). The Compliance Charge results from the costs incurred by Linde in order to comply with federal, state, and local laws.  However, the amount of the Compliance Charge may not relate to actual compliance costs incurred by Linde, which may vary by the type of Product, service, geographic location, or time. The Compliance Charge is not a federal, state, or local tax, and Linde need not collect and pay the Compliance Charge to any federal, state, or local government.  In addition, Linde may charge to Valley Protein surcharges based upon increases in distribution or production costs (e.g., energy, feedstock, and other raw material costs) during the Term, and applied in accordance with Linde's then current cost recovery program ("Surcharges").

(c) Revision to Other Charges.  Linde may revise the Compliance Charge, Surcharges, Incidental Charges, and Delivery Charges (collectively, "Other Charges") by giving Valley Protein a notice that states the terms of the revision.

14. Exclusion from Price and Rent Revision.  The following do not constitute, in any case, a price increase, as contemplated in sub-paragraph 3(b): (1) increases to the Product prices or Rental Equipment rent for Products that are identified in the related Term Sheet as exempt from sub-paragraph 3(b); (2) the reimbursements required under sub-paragraph 11(a); and (3) Other Charges or revisions to Other Charges.

15. General Provisions.

(a) Assignment.  Valley Protein shall not, without Linde's written consent, assign or transfer its rights or delegate or transfer its duties under this agreement, whether voluntarily or involuntarily, or by operation of law or otherwise, including any transfer by a change in control, merger, consolidation, reorganization, or other similar transaction.  Linde may terminate this agreement by giving Valley Protein a notice of termination if Valley Protein breaches the previous sentence.

(b) Entire Agreement. Each Term Sheet, in conjunction with the terms specified in this document and the related Riders: (1) constitutes a separate contract between the Parties; (2) constitutes all of the terms of the contract between the Parties regarding its subject matter; and (3) supersedes and terminates all previous agreements between the Parties regarding this agreement's subject matter. Any term contained in a delivery document used by Linde, or a purchase order, confirmation, or acknowledgment used by Valley Protein, that conflicts with, is different from, or is additional to, the terms of this agreement is not part of the contract between the Parties.

(c) Governing Law. New Jersey law governs all matters pertaining to the validity, construction, and effect of this agreement, without giving effect to any principles or rules of conflict of laws that apply the laws of another jurisdiction.

(d) No Third Party Rights. The Parties do not intend to confer any contractual rights or benefits upon any third party, either directly or incidentally.

(e) Use of Linde Website. Valley Protein may purchase Products using the Website. If Valley Protein uses the Website to purchase any Products, then Valley Protein will be bound by the "terms of use" on the Web site. However, the terms of this agreement will govern the transaction, rather than any "terms of sale" specified on the Website.

(f) Amendment. The Parties may amend this agreement only by a writing that Valley Protein and a Linde authorized representative sign.

(g) No Waiver. A waiver of any breach of this agreement does not constitute a waiver of any succeeding or other breach.

(h) Severability. Even if a court holds any part of this agreement to be invalid, this agreement will remain in force with such invalid part deleted.

(i) Notices. All notices must be written. Each Party shall deliver all notices by United States certified mail, postage prepaid, return receipt requested, or by overnight courier, to the representatives and addresses specified by the other Party, except that Linde may deliver Price/Rent Revision Notices or notices of revision to any Other Charges by regular United States mail or email, to a representative and address or email address specified by Customer.

(j) Joint and Several Liability. If Valley Protein consists of more than one person or entity, then Valley Protein's obligations under this agreement are joint and several.

(k) Binding Nature. The Parties are legally bound by this agreement when they sign the related Term Sheet, but as to Linde only when a Linde authorized representative signs on behalf of Linde. When the Parties are legally bound by this agreement, then their respective permitted successors, permitted assigns, heirs, and personal representatives are also legally bound and benefit from its terms. Regardless of sub-paragraph 15(a), if Valley Protein determines to sell substantially all of its assets (other than in the ordinary course of business), or the assets at the Locations, then Valley Protein shall require the buyer of those assets to assume the obligations of this agreement by written instrument delivered to Linde at the completion of the sale. However, Linde may terminate this agreement by giving Valley Protein a notice of termination within 10 days after the date that Linde learns of the completion of the sale.

