1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12   LINDE, LLC,                              No.  1:16-cv-00527-DAD-EPG

13                  Plaintiff,

14         v.                                 ORDER GRANTING IN PART PLAINTIFFS'
                                              MOTION FOR SUMMARY JUDGMENT
15   VALLEY PROTEIN, LLC,
                                              (Doc. No. 52)
16                  Defendant.

17

18   VALLEY PROTEIN, LLC,

19                  Counter-claimant,

20         v.

21   LINDE, LLC,

22                  Counter-defendant.

23

24

25         This matter is before the court on plaintiff and counter-defendant Linde, LLC's ("Linde")

26   motion for summary judgment, or in the alternative for partial summary judgment, filed on

27   August 7, 2018.  (Doc. No. 52.)  Defendant and counter-claimant Valley Protein, LLC ("Valley

28

                                              1

1  Protein") filed an opposition on September 4, 2018.  (Doc. No. 53.)  Linde filed its reply on

2  September 11, 2018.  (Doc. No. 58.)  On September 18, 2018, the court held a hearing on the

3  motion at which attorney Adam Scott Hamburg appeared for Linde, and attorney Russell K. Ryan

4  appeared for Valley Protein.  Having considered the parties' briefing and heard from counsel, the

5  court will grant Linde's motion for summary judgment in part.

6                                          **BACKGROUND**

7          The facts of this case are as follows, and are undisputed except where noted.  On January

8  27, 2011, Linde and Valley Protein entered into a Product Supply Agreement (the "2011

9  Agreement"), in which Valley Protein agreed to purchase from Linde its requirements for $CO_2$ for

10  its meat processing plant located at 1828 E. Hedges Avenue, Fresno, CA 93703 (the "Plant").

11  (Doc. No. 52-5 ("UMF") at ¶ 1.)  The 2011 Agreement also contained an Application Equipment,

12  Ancillary Equipment, and Services Term Sheet, wherein Valley Protein agreed to lease a Cryoline

13  (Cryowave) Tunnel 48-30 (the "2011 Freezer") from Linde (the "2011 Rental Agreement").  (*Id.*

14  at ¶ 2.)  In addition, the 2011 Agreement contained an Application Equipment, Ancillary

15  Equipment, and Services Rider (the "2011 Equipment Rider"), which provided that Valley

16  Protein was obligated to keep the 2011 Freezer clean at all times, and to "maintain the [2011

17  Freezer] in a good and fully functional condition, in accordance with any written instructions

18  provided by Linde."  (*Id.*)  Further, the 2011 Equipment Rider stated that Valley Protein "is solely

19  responsible for determining the suitability, compatibility, and use of the [2011 Freezer]."  (*Id.*)

20         By early 2012, Valley Protein realized that it was not meeting its target conversion rates

21  using the 2011 Freezer.[1]  (*Id.* at ¶ 6.)  In addition, by October 1, 2012, Valley Protein's

22  production increased due to additional business it acquired, and there is some evidence that it was

23  unable to fully meet this increased demand due to the 2011 Freezer malfunctioning.  (*Id.* at ¶ 7;

24  Doc. No. 54 ("DMF") at ¶ 7.)  Although it is undisputed that Valley Protein did not lose

25  customers as a result of these malfunctions, Valley Protein contends that "it did lose business."

26  (DMF at ¶ 7.)  In September 2014, Valley Protein was awarded a new contract with Safeway,

27

---

28  [1]  The court understands "target conversion rate" to refer to the freezer's efficiency, specifically
    the amount of $CO_2$ that was needed to operate it.

because of which it sought ways to improve and expand its freezing operations.  (UMF at ¶ 8.)
To that end, Valley Protein's president Robert Coyle contacted Michael Iannelli, a sales manager
employed by Linde, to inquire whether Linde possessed any newer technology or equipment that
would permit Valley Protein to increase its production rate and reduce its $CO_2$ consumption.
(Doc. No. 52-1 ("Iannelli Decl.") at ¶ 9; Doc. No. 52-2 at 17–18.)  On September 4, 2014, Linde
engineer Amanda Guzman contacted Coyle with a questionnaire to enable Linde to identify the
appropriate equipment that would suit Valley Protein's needs.  (UMF at ¶ 9; Iannelli Decl. at
¶ 11; Doc. No. 52-2 at 20–21.)  On September 29, 2014, Coyle returned this questionnaire to Ms.
Guzman.  (Iannelli Decl. at ¶ 12; Doc. No. 52-2 at 23–31.)  According to the questionnaire, Coyle
represented to Linde that the "desired production rate" was 3,500 pounds of poultry per hour.
(Iannelli Decl. at ¶ 12; Doc. No. 52-2 at 25–31.)

There is some lack of clarity about what occurred next.  Iannelli stated his understanding
that Valley Protein originally requested the ability to process 3,500 pounds of poultry per hour, as
indicated in the questionnaire, but "ultimately ended up" increasing that requirement to 5,000
pounds of poultry per hour.  (Doc. No. 57-2 at 12.)  In addition, Coyle stated that in October
2014, he received assurances from Ms. Guzman, one of Linde's engineers, that Linde's new
equipment would process 5,000 pounds of poultry per hour.  (Doc. No. 56 ("Coyle Decl.") at ¶ 9.)
However, there does not appear to be any evidence that Valley Protein conveyed to Linde that the
capability to process 5,000 pounds of poultry per hour was a *requirement* in October 2014:  Coyle
stated that information was not conveyed to Linde until at least November 5.  (Doc. No. 52-4 at
19.)  In addition, Iannelli stated that he was unaware of this 5,000-pound requirement as of
September or October, implying that he was made aware of it only later.  (Doc. No. 57-2 at 12.)

Effective November 1, 2014, Linde and Valley Protein entered into a new agreement,
referred to as the "2014 Agreement."[2]  (UMF at ¶ 11.)  The 2014 Agreement included the Product
Supply Agreement, which contained the following provisions relevant to this action:

---

[2]  For ease of reference, this order will refer collectively to all agreements entered into on
November 1, 2014 as "the 2014 Agreement."  However, as the court's analysis below reflects, the
"agreement" is in fact composed of multiple separate contracts.

9. **Warranty, Sole Remedies, and Limitation of Damages.**

. . .

(e) <u>Statute of Limitations.</u> A Party must commence an action for a breach of contract within one year after the action has accrued.

. . .

15. General Provisions.

. . .

(b) <u>Entire Agreement</u>. Each Term Sheet, in conjunction with the terms specified in this document and the related Riders: (1) constitutes a separate contract between the Parties; (2) constitutes all of the terms of the contract between the Parties regarding its subject matter; and (3) supersedes and terminates all previous agreements between the Parties regarding this agreement's subject matter. Any term contained in a delivery document used by Linde, or a purchase order, confirmation, or acknowledgement used by Valley Protein, that conflicts with, is different from, or is additional to, the terms of this agreement is not part of the contract between the parties.

(UMF at ¶ 11; Doc. No. 52-2 at 35, 37–38.) In addition, the 2014 Agreement included an Application Equipment, Ancillary Equipment and Services Term Sheet and accompanying Rider (the "2014 Rental Agreement"), wherein Valley Protein agreed to lease a Spiral Freezer 20-175S from Linde (UMF at ¶ 13; Doc. No. 52-2 at 45–55.) The 2014 Agreement also contained a Bulk Term Sheet and Rider, pursuant to which Valley Protein agreed to purchase its $CO_2$ gas requirements exclusively from Linde. (UMF at ¶ 12; Doc. No. 52-2 at 40–44.) The Bulk Term Sheet also authorized Linde to charge Valley Protein a fuel surcharge for the delivery of the $CO_2$ gas. (UMF at ¶ 12; Doc. No. 52-2 at 43.)

According to the Coyle Declaration, a few weeks after the 2014 Agreement was executed, Iannelli contacted Coyle and advised him the equipment that served as the core of the 2014 Agreement had been "mis-engineered," and was only capable of processing less than 2,000 pounds of poultry per hour. (Coyle Decl. at ¶ 12.) Iannelli acknowledged that the new equipment was insufficient to meet Valley Protein's needs and asked for a "do-over," agreeing to release Valley Protein from the 2014 Agreement. (*Id.*; Doc. No. 57-2 at 30–31.) According to Coyle, having equipment sufficient to meet its poultry production requirements "was an absolutely

/////

4

essential requirement and the primary and perhaps sole reason Valley Protein entered in the 2014 Agreement." (Coyle Decl. at ¶ 12.) Linde does not appear to contest this version of events.

On December 1, 2014, Coyle sent an email to Iannelli, which stated in relevant part that Valley Protein would "like to rescind the contract we signed previously requesting an extension of the contract date and the new equipment, the [2014 Freezer.]" (UMF at ¶ 14; Iannelli Decl. at ¶ 16; Doc. No. 52-2 at 57.) Iannelli responded by email the same day, agreeing to let Valley Protein rescind the 2014 Rental Agreement, but declining to accept Valley Protein's request to rescind the 2014 Agreement as a whole. (UMF at ¶ 15; Iannelli Decl. at ¶ 17.) On December 12, 2014, Valley Protein entered into an Equipment Lease Agreement with Linde's competitor, Air Liquide, for a Spiral Freezer Model MB1-30-0550-09. (UMF at ¶ 17.) Concurrently, Valley Protein also executed a Product Supply Agreement with Air Liquide to obtain $CO_2$ from Air Liquide, despite Iannelli's email to Coyle notifying him that "Linde does not accept [Valley Protein's] request to rescind the contract renewal of the $CO_2$ agreement." (*Id.*; Doc. No. 52-2 at 57.) On January 25, 2015, Coyle sent a Termination Notice to Iannelli, wherein Coyle notified Linde that Valley Protein would not be renewing the 2011 Product Supply Agreement. (UMF at ¶ 18; Iannelli Decl. at ¶ 18; Doc. No. 52-2 at 59–60.) In response to Coyle's email, Iannelli again advised Coyle that Linde and Valley Protein had a valid supply agreement for $CO_2$ that was renewed in November 2014, and that according to the terms of that agreement, Valley Protein was obligated to obtain its $CO_2$ from Linde for the term of five years after that date. (UMF at ¶ 19; Iannelli Decl. at ¶¶ 19–20; Doc. No. 52-2 at 59–60.) On February 1, 2016, Valley Protein notified Linde that it would no longer be purchasing its $CO_2$ from Linde. (UMF at ¶ 20; Iannelli Decl. at ¶ 22; Doc. No. 52-2 at 64.)