(l) Reimbursement of Expenses. Valley Protein shall reimburse Linde for any fees, costs, and expenses (including attorneys fees) incurred by Linde in enforcing any of the provisions of this agreement.

(m) <u>Customer's Signature</u>. Valley Protein warrants to Linde that the person signing the related Term Sheet on behalf of Valley Protein has the authority to bind Valley Protein to this agreement.

(n) <u>Definitions</u>. Capitalized terms or words are either defined in this document or have the meaning provided for in the related Term Sheets and Riders. Any reference to "this agreement" means this document and the related Rider and Term Sheet, collectively. "Delivery System" means the system for delivering Product, e.g., cylinders, tanks, tube trailers, pipeline, on-site facilities, etc. The word, "law" is used in its broadest sense, and includes statutes, ordinances, regulations, rules, orders, directives, governmental opinions, and the common law. "Parties" means both parties to this agreement. "Party" means a party to this agreement. "Product or Products" means all Product that is described in the Term Sheets. "Product Form" means, as to gas products, a gaseous, liquid, or solid state. "Rental Equipment" means all Rental Equipment that is described in the Term Sheets. "Term" means the Initial Term and all Renewal Terms, collectively.

(o) <u>Performance After Termination</u>. Until the Parties sign an agreement that supersedes this agreement, the terms of this agreement will apply to: (1) any Product that Linde sells to Valley Protein, and Valley Protein buys from Linde for Valley Protein's business operations conducted at the Locations, after the termination of this agreement as to those Products and Locations; and (2) any Rental Equipment that Linde rents to Valley Protein and Valley Protein rents from Linde after the termination of this agreement as to that Rental Equipment. However, until the Parties sign an agreement that supersedes this agreement: (3) Valley Protein may purchase Products from other suppliers for Valley Protein's business operations conducted at the Locations after the termination of this agreement as to those Products and Locations; and (4) Linde may revise the Product prices or the Rental Equipment rent after the termination of this agreement as to those Products and Rental Equipment, by giving Valley Protein a Price/Rent Revision Notice.

# EXHIBIT "6"

From:          Mike.Iannelli@linde.com
Sent:          Monday, December 1, 2014 5:49 PM
To:            Bob Coyle
Cc:            Gregory.Vreeburg@linde.com; amanda.guzman@linde.com
Subject:       Re: Spiral

Bob,

I agree you are welcome to rescind the agreement for the equipment rental of the 20-175 spiral. However, Linde does not accept your request to rescind the contract renewal of the CO2 agreement. Further Linde will provide formal notification to Air Liquide that they are infringing on a valid contract.

I do appreciate that you are at a critical point in your business expansion and are concerned about your equipment selection and supply chain. I have been working with our equipment group on two equipment options to meet your requirements. My expectation was that Linde would deliver to you the appropriate piece of equipment in replacement of the 20-175 that we originally agreed to. It is extremely rare for us to make an equipment sizing error and I believe we bear the responsibility to make this right even at an increase in cost to Linde. However, if your preference is to cancel the equipment rental agreement, we will be happy to provide you with a proposal for the recommended equipment that you can compare with alternative vendors. I have been waiting on getting some refurbishment cost numbers but should be prepared to discuss options with you on Thursday.

Please be assured that I value your business and recognize the importance that this has in your success. As I mentioned when we spoke, I think we need to help you better understand the changing CO2 landscape in CA and the strong position that Linde has. You are aligned with the right supplier and I assure you have my support to help you grow. I will give you a call tomorrow to discuss the situation with you further.