In addition to moving for summary judgment as to its own claims, Linde also moves for summary judgment in its favor as to Valley Protein's counter-claims for breach of contract, breach of the covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation, and unfair competition. These allegations center primarily on alleged malfunctioning of the 2011 Freezer. (*See* Doc. No. 29 at ¶¶ 11–15.) In addition to those allegations, Valley Protein alleges that between mid-2014 and the beginning of 2016, Linde

5

obtained the $CO_2$ delivered to the Plant from its competitor's plant in Pixley, California, as opposed to Richmond, California. (UMF at ¶ 22.) Linde admits that it sometimes improperly billed Valley Protein a surcharge that was based on the transportation of the gas from Richmond to the Plant. (*Id.*) Valley Protein characterizes this as a breach of the 2011 Agreement (*See* Doc. No. 53 at 11), while Linde contends that it was "merely an oversight," and that Linde subsequently reimbursed Valley Protein for any unwarranted transportation surcharges. (Doc. No. 52 at 17–18.)

As a result of what Linde contends was Valley Protein's breach of the 2014 Agreement, Linde asserts damages in the form of lost profits totaling $963,084.00. (UMF at ¶ 23.) Linde also asserts that at the time Valley Protein breached the 2014 Agreement, Valley Protein had a past due balance for $CO_2$ totaling $38,963.89, and that this amount remains unpaid. (*Id.* at ¶ 24.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party, *see Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v.*

1  *Cent. Contra Costa Cty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

2  party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

3  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

4  898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

5  more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where

6  the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

7  there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

8        "'When as is the case here, the moving party is a plaintiff, he or she must adduce

9  admissible evidence on all matters as to which he or she bears the burden of proof.'"  *Grimmway*

10  *Enters., Inc. v. PIC Fresh Glob., Inc.*, 548 F. Supp. 2d 840, 845 (E.D. Cal. 2008) (quoting *Zands*

11  *v. Nelson*, 797 F. Supp. 805, 808 (S.D. Cal. 1992)); *see also S. Cal. Gas Co. v. City of Santa Ana*,

12  336 F.3d 885, 888 (9th Cir. 2003) (noting that because plaintiffs are "the party with the burden of

13  persuasion at trial, the Gas Company must establish 'beyond controversy every essential element

14  of its' Contract Clause claim."  (quoting William W. Schwarzer, et al., *California Practice Guide:*

15  *Federal Civil Procedure Before Trial* § 14:124–127 (2001))).

16                                    **DISCUSSION**

17        As noted above, Linde moves for summary judgment on all of its causes of action:  breach

18  of contract, breach of the implied covenant of good faith and fair dealing, account stated, and

19  goods and services rendered.  (Doc. No. 52 at 2–3.)  In addition, Linde also moves for summary

20  judgment in its favor on Valley Protein's counter-claims for breach of contract, breach of the

21  covenant of good faith and fair dealing, intentional misrepresentation, negligent misrepresentation

22  and unfair competition, respectively.

23  **A.    Choice of Law**

24        Before turning to the individual claims at issue, the court first addresses the parties'

25  choice-of-law dispute.  Linde filed its motion for summary judgment under California law.  (*See*

26  *generally* Doc. No. 52.)  However, in its opposition, Valley Protein points out that both the 2011

27  Agreement and the 2014 Agreement specifically provide that New Jersey law "governs all

28  matters pertaining to the validity, construction, and effect" of the Agreements.  (Doc. No. 53 at

16–17.) Linde disputes whether New Jersey law applies, but nonetheless devotes much of its reply to rearguing its motion under New Jersey law. (Doc. No. 58 at 6, 8–17.)

District courts sitting in diversity apply the substantive law of the state in which they sit. *Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). In such circumstances, district courts look to the law of the forum state when making choice of law determinations. *Hoffman v. Citibank (S. Dakota), N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008). In making these determinations, the California Supreme Court has adopted the approach outlined in § 187(2) of the Restatement (Second) of Conflict of Laws. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464–66 (1992). Under this rubric, courts are instructed to first determine whether (1) the chosen state has a substantial relationship to the parties or their transaction, or (2) there is any other reasonable basis for the parties' choice of law. *Id.* at 466. If neither of these tests is met, the inquiry ends, and the court need not enforce the parties' choice of law. *Id.* However, if one of these tests is satisfied, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. *Id.* If there is no such conflict, the court enforces the parties' choice of law. If there is a conflict, the court must determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue." *Id.* If California's interest is materially greater, California law applies despite the choice of law provision. *Id.* The burden of demonstrating the existence of a fundamental policy of California rests with the party opposing application of the choice of law provision, as does the burden of demonstrating that California has a materially greater interest in the outcome of the case than the chosen state. *Wash. Mut. Bank, FA v. Superior Court*, 24 Cal. 4th 906, 917 (2001).

New Jersey plainly has a substantial relationship to the parties. As alleged in Linde's complaint, Linde is a limited liability company organized under the laws of Delaware with its principal place of business in New Jersey. (Doc. No. 1 at ¶ 1.) Accordingly, for purposes of diversity jurisdiction, Linde is a citizen of New Jersey. (*Id.*) This is sufficient to establish a substantial relationship between the chosen state and the parties. *See* Restatement (Second) of
/////

Conflict of Laws § 187 cmt. f (Am. Law. Inst. 1971) (finding a substantial relationship where "one of the parties is domiciled or has his principal place of business" in the chosen state).

Next, the court must determine whether the chosen state's law is contrary to a fundamental policy of California. Neither party has identified any differences between California and New Jersey law that are relevant to this action, and the court is unaware of any "fundamental policies" of California that are implicated by the facts of this case. The burden on this point rests with Linde as the party seeking to apply California law notwithstanding the parties' choice of law provision. *See Wash. Mut. Bank*, 24 Cal. 4th at 917. Because Linde has failed to carry that burden, this court will apply New Jersey law in addressing the breach of contract claims.

However, to say that New Jersey law applies to the breach of contract claims is not to say that New Jersey law also applies to the remaining claims in this action. On the contrary, courts routinely recognize that a valid choice-of-law provision contained in a contract does not necessarily govern the entire relationship between the parties. "The question of whether [the choice-of-law] clause is ambiguous as to its scope . . . is a question of contract interpretation that in the normal course should be determined pursuant to [the selected forum's law.]" *Nedlloyd Lines*, 3 Cal. 4th at 469 n.7; *see also Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1051 (N.D. Cal. 2013) (examining Florida law, the law specified in the choice-of-law provision, to determine whether a contractual choice-of-law provision covers related tort claims). The court will therefore consult New Jersey law to determine the breadth of the choice-of-law provisions here.

The parties have provided no briefing on this issue—indeed, plaintiff Linde did not recognize the existence of a choice-of-law issue in seeking summary judgment under California law despite the existence of the New Jersey choice-of-law provision. However, the court's research has revealed some, albeit limited, authority addressing how New Jersey law would apply to the provision at issue here. After conducting a thorough survey of the relevant law, a New Jersey district court recently concluded that "New Jersey principles of statutory construction would counsel a narrow reading of the choice-of-law provision [at issue]." *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 655 (D.N.J. 2018). In *Portillo*, the choice-of-law provision

stated that the agreement "shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey." *Id.* at 648. The court noted that the phrase "governed by" could be interpreted to encompass more than the breach of contract claim, and that some courts have construed it in that manner. *See, e.g.*, *Nat'l Seating & Mobility, Inc. v. Parry*, No. C 10-02782 JSW, 2012 WL 2911923, at *2 (N.D. Cal. July 16, 2012) (finding that a choice-of-law provision stating that the agreement would be "governed by and construed in accordance" with Tennessee law was "broad enough to encompass the breach of contract, the tort claims, and the UCL claim"). Nonetheless, the district court in *Portillo* concluded that New Jersey law did not sweep so broadly and the court is persuaded by that analysis of this issue. *See Portillo*, 323 F. Supp. 3d at 655–58.

Applying New Jersey's rules governing the scope of choice-of-law provisions here, the court concludes that the provision in this case extends only to the parties' breach of contract claims. By their terms, the choice-of-law provisions at issue here apply to matters "pertaining to the validity, construction, and effect of [the agreements.]" (Doc. No. 52-2 at 7, 38.) Compared with other choice-of-law provisions which courts have been called upon to consider, this language is quite narrow. *See, e.g.*, *Country Visions, Inc. v. MidSouth LLC*, No. 2:15-cv-01740-TLN-CKD, 2016 WL 1614585, at *2 (E.D. Cal. Apr. 22, 2016) ("Both parties agree to submit to exclusive jurisdiction in California and further agree that *any cause of action arising under this Agreement* shall be brought in an appropriate federal or state court located in California.") (emphasis added); *Brigham Young Univ. v. Pfizer, Inc.*, No. 2:06-CV-890 TS, 2012 WL 918744, at *1 (D. Utah Mar. 16, 2012) ("The validity, interpretation and performance of this Agreement *and any dispute connected herewith* shall be governed and construed in accordance with the laws of the State of Missouri.") (emphasis added); *Van Gundy v. P.T. Freeport Indonesia*, 50 F. Supp. 2d 993, 994 (D. Mont. 1999) ("Included in the offer was a choice of law provision which stated that *all disputes arising out of the employment relationship* would be governed by Louisiana law.") (emphasis added). As the court interprets the choice-of-law provisions here, they are cabined solely to the contracts themselves, and do not indicate that resolution of any other disputes will be "governed by" New Jersey law. *See Bd. of Educ. of Twp. of Cherry Hill v.*

*Human Res. Microsystems, Inc.*, No. CIV. 09-5766 JBS/JS, 2010 WL 3882498, at *4 (D.N.J. Sept. 28, 2010) ("Generally, when a choice-of-law provision is intended to apply not only to interpretation and enforcement of the contract but also to any claims related to the contract, the language used is broader."). Thus, although it may ultimately make little difference in the final analysis and resolution of the issues before it, the court will apply New Jersey law only to the breach of contract claims and will apply California law to the parties' remaining claims.