Best Regards,
Mike Iannelli
Linde LLC
Sales Manager West Market
Phone: 610-706-5919
Mobile: 026-706-5532
www.lindeus.com

Bob Coyle ---12/01/2014 04:56:46 PM---Mike, In light of our conversation Friday, November 21st, I'd like to rescind the contract we signed

From: Bob Coyle <BCoyle@valproca.com>
To: "Mike.Iannelli@linde.com" <Mike.Iannelli@linde.com>, "Gregory.Vreeburg@linde.com" <Gregory.Vreeburg@linde.com>,
Date: 12/01/2014 04:56 PM
Subject: Spiral

Mike,

In light of our conversation Friday, November 21st, I'd like to rescind the contract we signed previously requesting an extension of the contract date and the new equipment, the 20175 spiral. While I am confident Linde will find a solution for our spiral needs, my renewal anniversary date is coming this January and I'd like to keep options open. One of the options you suggested was a Dave Bauer spiral, as you know we have talked to Bauer (through Air Liquide) and they are proposing a rental/lease of the equipment also. I have seen 2 estimates one refurbished the other new...both are under $350K. We have also re-thought the "U" configuration and will need the pass thru configuration, so that might free up other options for you,

1

02874

# EXHIBIT 7



{In Archive} Re: Notice 🗎
Mike Iannelli  to: Bob Coyle                                                      01/26/2015 05:37 AM
Cc: Al Zail, Durbin Breckenridge, "Gregory.Vreeburg@linde.com"
Archive:            This message is being viewed in an archive.

Bob,

Please call me this morning to discuss the notice provided below. As I have previously indicated we have
a valid supply agreement for CO2 that was renewed by you in November of 2014 for 5 years. Your notice
is accepted and considered effective at the end of that term.

Thank You,
**Mike Iannelli**
Linde LLC
Sales Manager West Market
Phone: 510-786-5919
Mobile: 925-786-5532
www.lindeus.com

Bob Coyle                                    "Termination Notice" Mike,          01/25/2015 08:41:40 PM

From:        Bob Coyle <BCoyle@valproca.com>
To:          "Mike.Iannelli@linde.com" <Mike.Iannelli@linde.com>, "Gregory.Vreeburg@linde.com"
             <Gregory.Vreeburg@linde.com>,
Cc:          Al Zail <AZail@valproca.com>, Durbin Breckenridge <DBreckenridge@valproca.com>
Date:        01/25/2015 08:41 PM
Subject:     Notice

                            "Termination Notice"

Mike,

Valley Protein is giving official notice that we will not be renewing our current Product
Supply Agreement, Application Equipment and Bulk Rider Agreement dated January 27
[th] 2011. This letter represents our Official 12 month Notification as required by the
Agreements.

This decision was made after closely comparing proposals from both Linde and Air
Liquide (AL) for the equipment, gas supply and pricing. We will be purchasing our
equipment from MBI at Air Liquide's engineering design and begin pulling gas from Air
Liquide on January 28th 2016.

Equipment:  the quote we received from AL/MBI was $53,000 less for the same size
spiral, and the MBI equipment is new, not refurbished. In addition their installation
charges were $80,000 less. We are satisfied the MBI equipment will meet or exceed
our production needs.

CO2 pricing:  AL with their new facility in Pixley was very aggressive in their pricing and
is giving us a guaranteed rate at substantially reduced rates starting January 28, 2016
for 1 year, then capping any price increase at 5% annually. All in, our CO2 price after 5

years (assuming full increases) will still be $30 less per ton of your proposed start pricing, even if Linde did not raise prices (note -- pricing increased 22.7% under the current Agreement). Given our existing volume, not accounting for increased sales and production this amounts to over $1,650,000 in savings. If we increase sales to the spirals capacities the amount will exceed $3,300,000 in savings over the next 5 year term.

Linde has been a very good supplier for Valley Protein but a $1,650,000 - $3,300,000 difference is just economically impossible to ignore and the cost savings will help expand our growing business.