**B.      Linde's Breach of Contract Claim**

Linde first seeks summary judgment on its breach of contract claim as it relates to the 2014 Agreement. To prevail on a breach of contract claim, a party must prove (1) the existence of a valid contract between the parties, (2) the opposing party's failure to perform a defined obligation under the contract, and (3) that the breach caused the claimant to sustain damages. *EnviroFinance Grp. v. Envtl. Barrier Co.*, 113 A.3d 775, 787 (N.J. App. Div. 2015). Linde contends that these elements are all satisfied here as a matter of law. As for the existence of a valid contract, the 2014 Agreement was executed on November 1, 2014. (UMF at ¶ 11.) Under the terms of the 2014 Agreement, Valley Protein was required to purchase all of its $CO_2$ exclusively from Linde for five years, but instead began purchasing $CO_2$ from Linde's competitor, Air Liquide. (*Id.* at ¶¶ 12, 17.) The failure to purchase $CO_2$ from Linde led directly to Linde's lost sales volume, causing the damages it now seeks to recover. (*Id.* at ¶ 23.)

Valley Protein does not directly challenge these contentions in its opposition but rather asserts that it is entitled to rescission of the contract. Rescission is a remedy founded on "considerations of equity," the object of which is to "restore the parties to the *status quo ante* and prevent the party who is responsible for the misrepresentation from gaining a benefit." *Rutgers Cas. Ins. v. LaCroix*, 946 A.2d 1027, 1034–35 (N.J. 2008). In support of this argument, Valley Protein contends that Linde's representations about the production capacity of its equipment amounted to an equitable fraud, providing the basis for rescission of the contract. Under New Jersey law, "equitable fraud provides a basis for a party to rescind a contract." *First Am. Title Ins. v. Lawson*, 827 A.2d 230, 237 (N.J. 2003) (citing *Jewish Ctr. of Sussex Cty. v. Whale*, 432 A.2d 521 (N.J. 1981)). "'In general, equitable fraud requires proof of (1) a material

misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party.'" *Id.* (quoting *Liebling v. Garden State Indem.*, 767 A.2d 515, 518 (N.J. App. Div. 2001)).  Rescission voids the contact, meaning that it is considered "null from the beginning" and treated as if it does not exist.  *Id.*

The parties agree that a rescission occurred as to at least some portion of the 2014 Agreement, as evidenced by Iannelli's email to Coyle agreeing to Valley Protein rescinding the agreement to rent the 2014 Freezer.  (UMF at ¶ 15; Iannelli Decl. at ¶ 17; Doc. No. 52-2 at 57.)  Iannelli confirmed this rescission at his deposition.  (Doc. No. 57-2 at 34.)  The parties' dispute centers on the scope of that rescission—namely, whether that rescission was effective only as to the rental of the 2014 Freezer, or whether it amounted to a rescission of the entire 2014 Agreement.  Linde contends that the rescission was only with respect to the rental of the 2014 Freezer, while Valley Protein argues that this rescission nullified the parties' entire 2014 Agreement.  If the entire 2014 Agreement was nullified as Valley Protein suggests, it was free to purchase its $CO_2$ from sources other than Linde.

As stated above, the 2014 Agreement was comprised of several components:  The Product Supply Agreement, the Bulk Rider, the Bulk Term Sheet, the Application Equipment, Ancillary Equipment, and Services Rider, and the Application Equipment, Ancillary Equipment, and Services Term Sheet.  (Doc. No. 52-2 at 33–55.)  The 2014 Freezer was rented to Valley Protein pursuant to the Application Equipment, Ancillary Equipment, and Services Rider and Term Sheet and Rider, whereas Valley Protein's agreement to purchase its $CO_2$ requirements was contained in the Bulk Rider and Term Sheet.  (*See id.*)  The Product Supply Agreement specifies that "Each Term Sheet, in conjunction with the terms specified in this document and the related Riders . . . constitutes a separate contract between the parties."  (UMF at ¶ 11; Doc. No. 52-2 at 38.)  Linde therefore contends that although it agreed to rescind the Application Equipment, Ancillary Equipment, and Services Rider and Term Sheet, it did not rescind the Bulk Term Sheet and Rider.  If the Bulk Term Sheet and Rider remained in force, as Linde argues, Valley Protein remained obligated to purchase its $CO_2$ requirements from Linde.

/////

Valley Protein contests this conclusion, arguing that all of the agreements constituted a single contract.  (*See* Doc. No. 53 at 18–19.)  As evidence of this, Valley Protein points to Iannelli's deposition, in which Iannelli testified that he understood all three documents "to be integrated and [to] form essentially the application equipment, ancillary equipment and services term sheet."  (Doc. No. 57-2 at 19.)  In addition, Iannelli also acknowledged at deposition that Linde did not offer rental of the 2014 Freezer separate and apart from the $CO_2$, but that they were offered only as a package.  (*Id.* at 14–15.)  Iannelli further understood that the only reason Valley Protein entered into the agreement to purchase $CO_2$ was because Valley Protein was interested in renting the 2014 Freezer.  (*Id.* at 27–28.)   Relying on this testimony, Valley Protein contends that all of the agreements signed by the parties in 2014 were a single contract.

The court must resolve the question of whether the various agreements constituted multiple contracts or were instead just one contract.  *See Bosshard v. Hackensack Univ. Med. Ctr.*, 783 A.2d 731, 740 (N.J. App. Div. 2001) ("The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony."); *Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1061 (N.J. App. Div. 2000) ("The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury.").  In interpreting the terms of a contact, courts "should give contractual terms their plain and ordinary meaning unless specialized language is used peculiar to a particular trade, profession, or industry." *Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011) (internal quotation marks and citations omitted).  A contract provision is ambiguous "if the terms of the contract are susceptible to at least two reasonable alternative interpretations," *Schor v. FMS Financial Corp.*, 814 A.2d 1108, 1112 (N.J. App. Div. 2002) (brackets omitted) (quoting *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. App. Div. 1997)), but "a court should not torture the language of a contract to create ambiguity." *Nester*, 693 A.2d at 1220; *see also Kieffer*, 14 A.3d at 743 (noting that it is not the court's task "to rewrite a contract for the parties better than or different from the one they wrote for themselves").  However, "[e]ven when the contract on its face is free from ambiguity, evidence of the situation of the parties and the

surrounding circumstances and conditions is admissible in aid of interpretation." *Great Atl. &*
*Pac. Tea Co.*, 762 A.2d at 1061.

As the court interprets the language at issue here, the agreement for Linde to provide
Valley Protein with $CO_2$ and the agreement for Linde to rent the 2014 Freezer to Valley Protein
were not merely separate transactions within the same contract. Instead, according to the plain
language of the Product Supply Agreement, they constituted separate contracts altogether. (*See*
Doc. No. 52-2 at 38) ("Each Term Sheet, in conjunction with the terms specified in this document
and the related Riders . . . *constitutes a separate contract* between the parties.") (emphasis
added). In the court's view this clear language is susceptible of only one reasonable
interpretation—namely, that the Application Equipment, Ancillary Equipment, and Services
Rider and Term Sheet was an entirely separate contract from the Bulk Rider and Term Sheet.
Although the parties devote some of their briefing to the issue of whether the 2014 Agreement
was partially rescinded, partial rescission does not apply where, as here, the 2014 Agreement was
composed of multiple, distinct contracts.[3] Partial rescission is available only with respect to
different transactions *within the same contract. See Bonnco Petrol*, 560 A.2d at 662. The fact
that Linde and Valley Protein agreed to rescind one contract could not and did not effectuate a
rescission of an entirely separate contract.

The court acknowledges that portions of Iannelli's deposition testimony arguably evince a
contrary understanding of these agreements. It is also relevant that, as Iannelli testified, it was
"standard practice in the industry" to rent freezing equipment and purchase $CO_2$ or nitrogen from
the same company. (Doc. No. 57-2 at 28.) However, such extrinsic statements may be
considered only to "aid in interpretation," and may not be considered "for the purpose of
changing the writing." *Great Atl. & Pac. Tea Co.*, 762 A.2d at 1061. Here, the written

---

[3] Partial rescission of a contract is disfavored under New Jersey law. *See County of Morris v.
Fauver*, 707 A.2d 958, 966 (N.J. 1998) ("As a general rule, rescission 'must be exercised in toto
and is to be applied to the contract in its entirety with the result that what has been done is wholly
undone and no contract provisions remain in force to bind either of the parties'") (quoting
*Merickel v. Erickson Stores Corp.*, 95 N.W.2d 303, 306 (Minn. 1959)). "Only where a contract is
severable into different transactions may one of those separate transactions be avoided." *Id.*; *see
also Bonnco Petrol, Inc. v. Epstein*, 560 A.2d 655, 662 (N.J. 1989).

agreement of the parties itself is clear: although entered into at the same time and between the same parties, the Application Equipment, Ancillary Equipment, and Services Rider and Term Sheet was a separate contract from the Bulk Rider and Term Sheet.

Because the Bulk Rider and Term Sheet were not rescinded, Valley Protein remained under a contractual obligation to purchase its $CO_2$ gas requirements from Linde unless it can establish some other basis to avoid that obligation. Valley Protein suggests that the doctrine of equitable fraud provides such a basis. (Doc. No. 53 at 17.) "'[E]quitable fraud requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party.'" *First Am. Title Ins.*, 827 A.2d at 237 (quoting *Liebling*, 767 A.2d at 518). A review of the evidence before the court on summary judgment establishes that with respect to the Bulk Rider and Term Sheet, no reasonable juror could find the existence of an equitable fraud that would entitle Valley Protein to rescission of the Bulk Rider and Term Sheet. At deposition, Coyle testified that with respect to surcharges charged by Linde for the delivery of $CO_2$ gas to Valley Protein, no Linde employee ever made false or misleading statements regarding where the $CO_2$ gas was being delivered from. (Doc. No. 52-4 at 30:3–5.) Coyle also testified that any overcharging for delivery of $CO_2$ gas amounted only to an "honest mistake." (*Id.* at 31:3–5.) Based upon this testimony, the court finds no evidence supporting a claim of equitable fraud with respect to the Bulk Rider and Term Sheet. By failing to comply with the terms of the Bulk Rider and Term Sheet, Valley Protein breached that contract.