We believe we gave both parties a fair chance to compete for the business on all levels. We have had our bumps and bruises with this tunnel, but it has made it so far. With the current repairs and belt replacement we have made, daily capacities are such, a secondary tunnel will not be necessary and we can maintain customer needs until the new spiral arrives.

As our cryogenics supplier, looking back we would have wished this conversion issue would have been address 2 years ago and we would have saved over $500K in wasted $CO_2$, and lost sales from new capacities. Had that happened we would currently be in your spiral and pulling gas well into the future.

We realize we will be required to pay rent on the "moth-balled" tunnel until the end of the agreement January 27, 2016, and we will continue to utilize the 30 ton $CO_2$ tank until that time as well. We will work with you as to the removal of the existing tunnel over the coming months. We will also continue our existing payment arrangement of weekly COD + $5,000 weekly so current supplies remain uninterrupted.

We hope you understand our position and we thank you for your bids. We look forward to your continued solid distribution of $CO_2$ throughout 2015 and early 2016.


Bob Coyle, President
Valley Protein LLC


Sent via over night to:

Linde
attn: Mike Ianelli
2389 Lincoln Ave
Hayward, CA 94545

# EXHIBIT 8



**Termination Notice / Offer**
Mike Iannelli    to: BCoyle
Bcc: Werner Polak, Gregory Vreeburg, John MacRitchie

01/29/2015 01:05 PM

Dear Bob,

I wanted to follow up with you and confirm our conversation that we had yesterday. As I previously stated in response to the Termination Notice that you provide on January 24, 2015, Linde contends to have a valid Agreement between our companies for the supply of Carbon Dioxide that was fully executed by both parties on October 30, 2014. The term of this Agreement is for a period of five years from the effective date November 1, 2014. Our position is that this October 30, 2014 Agreement is in effect and that the Agreement dated January 27, 2011 that you reference in your Termination Notice was superseded by the October 30, 2014 Agreement. Therefore, we do not accept the Termination Notice provided by Valley Protein.

That said we do understand that you have received a competitive offer for the supply of Carbon Dioxide and related freezing equipment. As I mentioned when we spoke, Linde does not recognize this as a valid offer since Valley Protein is not contractually available until November 1, 2019. However, I do understand that it is in Valley Protein's interest to use the competitive quote and negotiate with Linde for better pricing and terms. Although our October 30, 2014 Agreement stipulates a price, which you accepted and were comfortable at the time of execution, Linde is willing to provide a price reduction to $120 per ton. From our prior contract price this price reduction represents a savings to Valley Protein of approximately $150,000 per year. Further we are offering to cap our price escalation annually at 4% with the ability for Valley Protein to check market pricing if the price adjustment exceeds 4% in any given year. This pricing offer is contingent on you moving forward with the Linde freezer solution to lease to Valley Protein a 40-300S spiral freezer.

I appreciate your consideration of this offer and I look forward to working with you to find a mutual path forward.

Best Regards,
**Mike Iannelli**
Linde LLC
Sales Manager West Market
Phone: 510-786-5919
Mobile: 925-786-5532
www.lindeus.com

01183

# EXHIBIT 9

From: Durbin Breckenridge <DBreckenridge@valproca.com>
To: "Gregory.Vrooburg@linde.com" <Gregory.Vrooburg@linde.com>,
Cc: Bob Coyle <BCoyle@valproca.com>, Al Zell <AZell@valproca.com>, Vince Rompinen <vrompinen@valproca.com>
Date: 02/01/2016 11:11 AM
Subject: CO2

Hi Gregory
Please inform Linde dispatch that Valley Protein is no longer using CO 2 from Linde
Thank you for your past service
Durbin

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**Caution:** The identity of the sender of this message could not be verified as it originates from the Internet. Please pay attention.