With respect to damages, Linde claims that as a result of this breach, it has suffered lost profits totaling $963,084.00. (UMF at ¶ 23.) In support of this claimed loss amount, Linde has submitted an exhibit prepared by Iannelli and attached to his Declaration. (Doc. No. 52-2 at 66–68.) Iannelli states that this projection provides an estimate of Linde's gross margins if Valley Protein had continued to purchase its $CO_2$ gas from Linde through 2018, as required under the Bulk Rider and Term Sheet. (Iannelli Decl. at ¶ 24.) Valley Protein objects to this evidence on the ground that Iannelli's projections lack foundation, are not based on personal knowledge, and amount to nothing more than speculation. (Doc. No. 55 at ¶ 8.)

"Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993). "Lost profits are one measure of compensatory damages that may be recoverable in a breach of contract action, if they can be established with a reasonable degree of certainty." *RSB Lab. Servs., Inc. v. BSI, Corp.*, 847 A.2d 599, 608 (N.J. App. Div. 2004). Notably, "[p]ast experience of an ongoing, successful business provides a reasonable basis for the computation of lost profits with a satisfactory degree of definiteness." *V.A.L. Floors, Inc. v. Westminster Cmtys., Inc.*, 810 A.2d 625, 631 (N.J. App. Div. 2002). Accordingly, Valley Protein's objections to this evidence are overruled.

Iannelli's projections are neither speculative nor lacking in foundation; rather, they are extrapolations based on the prior dealings of the parties, which New Jersey courts have explicitly held to be a proper basis for calculating lost profits. *See Weiss v. Revenue Bldg. & Loan Ass'n*, 182 A. 891, 893 (N.J. 1936) ("[P]ast experience has demonstrated the success of the enterprise and provides a reasonably certain basis for the calculation of plaintiff's probable loss consequent upon the breach of the contract to lease."); *V.A.L. Floors, Inc.*, 810 A.2d at 631. Nor do these calculations lack personal knowledge. Iannelli is a sales manager employed by Linde (Iannelli Decl. at ¶ 1) and would be expected to be intimately familiar with sales calculations. This is particularly so with respect to Linde's dealings with Valley Protein, since Iannelli was involved in forming the 2014 Agreement and has reviewed all of Linde's records pertaining to its contractual relationship with Valley Protein. (*Id.* at ¶¶ 2, 9–13.) Under these circumstances, the court finds that Iannelli's projections provide a "reasonable basis for the computation of lost profits." *V.A.L. Floors, Inc.*, 810 A.2d at 631. Moreover, Valley Protein has not submitted any evidence of its own on summary judgment that would call these lost profit calculations into question.

Accordingly, the court will grant summary judgment in favor of Linde on Linde's breach of contract claim, both with respect to liability and damages.

## C.     Linde's Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

Next, the court addresses Linde's motion for summary judgment with regard to its claim against Valley Protein for breach of the implied covenant of good faith and fair dealing.

"The [implied] covenant of good faith and fair dealing [is] implied by law in every contract." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010). "In order to establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: (1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *48 (N.D. Cal. Aug. 30, 2017). Notably, to succeed on such a claim, it is not "necessary that the party's conduct be dishonest." *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 373 (1992).

Linde's motion only briefly addresses whether it should be granted summary judgment on this claim. Linde's argument appears to be premised on the notion that summary judgment is proper because "[t]he elements of Linde's claim for breach of the implied covenant of good faith and fair dealing are identical to its breach of contract claim." (Doc. No. 52 at 23.) Thus, in Linde's view, because summary judgment in its favor is proper on its breach of contract claim for the reasons discussed above, it is also proper with respect to its claim of breach of the implied covenant of good faith and fair dealing. Linde's argument is not persuasive in this regard. To be sure, Linde is correct that under California law, "a breach of the implied covenant of good faith is a breach of the contract." *Carson v. Mercury Ins. Co.*, 210 Cal. App. 4th 409, 429 (2012) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990)). The converse, however, is not necessarily true—that is, a breach of contract does not automatically give rise to liability for breach of the implied covenant of good faith and fair dealing. Indeed, the California Court of Appeal has clarified that while "breach [of the covenant of good faith and fair dealing] will always result in a breach of the contract, . . . a breach of a consensual (i.e., an express or implied-in-fact) contract term will not necessarily constitute a breach of the covenant." *Careau & Co.*, 222 Cal. App. 3d at 1393–94. Because the court finds Linde's argument unpersuasive, and because Linde offers no other basis upon which to grant summary judgment on its claim for

/////

breach of the implied covenant of good faith and fair dealing, Linde's motion will be denied as to this claim.

**D.      Linde's Claim for Account Stated**

Next, the court addresses Linde's motion for summary judgment on its account stated claim. "An account stated is an agreement, based on prior transactions between the parties, that all items of the account are true and that the balance struck is due and owing from one party to the other." *Trafton v. Youngblood*, 69 Cal. 2d 17, 25 (1968). "The essential elements of an account stated are: (1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." *Zinn v. Fred R. Bright Co.*, 271 Cal. App. 2d 597, 600 (1969). As evidence of an account stated, Linde claims that between January 14, 2016 and February 4, 2016, Linde issued a total of twenty-two invoices to Valley Protein for $CO_2$ that was delivered to Valley Protein, totaling $38,963.89. (UMF at ¶ 24.)

As addressed above, under the terms of the 2014 Agreement, Valley Protein agreed to purchase its $CO_2$ gas requirements from Linde. (UMF at ¶ 12; Iannelli Decl. at ¶ 15.) Linde has submitted an invoice for each delivery, as well as its demand letter sent to Valley Protein requesting payment for those deliveries. (Doc. No. 52-2 at 70–71.) Valley Protein does not appear to dispute that those deliveries occurred, nor does it dispute that it has not paid for the $CO_2$ gas delivered. Instead, Valley Protein's opposition to Linde's motion in this regard is limited to the argument that it was relieved of its obligation to pay by virtue of rescission of the 2014 Agreement. As discussed above, the court has rejected this argument. Finding no material issue of fact in dispute with respect to this claim, Linde's motion for summary judgment on its account stated claim will be granted in the amount of $38,963.89.

**E.      Goods and Services Rendered**

Next, the court addresses Linde's cause of action for goods and services rendered. "A common count for Goods and Services Rendered 'is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness.'" *Ever Win Int'l Corp. v.*

1   *Premier Accessory Grp.*, No. 2:15-CV-07208-RGK (JCx), 2016 WL 11263125, at *4 (C.D. Cal.

2   Sept. 22, 2016) (quoting *McBride v. Boughton*, 123 Cal. App. 4th 379, 394 (2004)); *see also*

3   *McBride*, 123 Cal. App. 4th at 394 (noting that "[a] common count is not a specific cause of

4   action"); *Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. Trinity Fruit Sales Co.*,

5   30 F. Supp. 3d 954, 975 (E.D. Cal. 2014) ("Under California law, 'common counts' are general

6   pleadings that seek to recover money owed without necessarily specifying the nature of the

7   claim."). "The only essential allegations of a common count are (1) the statement of indebtedness

8   in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment."

9   *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 460 (1997). Common counts are frequently

10   coextensive with other causes of action pleaded in a complaint: "[w]hen a common count is used

11   as an alternative way of seeking the same recovery demanded in a specific cause of action, and is

12   based on the same facts, the common count is demurrable if the cause of action is demurrable."

13   *McBride*, 123 Cal. App. 4th at 394.

14       Linde's complaint demonstrates that its common count claim is based on the same facts as

15   its claim for account stated, namely that Linde delivered $CO_2$ and equipment to Valley Protein for

16   which it has not been paid. (Doc. No. 1 at ¶ 31–34.) Once more, Valley Protein's only

17   opposition to Linde's motion for summary judgment is based on its argument that the 2014

18   Agreement was rescinded. Because the court has already found that Linde is entitled to summary

19   judgment on its claim for account stated, and because the common count claim is coextensive

20   with it, the court will also grant Linde's motion for summary judgment as to the common count

21   claim. However, in light of the court's award of $38,963.89 on Linde's account stated claim, the

22   court finds that Linde will be fully compensated for Valley Protein's failure to pay for the $CO_2$

23   delivery. Any further award of damages would overcompensate Linde. Accordingly, while

24   summary judgment for Linde will be granted as to this claim, no additional damages will be

25   awarded with respect to it.

26   **F.**     **Valley Protein's Counter-claims for Breach of Contract**

27       Next, the court addresses the counter-claim for breach of contract brought by Valley

28   Protein in which Valley Protein contends that Linde breached the provisions of the 2011 and 2014

Agreements. As noted, Linde also moves for summary judgment in its favor on this claim brought by Valley Protein.[4]

As both parties acknowledge, the 2011 Agreement contained a provision requiring that "[a] Party must commence an action for a breach of contract within one year after the action has accrued." (UMF at ¶ 1.) The default statute of limitations for actions to enforce a breach of contract in New Jersey is six years from the time the cause of action accrued. N.J. Stat. Ann. § 2A:14-1. However, "[c]ontract provisions limiting the time parties may bring suit have been held to be enforceable, if reasonable." *Eagle Fire Prot. Corp. v. First Indem. of Am. Ins.*, 678 A.2d 699, 704 (N.J. 1996).