3

01201

EXHIBIT "10"

10/22/2014                                         rpl25

Go to Deal List          Go to Home          Go Back          Go To Site List

☑ VALLEY PROTEIN LLC/CAREFREE FINANCIAL FRESNO, CA LCO2

Select All    Deselect All

◉ Deal Report
○ Deal Summary

Run Report

Download to Excel          Download to Word

| Deal: VALLEY PROTEIN LLC/CAREFREE FINANCIAL (US) | Market Sector: Food | | | | |
|---|---|---|---|---|---|
| Site Name | Location | Product | Purity | Source Plant | Product Price |
| VALLEY PROTEIN LLC/CAREFREE FINANCIAL | FRESNO CA (US) | LCO2 | Commercial CO2 | Richmond | 129.00 $/ton |
| Maximum Volume | Year 1 Product Cost | Distribution Cost | Total Laid In Cost | Contract Start | Term |
| 420 Tons/Month | 40.560 $/Ton | 60.194 $/Ton | 100.754 $/Ton | 11/1/2014 | 5 Years |

| Actual Revenue Per Month | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Product | 54,180 | 54,180 | 54,180 | 54,180 | 54,180 |
| Fuel Surcharge | 4,137 | 4,137 | 4,137 | 4,137 | 4,137 |
| Power Surcharge | 0 | 0 | 0 | 0 | 0 |
| Natural Gas Surcharge | 0 | 0 | 0 | 0 | 0 |
| Delivery + Incidental | 1,525 | 1,525 | 1,525 | 1,525 | 1,525 |
| Station-Equip Rental | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 |
| App Equip Rental | 2,915 | 2,915 | 2,915 | 2,915 | 2,915 |
| Station-Equip Maint | 150 | 150 | 150 | 150 | 150 |
| App Equip Maint | 0 | 0 | 0 | 0 | 0 |
| Other Revenue | 0 | 0 | 0 | 0 | 0 |
| Totals | 64,307 | 64,307 | 64,307 | 64,307 | 64,307 |

| Monthly Costs | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Product | 17,035 | 19,895 | 20,446 | 20,446 | 20,446 |
| Distribution | 25,281 | 25,281 | 25,281 | 25,281 | 25,281 |
| Product + Distribution | 42,316 | 45,176 | 45,727 | 45,727 | 45,727 |
| Delivery + Incidental | 481 | 481 | 481 | 481 | 481 |
| Station Equip + Maint | 685 | 685 | 685 | 685 | 685 |
| App Equip + Maint | 1,975 | 1,975 | 1,975 | 1,975 | 1,975 |
| Other Costs | 0 | 0 | 0 | 0 | 0 |
| Totals | 45,457 | 48,317 | 48,868 | 48,868 | 48,868 |

10/22/2014                                                      rpl25

| First Year Equipment Sales | Sales | Costs | Gross Profit | Gross Profit Percent |
|---|---|---|---|---|
| Station Equipment | 0 | 0 | 0 | NaN |
| Application Equipment | 0 | 0 | 0 | NaN |
| Station Eq Install Freight & Rigging (Sold Eq Only) | 0 | 0 | 0 | NaN |
| App Eq Install Freight & Rigging | 40,600 | 40,600 | 0 | 0 |
| Totals | 40,600 | 40,600 | 0 | 0 |