Multiple courts in New Jersey have found contract provisions imposing one-year limitations on breach of contract actions to be reasonable. *See, e.g.*, *id.*; *Weinroth v. N.J. Mfrs. Ass'n Fire Ins.*, 189 A. 73, 75 (N.J. 1937); *A.J. Tenwood Assocs. v. Orange Senior Citizens Hous. Co.*, 491 A.2d 1280, 1284 (N.J. App. Div. 1985). Valley Protein directs the court to one contrary case, but the court finds it to be readily distinguishable in light of the facts here. *See Rodriguez v. Raymours Furniture Co.*, 138 A.3d 528 (N.J. 2016). In *Rodriguez*, an employment application contained a provision requiring the applicant, if hired, to bring any employment-related cause of action against the employer within six months of the challenged employment action and to waive any statute of limitations to the contrary. *Id.* at 529–30. An employee brought an action against his former employer, alleging a violation of New Jersey's Law Against Discrimination which claim was governed by a two-year statute of limitations. *Id.* at 530. In finding the application's six-month limitations period to be unreasonable, the New Jersey Supreme Court noted that the Law Against Discrimination "exists for the good of all the inhabitants of New Jersey," and therefore "concerns more than a purely private cause of action affecting only private interests."

---

[4] The parties dispute whether the 2011 Agreement remained in force following execution of the 2014 Agreement. Linde contends that the 2014 Agreement amounts to a novation, which "substitutes a new contract and extinguishes the old one." *Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation*, 999 A.2d 489, 497 (N.J. App. Div. 2010). By contrast, Valley Protein argues that "the 2011 Agreement arguably remained in effect." (Doc. No. 53 at 9.) The court acknowledges this dispute but need not reach this issue since Linde's counter-claim for breach of contract may be disposed of on alternative grounds, as explained below.

21

*Id.* at 538. Because of these competing public policy considerations, the Supreme Court declined to enforce the contractual limitation period. However, such considerations are absent here, and Valley Protein has offered no further argument as to how the holding in *Rodriguez* should compel the court to reject the limitations period agreed to by the parties under the circumstances of this case. Accordingly, the court finds that the one-year statute of limitations contained within the 2011 Agreement is reasonable and must be applied.

According to Valley Protein's counter-claim, Linde breached the 2011 Agreement by failing to provide Valley Protein with an adequate freezer, as it was required to do. (*See* Doc. No. 29 at ¶ 27.) However, the counter-claim indicates that Valley Protein became aware of that inadequacy no later than September of 2014. (*Id.* at ¶¶ 13–14 (stating that by 2014, the freezing equipment provided by Linde had become "inoperable").) By the terms of the 2011 Agreement, Valley Protein had until September of 2015 to bring causes of action based on a breach of a 2011 Agreement. *See County of Morris*, 707 A.2d at 972 (under New Jersey law, "a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action"). However, Valley Protein's claim for breach of contract was not brought until February 2017, far after the one-year limitations period had expired. (Doc. No. 29.)

The same logic holds true with respect to the 2014 Agreement. The evidence before the court on summary judgment establishes that Valley Protein was dissatisfied with the freezer provided by Linde under that Agreement no later than December 2014. (UMF at ¶ 14; Iannelli Decl. at ¶ 16; Doc. No. 52-2 at 57.) This dissatisfaction is what prompted Valley Protein to attempt to rescind that Agreement. Therefore, Valley Protein had until December 2015 to sue for breach of contract. Its counter-claim, brought in February 2017, falls far outside of that filing deadline.

Thus, even if Valley Protein is correct that the 2011 Agreement remained in force, its claim for breach of that contract is time-barred. The court will therefore grant summary judgment in favor of Linde on Valley Protein's counter-claims for breach of contract.

/////

**G.      Valley Protein's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing**

Next, the court addresses Valley Protein's counter-claim for breach of the implied covenant of good faith and fair dealing.  The relevant California law governing this claim has already been discussed above.  Valley Protein contends that Linde breached the covenant with respect to the 2011 Agreement by providing it with faulty equipment, and then by refusing to properly maintain that equipment.  (Doc. No. 29 at ¶ 34.)  Valley Protein also contends that Linde breached the covenant with respect to the 2014 Agreement by "failing to comply with its obligation to provide poultry-freezing equipment sufficient to meet Valley Protein's needs."  (*Id.* at ¶ 35.)  As with Valley Protein's claim for breach of contract, Linde argues that this cause of action is time-barred.  (Doc. No. 52 at 29–30.)

California mandates a four-year statute of limitations for actions for breach of the implied covenant of good faith and fair dealing.  *Frazier v. Metro. Life Ins.*, 169 Cal. App. 3d 90, 102 (1985) (citing Cal. Civ. Proc. Code § 337).  Moreover, under normal circumstances, "plaintiff's ignorance of the cause of action, or of the identity of the wrongdoer, does not toll the statute."  *Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (1971).  However, to avoid the often-harsh consequences of this rule, California courts also recognize the "discovery rule," under which the statute of limitations begins to run "when plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence."  *Apr. Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 826 (1983) (internal quotation marks omitted).

Here, having reviewed Valley Protein's counter-claim and the evidence before the court on summary judgment, the court concludes that the applicable statute of limitations bars some of Valley Protein's theories of recovery.  As noted, in its counter-claim Valley Protein alleges breaches of the covenant of good faith and fair dealing with respect to both the 2011 and 2014 Agreements.  Moreover, within those two agreements, Valley Protein advances multiple allegations which could potentially form the basis of a misrepresentation claim.  (*See generally* Doc. No. 29 at 34–47.)  For instance, with respect to the 2011 Agreement, Valley Protein asserts

23

that Linde breached the covenant of good faith and fair dealing by "failing to supply Valley Protein with modern, reliable, and efficient poultry-freezing equipment and instead providing equipment that was unreliable, obsolete and often inoperable." (*Id.* at ¶ 34(a).) Valley Protein also alleges a breach of the covenant for "failing to maintain the poultry-freezing equipment as it was required to do pursuant to the terms of the 2011 Agreement." (*Id.* at ¶ 34(c).) Thus, as pled by Valley Protein, multiple theories of liability are contained within this cause of action.

The evidence before the court on summary judgment—which Valley Protein does not dispute (*see* Doc. No. 54 at 8)—demonstrates that Valley Protein President Robert Coyle was aware by early 2012 that the poultry-freezing equipment provided by Linde was not meeting its target $CO_2$ conversion rate. (Doc. No. 52-4 at 142:25, 143:1–5.) Applying California's discovery rule, the statute of limitations is tolled until that date. Nonetheless, because Valley Protein's counter-claim for breach of the covenant of good faith and fair dealing was not filed until February 2017, any recovery under this theory of liability is barred by the applicable four-year statute of limitations which expired by early 2016.

However, with respect to whether Valley Protein's remaining theories of liability on this claim remain viable, Linde has not pointed to any evidence presented on summary judgment demonstrating that those theories are time-barred as a matter of law. It is conceivable that other evidence may exist in the record demonstrating that these remaining theories of liability are also foreclosed by the applicable statute of limitations. However, Linde has not cited to any such evidence in its motion, and the court declines to comb through the record to find support for Linde's motion. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."). Accordingly, the court finds that Valley Protein's counter-claim for breach of the implied covenant of good faith and fair dealing is time-barred only as to Valley Protein's claim that Linde breached the implied covenant of good faith and fair dealing with respect to the issue of the $CO_2$ conversion rate.

Regardless of the theory of liability relied upon by Valley Protein, however, Valley Protein's claim for breach of the implied covenant of good faith and fair dealing fails for a

separate reason.  The California Supreme Court has held that where a claim for breach of the

implied covenant of good faith and fair dealing is based upon the same breaches as those alleged

in a breach of contract claim, the good faith and fair dealing claim fails as a matter of law.  *Guz v.*

*Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 327 (2000) ("[W]here breach of an actual term is alleged, a

separate implied covenant claim, based on the same breach, is superfluous.").  Thus, district

courts in California routinely dismiss claims for breach of the implied covenant of good faith and

fair dealing where those allegations essentially repeat those already made in a breach of contract

claim.  *See, e.g.*, *Tryfonas v. Splunk, Inc.*, No. 17-CV-01420-HSG, 2018 WL 534287, at *2 (N.D.

Cal. Jan. 24, 2018) (dismissing plaintiff's claim for breach of the covenant of good faith and fair

dealing as duplicative because "[p]laintiff's claim . . . relies on the same acts as his claim for

breach of contract"); *Tam v. Qualcomm, Inc.*, 300 F. Supp. 3d 1130, 1146 (S.D. Cal. 2018) ("[A]

plaintiff may bring both a breach of contract claim and a claim for breach of the implied covenant

of good faith and fair dealing, but when both causes of action cite the same underlying breach, the

implied covenant claim is superfluous."); *Landucci v. State Farm Ins.*, 65 F. Supp. 3d 694, 716

(N.D. Cal. 2014) (citing the decision in *Guz* for the proposition that "although . . . a plaintiff may

bring both a breach of contract claim and a claim for breach of the implied covenant of good faith

and fair dealing, . . . when both causes of action cite the same underlying breach, the implied

covenant cause of action will be superfluous with the contract cause of action").

  A review of Valley Protein's counter-claim reveals that the claim for breach of the

implied covenant of good faith and fair dealing is based on the same conduct as the breach of

contract claim.  In fact, the factual allegations contained within each cause of action are identical.

(*Compare* Doc. No. 29 at ¶¶ 27, 30, *with id.* at ¶¶ 34–35.)  Therefore, under California law,

Valley Protein's claim for breach of the implied covenant of good faith and fair dealing must fail.

The court accordingly will grant summary judgment in Linde's favor on Valley Protein's counter-

claim for breach of the implied covenant of good faith and fair dealing.

**H.**  **Valley Protein's Claims for Intentional and Negligent Misrepresentation**

  The court next addresses Valley Protein's counter-claims for intentional and negligent

misrepresentation, respectively.  Linde argues that it is entitled to summary judgment on these

claims since they are barred by the applicable statute of limitations and, alternatively, because Valley Protein cannot establish these claims as a matter of law. (Doc. No. 52 at 31–33.) Linde also argues that these claims are barred by the economic loss rule. (*Id.* at 33.)

To establish a claim for intentional misrepresentation a plaintiff must plead and prove: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004) (citing *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)). Meanwhile, "[n]egligent misrepresentation is a form of deceit, the elements of which consist of (1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) ignorance of the truth and justifiable reliance thereon by the party to whom the misrepresentation was directed, and (5) damages." *Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986).