| Yearly Summary Results Follow | | | | | |
|---|---|---|---|---|---|
| Gross Profit excluding equipment sales (Full Costs) | 2014 | 2015 | 2016 | 2017 | 2018 |
| Months | 12 | 12 | 12 | 12 | 12 |
| Product | 192,012 | 157,692 | 151,080 | 151,080 | 151,080 |
| Delivery + Incidental | 12,528 | 12,528 | 12,528 | 12,528 | 12,528 |
| Station Equipment Install Freight & Rigging (Stat Eq rental only) | -2,160 | -2,160 | -2,160 | -2,160 | -2,160 |
| Station Equipment Rental | 10,140 | 10,140 | 10,140 | 10,140 | 10,140 |
| Application Equipment Rental | 12,300 | 12,300 | 12,300 | 12,300 | 12,300 |
| Station Equipment Maintenance | 240 | 240 | 240 | 240 | 240 |
| Application Equipment Maintenance | -1,020 | -1,020 | -1,020 | -1,020 | -1,020 |
| Other | | | | | |
| Totals | 224,040 | 189,720 | 183,108 | 183,108 | 183,108 |
| Product GP Percent | 27.4 | 22.5 | 21.6 | 21.6 | 21.6 |
| Station GP Percent | 55.8 | 55.8 | 55.8 | 55.8 | 55.8 |
| App GP Percent | 32.2 | 32.2 | 32.2 | 32.2 | 32.2 |
| Total GP Percent | 29 | 24.6 | 23.7 | 23.7 | 23.7 |

| Total Net Assets for Opportunity | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Equipment | 185,461 | 169,012 | 152,563 | 136,114 | 119,665 |
| Install Freight & Rigging | 10,800 | 8,640 | 6,480 | 4,320 | 2,160 |
| Distribution Equipment | 137,493 | 137,493 | 137,493 | 137,493 | 137,493 |
| Plant Allocation | 617,820 | 576,632 | 535,444 | 494,256 | 453,068 |
| Working Capital | 77,168 | 77,168 | 77,168 | 77,168 | 77,168 |
| Total Asset Base | 1,028,742 | 968,945 | 909,148 | 849,351 | 789,554 |

| Summary Including One-Time Equipment Sales w w/o SG&A Impact | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Revenue | 812,284 | 771,684 | 771,684 | 771,684 | 771,684 |
| Cost | 586,084 | 579,804 | 586,416 | 586,416 | 586,416 |
| Gross Profit | 226,200 | 191,880 | 185,268 | 185,268 | 185,268 |
| ROCE Percent (GP/Asset Base) | 21.99 | 19.8 | 20.38 | 21.81 | 23.46 |
| ROCE I Percent ((GP - SG&A)/(Asset Base)) | 14.09 | 11.84 | 11.89 | 12.73 | 13.69 |

| Summary excluding One-Time Equipment Sales w w/o SG&A Impact | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Revenue | | 771,684 | 771,684 | 771,684 | 771,684 | 771,684 |

10/22/2014                                                           rpt25

| | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Cost | 545,484 | 570,804 | 586,416 | 586,416 | 586,416 |
| Gross Profit | 226,200 | 191,880 | 185,268 | 185,268 | 185,268 |
| ROCE Percent(GP/Asset Base) | 21.99 | 19.8 | 20.38 | 21.81 | 23.46 |
| ROCE I Percent((GP - SG&A)/(Asset Base)) | 14.49 | 11.84 | 11.89 | 12.73 | 13.69 |

| Variable Summary (Including One-Time Equipment Sales) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Revenue | 812,284 | 771,684 | 771,684 | 771,684 | 771,684 |
| Variable Cost (Variable Costs of Product and Distr) | 481,109 | 458,351 | 462,735 | 462,735 | 462,735 |
| Variable Gross Profit | 331,175 | 313,333 | 308,949 | 308,949 | 308,949 |
| Variable Gross Profit Percent | 40.77 | 40.60 | 40.04 | 40.04 | 40.04 |
| ROCE II Percent ((GP /(Total Net Assets for Opportunity - Plant Capital)) | 80.59 | 79.87 | 82.67 | 87.00 | 91.82 |

| Incremental Summary (Including One-Time Equipment Sales) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Revenue | 812,284 | 771,684 | 771,684 | 771,684 | 771,684 |
| Incremental Cost (Incremental Costs of Product and Distr) | 477,329 | 454,571 | 458,955 | 458,955 | 458,955 |
| Incremental Gross Profit | 334,955 | 317,113 | 312,729 | 312,729 | 312,729 |
| Incremental Gross Profit Percent | 41.24 | 41.09 | 40.53 | 40.53 | 40.53 |
| ROCE III Percent ((GP /(Total Net Assets for Opportunity - Plant Capital)) | 81.51 | 80.83 | 83.68 | 88.07 | 92.94 |