The court first turns to the Coyle Declaration, the evidence relied upon by Valley Protein in opposing summary judgment as to this claim. In that declaration, submitted under penalty of perjury, Coyle averred that "[a]t the time the 2011 Agreement was executed in January 2011, Linde's Vice President of Western Markets, Michael Beckman, represented that the equipment provided to Valley Protein by Linde was high quality, reliable, and efficient." (Coyle Decl. at ¶ 5.) The Coyle Declaration also states that during the course of the 2011 Agreement, Valley Protein discovered that the freezer provided by Linde was outdated, obsolete, and frequently inoperable. (*Id.* at ¶ 6.) In his declaration Coyle lists a variety of misrepresentations Linde made to Valley Protein, relating to the size and capabilities of the equipment, the age of the equipment, and how much $CO_2$ the equipment would use. (*Id.* at ¶ 8.) Coyle declares that these representations and promises induced Valley Protein to enter into the 2011 Agreement, and that absent those representations, Valley Protein would not have done so. (*Id.*) Linde acknowledges, at least implicitly, the Coyle Declaration would create a triable issue of fact as to whether Linde employees made material misrepresentations to Valley Protein. However, Linde argues that /////

Coyle's declaration is self-serving and contradicted by his own deposition testimony, because of which the court should disregard it. (Doc. No. 58 at 15.)

At the outset, the court observes that many of the statements made in Coyle's declaration filed in opposition to summary judgment are markedly different from the testimony he gave at his deposition. Whereas his declaration attributed at least some of the misrepresentations to Linde employee Michael Beckman, Coyle at his deposition testified that he never had any conversations with Michael Beckman, and that in fact he was unfamiliar with any Linde employee with that name. (*Compare* Coyle Decl. at ¶ 5, *with* Doc. No. 52-4 at 6.) In addition, while Coyle's declaration lists numerous alleged misrepresentations by Linde employees that induced Valley Protein to enter into the 2011 Agreement, Coyle testified at his deposition that all such statements made by Linde employees were accurate at the time they were made to the best of his knowledge. (*Compare* Coyle Decl. at ¶¶ 5, 8, *with* Doc. No. 52-4 at 25.) Finally, when questioned at his deposition whether he believed any Linde employee had ever made any misleading statements to him regarding the equipment at issue, Coyle responded, "knowingly, no." (Doc. No. 52-4 at 26:5–7.)

"'The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins.*, 952 F.2d 262, 266 (9th Cir. 1991)). This rule, known as the sham affidavit rule, "prevents a party who has been examined at length on deposition from raising an issue of fact simply by submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (internal quotation marks and brackets omitted). As courts have acknowledged, this rule is at least somewhat in tension with normal procedures employed in connection with summary judgment motions, in which courts are prohibited from making credibility determinations or weighing conflicting evidence. *See Van Asdale*, 577 F.3d at 998. Accordingly, the sham affidavit rule is to be employed sparingly, and only when "the inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous." *Id.* at 998–99.

Here, the court finds that Coyle's declaration submitted in opposition to summary judgment cannot logically be reconciled with his deposition testimony. Coyle testified that Beckman was not involved at all with negotiations leading to the 2011 Agreement and that sworn testimony simply cannot be squared with Coyle's statement in his declaration that Beckman "represented that the equipment provided to Valley Protein by Linde was high quality, reliable, and efficient." (Coyle Decl. at ¶ 5.) Nor can the court credit the alleged misrepresentations leading up to the execution of the 2011 Agreement set forth in Coyle's declaration in light of his deposition testimony that all statements made by Linde employees were accurate at the time they were made. Because Coyle's deposition is clearly and unambiguously inconsistent with his later declaration submitted in support of the opposition to summary judgment, the court will disregard Coyle's declaration to the extent it is in conflict with his sworn deposition testimony.

Coyle's deposition testimony affirmatively establishes that, in his opinion, any false statements made to Valley Protein were not knowingly made by Linde employees. As noted, under California law, a party must establish "knowledge of falsity" in order to prevail on an intentional misrepresentation claim. *Robinson Helicopter Co.*, 34 Cal. 4th at 990. Linde has thus satisfied its burden of "produc[ing] evidence negating an essential element of the nonmoving party's case." *See Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). The burden therefore shifts to Valley Protein to establish that a genuine issue of disputed fact actually does exist with respect to this claim. *See Matsushita*, 475 U.S. at 586. However, in opposing summary judgment on its intentional misrepresentation claim, Valley Protein has relied solely on Coyle's declaration to create a triable issue of fact. (Doc. No. 53 at 25–26.) As a sham affidavit, Coyle's declaration fails to establish the existence of a genuinely disputed factual issue with respect to the knowingness of the alleged misrepresentations. The undersigned therefore

/////
/////
/////
/////
/////

1    finds that summary judgment in favor of Linde is warranted as to Valley Protein's counter-claim

2    for intentional misrepresentation.[5]

3        By contrast, a party need not prove that a false statement was "knowing" in order to

4    prevail on a claim for negligent misrepresentation. *Small v. Fritz Cos.*, 30 Cal. 4th 167, 173

5    (2003) ("The tort of negligent misrepresentation does not require scienter or intent to defraud.").

6    Therefore, the court will next consider Linde's argument that Valley Protein's misrepresentation

7    claims are barred by the economic loss doctrine. The California Supreme Court recently

8    discussed the economic loss rule, stating as follows:

9            Economic loss consists of damages for inadequate value, costs of
             repair and replacement of [a] defective product or consequent loss of
10           profits—without any claim of personal injury or damages to other.
             Simply stated, the economic loss rule provides: Where a purchaser's
11           expectations in a sale are frustrated because the product he bought is
             not working properly, his remedy is said to be in contract alone, for
12           he has suffered only "economic" losses. This doctrine hinges on a
             distinction drawn between transactions involving the sale of goods
13           for commercial purposes where economic expectations are protected
             by commercial and contract law, and those involving the sale of
14           defective products to individual consumers who are injured in a
             manner which has traditionally been remedied by resort to the law of
15           torts. *The economic loss rule requires a purchaser to recover in
             contract for purely economic loss due to disappointed expectations,
16           unless he can demonstrate harm above and beyond a broken
             contractual promise.* Quite simply, the economic loss rule prevents
17           the law of contract and the law of tort from dissolving one into the
             other.

18

19   *Robinson Helicopter*, 34 Cal. 4th at 988 (emphasis added).

20       At its heart, this rule requires a plaintiff to rely on the law of contracts and implied and

21   express warranties to recover based upon any defect in the product sold to plaintiff, rather than

22   resort to tort law. When applied to product liability suits, one may still sue for damage to

23   _____

24   [5] While the court finds that this particular statement within Coyle's declaration must be
     disregarded under the sham affidavit rule, it does not follow that all statements contained within it
     must also be disregarded. For instance, Coyle states in his declaration that Linde's engineer,
25   Amanda Guzman, represented in October 2014 that the poultry-freezing equipment to be
     provided under the 2014 Agreement would be capable of processing 5,000 pounds of poultry per
26   hour. (Coyle Decl. at ¶ 9.) Although the evidence establishes that Linde was unaware that a
     5,000-pound-per-hour processing capacity was a requirement for Valley Protein at the time the
27   2014 Agreement was executed (*see* Doc. No. 52-4 at 19), that does not affirmatively prove that
     the statement contained within the Coyle declaration was never made.
28

property *other than the product* under the economic loss rule, but losses to the allegedly defective product itself are barred as "economic" losses. *Jimenez v. Superior Court of San Diego Cty.*, 29 Cal. 4th 473, 456 (2002). The economic loss rule has also been applied to bar general negligence claims. *See Robinson Helicopter*, 34 Cal. 4th at 989 (citing *Aas v. Superior Court*, 24 Cal. 4th 627, 640 (2000) and *Seely v. Liberty Mut. Fire Ins.*, 63 Cal. 2d 41, 45 (1965)).

In *Robinson Helicopter*, the California Supreme Court noted other exceptions to the economic loss rule besides those carved out for certain products liability cases. Thus, the court recognized that aside from cases involving physical injury or damage to other property, plaintiffs may also recover for "breach of the covenant of good faith and fair dealing in insurance contracts; for wrongful discharge in violation of fundamental public policy; or *where the contract was fraudulently induced*." *Id.* at 989–90 (emphasis added). "In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.* at 990 (citations and quotations omitted). "Focusing on intentional conduct gives substance to the proposition that a breach of contract is tortious only when some independent duty arising from tort law is violated." *Id.* However, if "every negligent breach of a contract gives rise to tort damages the limitation would be meaningless, as would the statutory distinction between tort and contract remedies." *Id.* Thus, the focus for the California Supreme Court in *Robinson Helicopter* centered on the intentional nature of the defendant's behavior, because courts should only apply tort remedies to contract suits "when the conduct in question is so clear in its deviation from socially useful business practices that the effect of enforcing such tort duties will be to aid rather than discourage commerce." *Id.* at 991–92 (citations and quotations omitted). "California also has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices," and therefore fraudulent conduct cannot be considered a "socially useful business practice." *Id.* at 992 (citations and quotations omitted).