# EXHIBIT "11"



THE LINDE GROUP

575 Mountain Avenue
Murray Hill, NJ 07974-2082
908-464-8100

March 11, 2016

Valley Protein
1828 E. Hedges Avenue
Fresno, CA  93703-3633

Attn:  Mr. Bob Coyle

Reference:  Account Number 2518874

Dear Bob~

Your account of $38,963.89 is still unpaid on our records.

The long, past-due condition of your account, together with the fact that every amicable effort has been exhausted to induce payment, makes it necessary for us to request that you consider this letter as a final demand for settlement, to be in our hands on or before March 21, 2016, with the alternative of our taking such action as may be necessary to protect our interests.

We trust that your prompt remittance will avoid action entailing needless embarrassment and expense.

Thank you.

Regards,

Victoria Zilli
Credit Representative
Tel – 908-508-2488

c:      M. Iannelli
        S. Pickering
        R. Lingg

Linde LLC

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | Invoice Date | Invoice | Amount | Arrears | Delivery Ticket # | |
| 2 | 2/8/2016 | 53504911 | 1,079.44 | 51 | 0561515848 | balance due |
| 3 | 1/14/2016 | 53504912 | 451.90 | 47 | 0561527537 | |
| 4 | 1/15/2016 | 53504913 | 1,621.34 | 46 | 0561531226 | |
| 5 | 1/18/2016 | 53511312 | 1,604.47 | 43 | 0561539541 | |
| 6 | 1/15/2016 | 53511313 | 848.77 | 46 | 0561535141 | |
| 7 | 1/19/2016 | 53517703 | 2,526.88 | 42 | 0561543308 | |
| 8 | 1/20/2016 | 53523498 | 2,266.60 | 41 | 0561546654 | |
| 9 | 1/21/2016 | 53523499 | 1,475.58 | 40 | 0561550202 | |
| 10 | 1/22/2016 | 53531650 | 1,588.89 | 39 | 0561553875 | |
| 11 | 1/25/2016 | 53543002 | 1,904.91 | 36 | 0561560331 | |
| 12 | 1/25/2016 | 53543003 | 1,970.91 | 36 | 0561560176 | |
| 13 | 1/26/2016 | 53549235 | 2,092.46 | 35 | 0561564164 | |
| 14 | 1/22/2016 | 53549236 | 1,971.60 | 39 | 0561557362 | |
| 15 | 1/26/2016 | 53595423 | 890.48 | 35 | 0561568525 | |
| 16 | 1/27/2016 | 53595424 | 1,334.78 | 34 | 0561568550 | |
| 17 | 2/1/2016 | 53600112 | 4,100.00 | 29 | 0407134908 | |
| 18 | 1/28/2016 | 53606345 | 2,045.22 | 33 | 0561572832 | |
| 19 | 2/1/2016 | 53613983 | 576.70 | 29 | 0561576311 | |
| 20 | 2/1/2016 | 53619762 | 910.02 | 29 | 0561576321 | |
| 21 | 2/1/2016 | 53619763 | 1,439.03 | 29 | 0561583628 | |
| 22 | 2/3/2016 | 53645352 | 778.00 | 27 | 0561595806 | |
| 23 | 2/4/2016 | 53645353 | 733.09 | 26 | 0561597707 | |
| 24 | 3/1/2016 | 53772331 | 2,850.00 | 0 | 0407181677 | |
| 25 | 2/1/2016 | 0262518874 | 1,228.55 | 39 | Finance charge | |
| 26 | 3/1/2016 | 0362518874 | 674.27 | 10 | Finance charge | |
| 27 | | | 38,963.89 | | | |