No published Ninth Circuit opinion nor California Supreme Court decision has analyzed how the exceptions to the economic loss rule identified in *Robinson Helicopter* apply to claims of negligent misrepresentation which, by their very nature, occupy the space between negligence

30

and fraud claims. However, two unpublished Ninth Circuit decisions have suggested negligent

misrepresentation claims are not barred by the economic loss rule. *See Hannibal Pictures, Inc. v.*

*Sonja Prods. LLC*, 432 Fed. App'x 700, 701 (9th Cir. 2011) (holding that a jury verdict in favor

of a negligent misrepresentation claim was not precluded by the economic loss rule where "one

party has lied to the other"); *Kalitta Air, L.L.C. v. Cent. Texas Airborne Sys., Inc.*, 315 Fed. App'x

603, 607 (9th Cir. 2008) (holding that negligent misrepresentation is a "species of fraud" under

California law, for which "economic loss is recoverable"). A third unpublished Ninth Circuit

decision reached a contrary holding. *See Astrium S.A.S. v. TRW, Inc.*, 197 Fed. App'x 575, 577

(9th Cir. 2006) (citing *Robinson Helicopter* for the proposition that the economic loss rule barred

recovery for fraud and negligent misrepresentation "because, even if fraud were shown, there is

no showing that people or property were placed at risk or that Astrium was exposed to 'personal

damages' beyond economic losses"); *accord Crystal Springs Upland Sch. v. Fieldturf USA, Inc.*,

219 F. Supp. 3d 962, 969 n.3 (N.D. Cal. 2016) (recognizing this split of authority).[6]

Numerous district courts in California have considered this issue, reaching varying

conclusions. *See, e.g.*, *Shahinian v. Kimberly-Clark Corp.*, No. CV 14-8390 DMG(SHx), 2015

WL 4264638, at *8 (C.D. Cal. July 10, 2015); *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,

117 F. Supp. 3d 1092, 1104 (C.D. Cal. 2015); *Ladore v. Sony Comput. Entm't Am., LLC*, 75 F.

Supp. 3d 1065, 1074–76 (N.D. Cal. 2014); *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, No.

C-13-1803-EMC, 2013 WL 4530470, at *3–9 (N.D. Cal. Aug. 26, 2013); *NuCal Foods, Inc. v.*

*Quality Egg LLC*, 918 F. Supp. 2d 1023, 1030 (E.D. Cal. 2013); *Castro Valley Union 76, Inc. v.*

*Vapor Sys. Techs., Inc.*, No. C 11-0299 PJH, 2012 WL 5199458, at *4 (N.D. Cal. Oct. 22, 2012);

*United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1179 (C.D.

Cal. 2009); *Barrier Specialty Roofing & Coatings, Inc. v. ICI Paints N. Am., Inc.*, No. CV F 07-

1614-LJO-TAG, 2008 WL 2724876, at *5–6 (E.D. Cal. July 11, 2008). One district court has

observed that "reasonable minds can and do disagree on the applicability of the economic loss

rule to negligent representation claims, and this issue is ripe to be revisited by the California

---

[6] Citation to these unpublished Ninth Circuit opinions is appropriate pursuant to Ninth Circuit Rule 36-3(b).

Supreme Court." *Broomfield v. Craft Brew All., Inc.*, No. 17-CV-01027-BLF, 2017 WL 3838453, at *9 (N.D. Cal. Sept. 1, 2017), *on reconsideration in part*, 2017 WL 5665654 (N.D. Cal. Nov. 27, 2017).

Because this question is one of state law, this court is obligated to resolve it as the court believes the California Supreme Court would. *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997), *as amended*, 136 F.3d 1208 (9th Cir. 1998). "In the absence of a controlling California Supreme Court decision, [the court] must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids." *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003). As the above-cited cases demonstrate, both district courts and panels of the Ninth Circuit have arrived at differing conclusions. However, having reviewed all of these decisions, the court finds the opinion in *Lincoln General Insurance Co. v. Access Claims Administrators, Inc.*, No. CIV. S-07-1015 LKK/EFB, 2007 WL 2492436 (E.D. Cal. Aug. 30, 2007) to be persuasive. In confronting this issue in that case, Judge Karlton held that the economic loss rule bars negligent misrepresentation claims where the allegation runs "closely parallel" to a concurrent breach of contract claim. *Lincoln Gen. Ins. Co.*, 2007 WL 2492436, at *8. Rather than adopting a bright-line rule that negligent misrepresentation claims either are or are not barred by the economic loss rule, this analysis examines the factual basis of the claim to determine whether, as a practical matter, the negligent misrepresentation claim is in actuality a breach of contract claim in disguise. This approach is in keeping with that employed by the California Supreme Court in *Robinson Helicopter*, where that court concluded that the fraud and intentional misrepresentation claims were not barred "because they were independent of Dana's breach of contract." *Robinson Helicopter*, 34 Cal. 4th at 991.[7] Accordingly, the court

---

[7] California courts undertake a similarly functional analysis in other areas. For instance, in determining whether a particular cause of action sounds in tort or contract, California courts eschew a more formalistic approach in favor of an examination of "the quintessence of the action." *Voth v. Wasco Pub. Util. Dist.*, 56 Cal. App. 3d 353, 356 (1976) ("Whether an action is contractual or tortious depends upon the nature of the right sued upon, and not the form of the pleading or the relief demanded."); *accord Amtower v. Photon Dynamics, Inc.*, 158 Cal. App. 4th 1582, 1602 (2008).

will compare Valley Protein's counter-claims for breach of contract and negligent misrepresentation to determine whether they are predicated on the same or similar factual allegations. *See Bret Harte Union High Sch. Dist. v. FieldTurf, USA, Inc.*, No. 1:16-cv-00371-DAD-SMS, 2016 WL 3519294, at *5 (E.D. Cal. June 27, 2016) (declining to dismiss plaintiff's negligent representation claim despite the additional allegation of a breach of contract claim because the negligent representation allegations "are, by nature, different"); *Tasion Commc'ns*, 2013 WL 4530470, at *9 (collecting cases and noting that "courts have nonetheless dismissed negligent misrepresentation claims as barred by the economic loss rule where the complained-of misrepresentations were simply those made in the course of forming the contract"). If Valley Protein's breach of contract and negligent misrepresentation claims are predicated on the same or similar factual allegations, summary judgment in Linde's favor as to the negligent misrepresentation claim is appropriate.

Here, Valley Protein's breach of contract claim is based on the following factual allegations: (1) Linde's failure to supply Valley Protein with modern, reliable, and efficient poultry-freezing equipment; (2) causing Valley Protein to use significantly more $CO_2$ gas than was necessary; (3) failing to properly maintain its poultry-freezing equipment; (4) improperly charging Valley Protein fuel surcharge and delivery fees by delivering $CO_2$ gas from Richmond, CA instead of Pixley, CA; and (5) failing to deliver the poultry-freezing equipment it was obligated to provide under the 2014 Agreement. (Doc. No. 29 at ¶¶ 27, 30.) Its negligent misrepresentation claim is based on alleged misrepresentations that (1) Linde would provide Valley Protein with modern, reliable, and efficient equipment that would satisfy Valley Protein's needs; (2) Linde would deliver $CO_2$ gas from Pixley, CA rather than Richmond, CA; and (3) Linde would supply Valley Protein with poultry-freezing equipment sufficient to meet Valley Protein's production needs in connection with the 2014 Agreement. (*Id.* at ¶¶ 49, 54, 56.) An examination and comparison of these claims reveals that not only do they "closely parallel" one another, they are effectively identical. Valley Protein's negligent misrepresentation claim plainly seeks to redress the same grievances as the breach of contract claim, namely the economic damages Valley Protein allegedly suffered as a result of entering into the 2011 and 2014

Agreements. Under such circumstances, the economic loss rule limits Valley Protein to recovery under contract law rather than tort law. *See JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1043 (N.D. Cal. 2012) (dismissing claims for fraud and negligent misrepresentation after finding those claims "consist of nothing more than Altair's alleged failure to make good on its contractual promises"). Summary judgment in Linde's favor is therefore also appropriate as to Valley Protein's claim for negligent misrepresentation.

## I.    Valley Protein's Claims for Unfair Competition

Finally, the court addresses Valley Protein's counter-claim under California Business and Professions Code § 17200, commonly referred to as the Unfair Competition Law ("UCL"). Linde argues that this counter-claim is also time-barred, that Valley Protein has not raised a triable issue of fact with respect to the claim, and that Valley Protein is not entitled to any of the remedies available under the UCL.

The UCL prohibits "unfair competition," which is defined as including "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. This language is broad, and deliberately so. As the California Supreme Court has observed,

> The Legislature intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur. Indeed, the section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive.

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (1999) (internal quotation marks, brackets, and ellipses omitted); *see also Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993) (stating that the law "embraces anything that can properly be called a business practice and that at the same time is forbidden by law").

Notably, courts give independent effect to each of the three prongs of § 17200. With respect to the "unlawful" prong, § 17200 "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 980 (2018) (internal quotation marks omitted). As to the "unfair" prong, § 17200 makes clear that "a practice may be deemed unfair even if not

34

specifically proscribed by some other law." *Cel-Tech Commc'ns*, 20 Cal. 4th at 180. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1102 (1996), *abrogated on other grounds by Cel-Tech Commc'ns*, 20 Cal. 4th at 184–85. Finally, California courts recognize a distinct cause of action under the "fraudulent" prong of § 17200. Under this prong, "it is necessary only to show that the plaintiff was likely to be deceived, and suffered economic injury as a result of the deception." *Zhang v. Superior Court*, 57 Cal. 4th 364, 380 (2013) (citing *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) and *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). Although the scope of relief under this provision is broad, the available remedies are limited. "Prevailing plaintiffs are generally limited to injunctive relief and restitution . . . [and] Plaintiffs may not receive damages, much less *treble* damages, or attorneys fees." *Cel-Tech Commc'ns*, 20 Cal. 4th at 179.

With respect to whether Valley Protein's claim filed in February of 2017 is time-barred, the analysis set forth above in addressing the breach of the implied covenant of good faith and fair dealing claim applies to this cause of action as well. As with that cause of action, claims brought under the UCL are subject to a four-year statute of limitations. Cal. Bus. & Prof. Code § 17208. Again, the undisputed evidence before the court on summary judgment demonstrates that Valley Protein was aware by early 2012 that the equipment provided by Linde was not meeting its target $CO_2$ conversion rate. (Doc. No. 52-4 at 142:25, 143:1–5.) Even accounting for tolling because of California's discovery rule, any recovery under this theory of liability is barred by the four-year statute of limitations which would have expired by early 2016. However, the court finds no basis to apply the statute of limitations with respect to Valley Protein's other theories of recovery with respect to this claim for the same reasons explained above in addressing Valley Protein's counter-claim for breach of the covenant of good faith and fair dealing.

The court next addresses whether Valley Protein is entitled to the relief sought. For violation of § 17200, Valley Protein's counter-claim seeks injunctive relief, restitution, and attorneys' fees. (Doc. No. 29 at 18–19.) A plaintiff must demonstrate standing "with respect to each form of relief sought, whether it be injunctive relief, damages, or civil penalties." *See Bates*

*v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc); *see also Haro v. Sebelius*, 747 F.3d 1099, 1108 (9th Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

The matter of attorneys' fees is easily resolved since such fees are not recoverable under § 17200. *Cel-Tech Commc'ns*, 20 Cal. 4th at 179. Nor has Valley Protein demonstrated its entitlement to injunctive relief. Linde asserts in its motion that Valley Protein and Linde are not presently engaged in any business relationship, and there is no evidence before the court indicating to the contrary. (Doc. No. 52 at 35.) Thus, any injunctive relief Valley Protein seeks is necessarily prospective in nature. Indeed, Valley Protein's counter-claim indicates that it seeks injunctive relief "prohibiting Linde from engaging in such false, deceptive and fraudulent conduct *in the future*." (Doc. No. 29 at ¶ 63) (emphasis added). However, to have standing to seek injunctive relief, the threat of injury to plaintiffs "must be actual and imminent, not conjectural or hypothetical." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). "In other words, the 'threatened injury must be *certainly impending* to constitute injury in fact' and 'allegations of *possible* future injury are not sufficient.'" *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Past wrongs do not by themselves amount to real and immediate threats of injury. *See San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effect"). However, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. "In addition, the claimed threat of injury must be likely to be redressed by the prospective injunctive relief." *Bates*, 511 F.3d at 985–86. Valley Protein's brief in opposition to summary judgment does not respond to Linde's argument that injunctive relief is foreclosed here. (*See* Doc. No. 53 at 27–28.) Having reviewed the evidence submitted on summary judgment, the court agrees with Linde that Valley Protein has not demonstrated any "certainly impending" harm. Rather, the evidence establishes that Valley Protein began purchasing $CO_2$ from Air Liquide, and that its business relationship with Linde has

terminated.  Under these circumstances, the court finds that injunctive relief is unavailable to Valley Protein.

Finally, the court looks to whether Valley Protein is entitled to restitution damages. California Business & Professions Code § 17203 provides that restitution is an available remedy under the UCL "to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Linde argues that Valley Protein is not entitled to restitution because it "has not alleged and cannot establish that Linde has obtained money from Valley Protein to which it was not entitled, nor has it established that it gave up money that it was otherwise entitled to keep."  (Doc. No. 52 at 36.)  At bottom, this amounts to an assertion that Valley Protein's UCL counter-claim fails on the merits.  The court therefore turns to Linde's alternative argument that Valley Protein's UCL claim fails as a matter of law, whether couched as unlawful, unfair, or fraudulent.

Under the unlawful prong of the UCL, "a violation of another law is a predicate for stating a cause of action under the UCL's unlawful prong."  *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007).  Although Valley Protein's counter-claim alleges generally that "Linde engaged in, and continues to engage in, unlawful and unfair claims practices [*sic*] as alleged herein," it does not identify which law Linde has allegedly violated.  (Doc. No. 29 at ¶ 62.)  Likewise, in its opposition to Linde's motion for summary judgment Valley Protein has failed to point to any violation of law.  The only possible such violations are the common law causes of action asserted in Valley Protein's counter-claim, discussed above.  However, "a common law violation . . . is insufficient" as a predicate for a UCL claim under the unlawful prong of the statute.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1044 (9th Cir. 2010) (citing *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 450–54 (1988)).  Finding no other basis to support a claim under the unlawful prong of the UCL, the court will grant Linde's motion for summary judgment with respect to the unlawful prong of Valley Protein's UCL claim.

Next, the court considers whether Linde is entitled to summary judgment on Valley Protein's UCL claim brought under the fraudulent prong of the statute.  A business practice is

"fraudulent" under the UCL if members of the public are likely to be deceived. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (citing *Puentes v. Wells Fargo Home Mortg., Inc.*, 160 Cal. App. 4th 638 (2008)). "A UCL claim based on the fraudulent prong can be based on representations that deceive because they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive . . . A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL." *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009).

Here, Valley Protein has not come forward on summary judgment with any evidence of harm to the general public resulting from Linde's misrepresentations. A plaintiff must plead and prove harm to the public as a prerequisite to succeed on a UCL claim under the fraudulent prong. *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Centex Homes*, No. 11-3638-SC, 2013 WL 4528956, at *5 (N.D. Cal. Aug. 26, 2013) (dismissing plaintiff's claim under the fraudulent prong with prejudice and noting that "both private individuals and corporations must show that the alleged wrongdoing has some impact on the general public"); *Med. Instrument Dev. Labs. v. Alcon Labs.*, No. C 05-1138 MJJ, 2005 WL 1926673, at *5 (N.D. Cal. Aug. 10, 2005) ("Plaintiff fails to allege in its Complaint that any 'members of the public are likely to be deceived' by Defendant's allegedly fraudulent conduct."). Here, Valley Protein appears to base its UCL claim entirely on Linde's conduct in relation to the 2011 and 2014 Agreements. (*See* Doc. No. 53 at 27) ("In the case at hand, there are facts that support claims for unfair business practices, both in the fraudulent conduct used to include [*sic*] Valley Protein into the 2011 Agreement as well as the so-called 'mistake' made by Linde on the sizing of the freezing equipment in connection with the 2014 Agreement[.]"). However, there is no evidence before the court on summary judgment evincing that those Agreements caused any harm to the public. Indeed, Valley Protein has not put forward evidence that Linde ever communicated to the public in any way. In essence, Valley Protein "is trying to use the UCL fraud prong to vindicate its contractual . . . rights." *Travelers Prop. Cas. Co. of Am.*, 2013 WL 4528956, at *5. Because of this, Linde is entitled to judgment in its favor with respect to Valley Protein's claim under the fraudulent prong of the UCL. *See*

*Capella Photonics, Inc. v. Cisco Sys., Inc.*, 77 F. Supp. 3d 850, 865 (N.D. Cal. 2014) (dismissing the defendant's UCL counter-claim brought under the fraudulent prong after finding that the defendant "does not allege that members of the public have been deceived by [plaintiff's] alleged fraudulent misrepresentations about the strength of its patent rights").

Finally, the court considers whether summary judgment is warranted in favor of Linde under the unfair prong of Valley Protein's UCL claim. In the wake of the California Supreme Court's decision in *Cel-Tech*, appellate courts have been split regarding the proper test to be employed in determining whether a business practice is "unfair." Under one line of cases, an unfair business practice occurs "when that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 612 (2014). A second line of cases considers the factors for unfairness set forth in section 5 of the Federal Trade Commission Act: "'(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.'" *Id.* at 613 (quoting *Camacho v. Auto. Club of S. Cal.*, 142 Cal. App. 4th 1394, 1403 (2006)). Yet a third line of cases holds that "a plaintiff alleging an unfair business practice must show the defendant's conduct is tethered to an underlying constitutional, statutory or regulatory provision, or that it threatens an incipient violation of an antitrust law, or violates the policy or spirit of an antitrust law." *Id.* (internal quotation marks and brackets omitted).[8]

Regardless of the correct test, however, "where the unfair business practices alleged under the unfair prong of the UCL overlap entirely with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive if the claims under the other two prongs of the UCL do not survive." *Hoai Dang v. Samsung Elecs. Co.*, No. 14-CV-00530-LHK, 2018 WL 6308738, at *10 (N.D. Cal. Dec. 3, 2018); *Hadley v.*

---

[8] Neither Linde nor Valley Protein acknowledge that a split of authority exists on this point nor have they briefed the issue of which test this court should adopt. In the absence of any briefing addressing this point, the court declines to resolve the question of what test should properly apply.

*Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104–05 (N.D. Cal. 2017) (same).  Here, Valley Protein makes no distinction between its UCL claims, whether alleged under the unlawful, unfair, or fraudulent prongs.  Because the undersigned has already found that Linde is entitled to summary judgment with respect to Valley Protein's claims under the unlawful and fraudulent prongs, the court finds that summary judgment is also appropriate in favor of Linde with respect to the unfair prong.

## CONCLUSION

For the reasons set forth above,

1. Linde's motion for summary judgment (Doc. No. 52) is granted with respect to its breach of contract claim, with damages to be awarded in the amount of $963,084.00;

2. Linde's motion for summary judgment is denied with respect to its claim for breach of the implied covenant of good faith and fair dealing;

3. Linde's motion for summary judgment is granted with respect to its claim for account stated, with damages to be awarded in the amount of $38,963.89;

4. Linde's motion for summary judgment is granted with respect to its claim for goods and services rendered;

5. Linde's motion for summary judgment is granted with respect to Valley Protein's counter-claim for breach of contract;

6. Linde's motion for summary judgment is granted with respect to Valley Protein's counter-claim for breach of the implied covenant of good faith and fair dealing;

7. Linde's motion for summary judgment is granted with respect to Valley Protein's counter-claim for intentional misrepresentation;

8. Linde's motion for summary judgment is granted with respect to Valley Protein's counter-claim for negligent misrepresentation;

9. Linde's motion for summary judgment is granted with respect to Valley Protein's counter-claim for violation of California's Unfair Competition Law;

/////

10.      The total amount to be awarded to Linde, LLC on its claims for breach of contract and account stated against Valley Protein, LLC is $1,002,047.89; and

11.      A status conference to be held on August 20, 2019 at 9:30 a.m. in Courtroom 5 before the undersigned, telephonic appearance authorized, to address the remaining claim in this action.[9] However, if the court receives a notice of voluntary dismissal from plaintiff as to its remaining claim for breach of the implied covenant of good faith and fair dealing prior thereto, the status conference will be vacated and judgment will be entered in accordance with this order.

IT IS SO ORDERED.

Dated:   **July 11, 2019**                                

                                         UNITED STATES DISTRICT JUDGE

---

[9] If the parties are unavailable on August 20, 2019 at 9:30 a.m., they are directed to contact Courtroom Deputy Jami Thorp at (559) 499-5652, or JThorp@caed.uscourts.gov, within ten days of service of this order to reschedule the status conference to a mutually agreeable date.